```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -   X
UNITED STATES OF AMERICA          :     SEALED INDICTMENT
                                  :
         - v. -                   :     23 Cr. ___
                                  :
CHARLES McGONIGAL and             :
SERGEY SHESTAKOV,                 :     23 CRIM 016
                                  :
         Defendants.              :
                                  :
- - - - - - - - - - - - - - - -   X
```

## INTRODUCTION

1.  CHARLES McGONIGAL and SERGEY SHESTAKOV, the defendants, violated sanctions imposed by the United States on Oleg Deripaska, a Russian oligarch. McGONIGAL is a former senior official of the Federal Bureau of Investigation (the "FBI"). SHESTAKOV is a former Soviet and Russian diplomat who more recently served as an interpreter for United States federal courts and prosecutors. In or about 2021, McGONIGAL and SHESTAKOV agreed to and did investigate a rival Russian oligarch ("Oligarch-2") of Deripaska in return for concealed payments from Deripaska, in violation of sanctions the United States imposed on Deripaska in 2018. McGONIGAL and SHESTAKOV were aware that their actions violated these sanctions because, among other reasons, while serving as an FBI Special Agent in Charge,

McGONIGAL received then-classified information that Deripaska would be added to a list of oligarchs considered for sanctions as part of the process that led to the imposition of sanctions against Deripaska, and after McGONIGAL left the FBI, he and SHESTAKOV worked on behalf of DERIPASKA in an unsuccessful effort to have those sanctions lifted.

## McGONIGAL, SHESTAKOV, and Deripaska

2.    CHARLES McGONIGAL, the defendant, served in the FBI from 1996 to 2018.  During his FBI career, McGONIGAL worked in Russian counterintelligence and organized crime matters and counter-espionage, among other areas.  Beginning in 2016 until his retirement in 2018, McGONIGAL served as the Special Agent in Charge ("SAC") of the Counterintelligence Division of the FBI's New York Field Office.  As SAC, McGonigal supervised and participated in investigations of Russian oligarchs, including Deripaska.  Among other things, in 2018, McGONIGAL, while acting as SAC, received and reviewed a then-classified list of Russian oligarchs with close ties to the Kremlin who would be considered for sanctions to be imposed as a result of Russia's 2014 conflict with Ukraine.

3.    SERGEY SHESTAKOV, the defendant, served as a translator and as a diplomat for the Ministry of Foreign Affairs

2

of the Soviet Union and the Russian Federation from 1979 until
his retirement in 1993, often in New York, New York. After his
retirement, SHESTAKOV continued to work in the New York City
area, and maintained residence in Connecticut. Among other
employment, SHESTAKOV worked as an interpreter for the federal
courts and United States attorneys' offices in the Southern and
Eastern Districts of New York.

4.    Oleg Deripaska is a Russian national, often referred
to as an oligarch, meaning that he has vast wealth and close
connections to the Russian state. On or about April 6, 2018,
the United States Department of the Treasury's Office of Foreign
Assets Control ("OFAC") designated Deripaska as a Specially
Designated National ("SDN"), in connection with its finding that
the actions of the government of the Russian Federation with
respect to Ukraine constitute an unusual and extraordinary
threat to the national security and foreign policy of the United
States (the "OFAC Sanctions").

## The OFAC Sanctions

5.    The International Emergency Economic Powers Act (the
"IEEPA"), codified at Title 50, United States Code, Sections
1701-1708, confers upon the President authority to deal with
unusual and extraordinary threats to the national security and

3

foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

6. In 2014, pursuant to his authorities under the IEEPA, the President issued Executive Order 13660, which declared a national emergency with respect to the situation in Ukraine. To address this national emergency, the President blocked all property and interest in property that were then or thereafter came within the United States or that were then or thereafter came within the possession or control of any United States person, of individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria. These criteria include, but are not limited to, individuals determined to be responsible for or complicit in, or who engage in, actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or who materially assist, sponsor, or provide financial, material, or technological support for, or goods or services to, individuals or entities engaging in such activities. Executive Order 13660 prohibits, among other things, the making of any contribution or

4

provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked, and the receipt of any contribution or provision of funds, goods, or services from any such person.

7. The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine has remained in continuous effect since 2014, and was most recently continued on March 2, 2022.

8. The President on multiple occasions expanded the scope of the national emergency declared in Executive Order 13660, including through: (1) Executive Order 13661, issued on March 16, 2014, which addresses the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addresses the actions and policies of the government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine. Executive Orders 13660, 13661, and 13662 are collectively referred to as the "Ukraine-Related Executive Orders."

9. The Ukraine-Related Executive Orders authorized the Secretary of the Treasury to take such actions, including the

5

promulgation of rules and regulations, and to employ all powers
granted to the President under the IEEPA, as may be necessary to
carry out the purposes of those orders. The Ukraine-Related
Executive Orders further authorized the Secretary of the
Treasury to redelegate any of these functions to other offices
and agencies of the United States Government.

        10.   To implement the Ukraine-Related Executive Orders,
OFAC issued certain Ukraine-Related Sanctions Regulations.
These regulations incorporate by reference the definition of
prohibited transactions set forth in the Ukraine-Related
Executive Orders. See 31 C.F.R. § 589.201. The regulations also
provide that the names of persons designated directly by the
Ukraine-Related Executive Orders, or by OFAC pursuant to the
Ukraine-Related Executive Orders, whose property and interests
are therefore blocked, are published in the Federal Register and
incorporated into the SDN and Blocked Persons List (the "SDN
List"), which is published on OFAC's public website. See 31
C.F.R. § 589.201 n.1.

        11.   On or about April 6, 2018, OFAC designated Deripaska
as an SDN pursuant to the Ukraine-Related Executive Orders.  In
particular, OFAC designated Deripaska pursuant to Executive
Order 13661 for having acted or purported to act for or on

behalf of, directly or indirectly, a senior official of the
Government of the Russian Federation, as well as pursuant
Executive Order 13662 for operating in the energy sector of the
Russian Federation economy.

### SHESTAKOV Connects McGONIGAL to Agent-1, Deripaska's Agent

12.  In or about 2018, while McGONIGAL was still serving as
SAC, SHESTAKOV introduced McGONIGAL via email to an employee and
agent of Deripaska ("Agent-1").  Agent-1 was formerly a diplomat
with the Ministry of Foreign Affairs for the Soviet Union and
Russian Federation, and rumored in public media reports to be a
Russian intelligence officer.  At all relevant times, Agent-1
worked for and reported to Deripaska and served as an officer of
a corporation that, in 2018, was primarily owned by Deripaska
and itself subject to sanctions under the IEEPA.

13.  In or about the Spring and Summer of 2018, SHESTAKOV
asked McGONIGAL to help Agent-1 obtain an internship with the
New York City Police Department ("NYPD") for Agent-1's daughter,
in the fields of counterterrorism, intelligence gathering, and
"international liaisoning."  McGONIGAL agreed to help, and he
requested assistance from a contact in the NYPD, telling the
contact "I have an interest in her father for a number of
reasons."  McGONIGAL also informed an FBI supervisor who worked

for McGONIGAL that McGONIGAL wanted to recruit Agent-1, who was, according to McGONIGAL, a Russian intelligence officer. Through McGONIGAL's efforts, Agent-1's daughter received VIP treatment from the NYPD. An NYPD Sergeant assigned to brief Agent-1's daughter subsequently reported the event to the NYPD and FBI, because, among other reasons, Agent-1's daughter claimed to have an unusually close relationship to "an FBI agent" who had given her access to confidential FBI files, and it was unusual for a college student to receive such special treatment from the NYPD and FBI.

## The 2019 Law Firm Engagement

14. In or about 2019, after McGONIGAL had retired from the FBI, SHESTAKOV and McGONIGAL introduced Agent-1 to an international law firm with an office in Manhattan, New York (the "Law Firm"). Agent-1 sought to retain the Law Firm to work in having the OFAC Sanctions against Deripaska removed, a process often referred to as "delisting."

15. During negotiations to retain the Law Firm, McGONIGAL traveled to meet Deripaska and others at Deripaska's residence in London, and in Vienna. In electronic communications exchanged as part of these negotiations, McGONIGAL, SHESTAKOV, Agent-1, and others did not refer to Deripaska by his surname,

but rather used labels such as "the individual," "our friend from Vienna," and "the Vienna client." At the conclusion of the negotiations, Deripaska personally signed an engagement letter with the Law Firm, engaging it to undertake efforts at delisting Deripaska, pursuant to 31 C.F.R. 589.506(a), which provides a limited exception to the OFAC Sanctions for certain legal representation of persons subject to the OFAC Sanctions.

16. Pursuant to the terms of the engagement between the Law Firm and Deripaska, Deripaska was to pay the Law Firm $175,000 per month, with $25,000 "currently earmarked" for "certain other professionals." The Law Firm retained McGONIGAL as a consultant and investigator on the Deripaska matter. McGONIGAL asked that the Law Firm compensate him by transmitting $25,000 to a corporation owned by SHESTAKOV (the "Shestakov Corporation"). The Law Firm in fact made that payment.

17. The Law Firm's work for Deripaska was interrupted by, among other things, the COVID-19 pandemic. Although the engagement was not formally terminated, work and payment on the matter had ceased by in or about March 2020.

**The Defendants Illegally Work for Deripaska**

18. Beginning in or about the Spring of 2021, Agent-1 began negotiating with McGONIGAL and SHESTAKOV to retain the

defendants to work directly for Deripaska, without the involvement of the Law Firm and on a non-legal matter not lawful under the OFAC Sanctions. In electronic messages exchanged among the defendants and Agent-1, Deripaska was again not named, but rather referred to using labels as "you know whom," "the big guy," and "the client." The project for which Deripaska, operating through Agent-1, sought to retain the defendants was investigating Oligarch-2, with an emphasis on, among other things, Oligarch-2's interests in a large Russian corporation (the "Russian Corporation") which Deripaska and Oligarch-2 were contesting control over; assets that Oligarch-2 may have hidden outside Russia; and the possibility that Oligarch-2 secretly held a passport issued by a nation other than Russia.

19.   In or about August 2021, McGONIGAL, SHESTAKOV, and Agent-1 drafted and executed a contract (the "Contract"). According to the Contract, a Cyprus corporation (the "Cyprus Corporation") would pay a Corporation based in New Jersey (the "New Jersey Corporation") $51,280 upon execution of the Contract and $41,790 per month for "business intelligence services, analysis, and research relevant to [the Russian Corporation], its business operations, and shareholders." Although the payments under the Contract in fact would be made to McGONIGAL

10

and SHESTAKOV at the behest of Deripaska, as negotiated by
Agent-1, none of those people was named in or was a signatory to
the Contract. Pursuant to the Contract, on August 13, 2021,
$51,280 was wired from a Russian bank (the "Russian Bank") to
the New Jersey Corporation, to be followed by monthly payments
of $41,790 between August 18 and November 18, 2021.

20.   The New Jersey Corporation was owned by a friend of
McGONIGAL (the "Friend"). The Friend had arranged for McGONIGAL
to participate in the business of the New Jersey Corporation
while McGONIGAL was still serving as SAC with the FBI.   The
Friend provided McGONIGAL with a corporate email account and a
cellphone under a false name, which McGONIGAL at times used, in
order to conceal McGONIGAL's work for the New Jersey Corporation
while still employed by the FBI. With respect to the Contract,
however, McGONIGAL told SHESTAKOV that he had not informed the
Friend that he was using the New Jersey Corporation to receive
payment on the Contract.   SHESTAKOV subsequently forged the
Friend's signature on the Contract without the Friend's
knowledge or permission.   When the Friend questioned McGONIGAL
about why the Russian Bank was making payments to the New Jersey
Corporation, McGONIGAL told the Friend, in substance and in
part, that it was payment for "legitimate" work McGONIGAL was

11

performing for "a rich Russian guy."  The Friend acquiesced in
the use of the New Jersey Corporation, and subsequently
transferred funds obtained pursuant to the Contract at
McGONIGAL's direction, including to McGONIGAL and SHESTAKOV.

21.  From at least in or about August 2021 until in or
about November 2021 and in return for the payments specified in
the Contract, McGONIGAL sought to gather information about
Oligarch-2 and the Russian Corporation.  Among other things,
McGONIGAL retained subcontractors to assist in this endeavor.
With respect to one such subcontractor ("Subcontractor-1"),
McGONIGAL requested a "soup to nuts" investigation of Oligarch-2
and the Russian Corporation.  McGONIGAL declined to tell
Subcontractor-1 the identity of his client, despite having an
established relationship with Subcontractor-1 in which McGONIGAL
had identified his prior, lawful client.

22.  On or about October 28, 2021, Subcontractor-1 informed
McGONIGAL that a third-party had located "dark web" files that
could reveal "hidden assets valued at more than 500 million us
$" and other information that McGONIGAL believed would be
valuable to Deripaska.  Between then and on or about November
21, 2021, McGONIGAL and SHESTAKOV negotiated with Agent-1 to
obtain funds from Deripaska to purchase these "dark web" files.

12

This activity largely or completely ceased on or about November 21, 2021, when special agents of the FBI, acting pursuant to court-issued search warrants, seized the defendants' personal electronic devices.

**SHESTAKOV Lies to Conceal His Relationship with Agent-1**

23. Immediately prior to the seizure of his electronic devices on or about November 21, 2021, SHESTAKOV met with FBI agents in a Manhattan restaurant. During that meeting, SHESTAKOV attempted to conceal the nature and depth of the relationship between himself, McGONIGAL, and Agent-1. Among other things, SHESTAKOV feigned uncertainty as to how recently McGONIGAL and Agent-1 had met with each other, even though SHESTAKOV had in fact met with McGONIGAL and Agent-1 just twelve days prior. SHESTAKOV was also asked whether he had "ever engaged in a business relationship with" Agent-1, to which SHESTAKOV replied, in material part, "No, no business," even though SHESTAKOV was then involved in the Contract, which he regularly discussed with Agent-1, including earlier that day, and on which the most recent payment had been made three days earlier.

13

## STATUTORY ALLEGATIONS

### Count One
(Conspiracy to Violate the
International Emergency Economic Powers Act)

The Grand Jury charges:

24. The allegations contained in paragraphs 1 through 23 of this Indictment are incorporated as though fully set forth herein.

25. From at least in or about the Spring of 2021, up to and including at least in or about November 2021, in the Southern District of New York and elsewhere, CHARLES McGONIGAL and SERGEY SHESTAKOV, the defendants, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to violate the IEEPA, in violation of 50 U.S.C. § 1705, Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

26. It was a part and an object of the conspiracy that CHARLES McGONIGAL and SERGEY SHESTAKOV, the defendants, and others known and unknown, would and did willfully violate, attempt to violate, and cause a violation of a license, order, regulation, and prohibition issued under the IEEPA.

(Title 50, United States Code, Section 1705; Executive Orders 13660, 13661, and 13662; Title 31, Code of Federal Regulations § 589.201.)

14

**Count Two**
(Violation of the
International Emergency Economic Powers Act)

The Grand Jury further charges:

27. The allegations contained in paragraphs 1 through 23 of this Indictment are incorporated as though fully set forth herein.

28. From at least in or about the Spring of 2021, up to and including at least in or about November 2021, in the Southern District of New York and elsewhere, CHARLES McGONIGAL and SERGEY SHESTAKOV, the defendants, willfully attempted to and did make and receive a contribution of funds, goods, and services to and for the benefit of Oleg Deripaska, a specially designated national.

(Title 50, United States Code, Section 1705; Executive Orders 13660, 13661, and 13662; Title 31, Code of Federal Regulations § 589.201; Title 18, United States Code, Section 2.)

**Count Three**
(Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

29. The allegations contained in paragraphs 1 through 23 of this Indictment are incorporated as though fully set forth herein.

30. From at least in or about August 2021, up to and including at least in or about November 2021, in the Southern

District of New York and elsewhere, CHARLES McGONIGAL and SERGEY SHESTAKOV, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1956(a)(1)(B)(i).

31.  It was a part and an object of the conspiracy that CHARLES McGONIGAL and SERGEY SHESTAKOV, the defendants, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which in fact involved the proceeds of specified unlawful activity, to wit, violations of IEEPA, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## Count Four
(Money Laundering)

The Grand Jury further charges:

32. The allegations contained in paragraphs 1 through 23 of this Indictment are incorporated as though fully set forth herein.

33. From at least in or about the Spring of 2021, up to and including at least in or about November 2021, in the Southern District of New York and elsewhere, CHARLES McGONIGAL and SERGEY SHESTAKOV, the defendants, and others known and unknown, in an offense in and affecting interstate and foreign commerce, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction, which in fact involved the proceeds of specified unlawful activity, to wit, violations of IEEPA, in violation of Title 50, United States Code, Section 1705, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit, the defendants caused Deripaska to transfer funds to them through the Russian Bank, the Cyprus Corporation, and the

17

New Jersey Corporation in order to conceal the origin and control of those funds.

(Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.)

## COUNT FIVE
## (False Statements)

The Grand Jury further charges:

34. The allegations contained in paragraphs 1 through 23 of this Indictment are incorporated as though fully set forth herein.

35. On or about November 21, 2021, in the Southern District of New York and elsewhere, SERGEY SHESTAKOV, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device a material fact, and made a materially false, fictitious, and fraudulent statement and representation, to wit, when interviewed by Special Agents of the FBI, SHESTAKOV (1) concealed the nature of the relationship between CHARLES McGONIGAL and Agent-1, and (2) falsely stated that he (SHESTAKOV) did not have any business relationship with Agent-1, when in truth and in fact, and as SHESTAKOV knew: (1) McGONIGAL and Agent-1 met and communicated regularly and were then in a business relationship related to the Contract, and (2) SHESTAKOV and Agent-1 were then in a business

18

relationship related to the Contract, regarding which SHESTAKOV and Agent-1 had communicated earlier on the same day on which SHESTAKOV denied to the FBI having a business relationship with Agent-1.

(Title 18, United States Code, Section 1001.)

## FORFEITURE ALLEGATION

36. As a result of committing the sanctions violations alleged in Counts One and Two of this Indictment, CHARLES McGONIGAL and SERGEY SHESTAKOV, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One and Two.

37. As a result of committing the money laundering offenses alleged in Counts Three and Four of this Indictment, CHARLES McGONIGAL and SERGEY SHESTAKOV, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real or personal, involved in said offenses, or any property traceable to such property.

## Substitute Asset Provision

38. If any of the property described above as being subject

19

to forfeiture, as a result of any act or omission of CHARLES McGONIGAL and SERGEY SHESTAKOV, the defendants,

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third party;

      c.   has been placed beyond the jurisdiction of the court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461 to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 981;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

*Darien Williams* 6/1/4c
DAMIAN WILLIAMS
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

v.

### CHARLES McGONIGAL and
### SERGEY SHESTAKOV,

Defendants.

### SEALED INDICTMENT

23 Cr. ____

(18 U.S.C. §§ 2, 1001, and 1956;
50 U.S.C. § 1705.)

DAMIAN WILLIAMS
United States Attorney