N291MCGC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          23 Cr. 16 (JHR)

5   CHARLES McGONIGAL, SERGEY
    SHESTAKOV,
6
                 Defendants.               Conference
7   ------------------------------x

                                           New York, N.Y.
8                                          February 9, 2023
9                                          11:05 a.m.

10
    Before:
11
                    HON. JENNIFER H. REARDEN,
12
                                           District Judge
13

14                      APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  HAGAN C. SCOTTEN, ESQ.
17       REBECCA T. DELL, ESQ.
         DEREK WIKSTROM, ESQ.
18       Assistant United States Attorneys

19  BRACEWELL LLP
         Attorneys for Defendant Charles McGonigal
20  BY:  SETH D. DuCHARME, ESQ.
         MEAGAN MALONEY, ESQ.
21
22  GLAVIN PLLC
         Attorneys for Defendant Sergey Shestakov
    BY:  RITA M. GLAVIN, ESQ.
23       KATHERINE E. PETRINO, ESQ.

24

25

N291MCGC

```
1          (Case called)
2          THE COURT:  We are here for an initial conference.  Is
3    the United States ready to proceed?
4          MR. SCOTTEN:  We are.  Good morning, your Honor.
5    Hagan Scotten for the government.  Also at counsel table are
6    Assistant United States Attorneys Rebecca Dell and Derek
7    Wikstrom.
8          THE COURT:  Good morning.
9          MS. DELL:  Good morning.
10         MR. WIKSTROM:  Good morning.
11         THE COURT:  Defense counsel, are you ready to proceed?
12         MR. DuCHARME:  Yes, your Honor.  For Mr. McGonigal,
13   I'm Seth DuCharme.
14         MS. MALONEY:  Good morning, your Honor.  Meagan
15   Maloney.
16         THE COURT:  Good morning.
17         MS. GLAVIN:  Good morning, your Honor.  Rita Glavin
18   along with my associate Katherine Petrino, here with our client
19   Sergey Shestakov.
20         THE COURT:  Good morning.
21         All right.  I would take a report from the government
22   now on the procedural history.
23         MR. SCOTTEN:  Yes, your Honor.
24         So the procedural history is fairly short.  On
25   January 12, a sealed indictment against both defendants was
```

N291MCGC

1     returned.  On January 21st, both defendants were arrested.

2     They appeared before Magistrate Judge Lehrburger on the 23rd.

3     They were granted bail and time was excluded.  And then on --

4              THE COURT:  Magistrate Judge Cave?

5              MR. SCOTTEN:  I'm sure you're right if you're looking

6     at something, your Honor.

7              THE COURT:  I think it was Magistrate Judge Cave, but

8     in any event, please go ahead.

9              MR. SCOTTEN:  And then on January 27th, this Court

10    extended the exclusion of time under the Speedy Trial Act until

11    today.

12             A couple other procedural notes, your Honor.  As the

13    Court is probably aware, McGonigal —— but not Shestakov —— is

14    also indicted separately in the District of Columbia.  There

15    hasn't been an appearance before the district court in that

16    matter yet so I don't think it constrains the district court,

17    this Court, in terms of scheduling, but I just wanted the Court

18    to be aware.

19             Second, we expect to be submitting a protective order

20    to the Court soon governing the use of discovery in this case.

21    We've actually already agreed to the essential terms of that

22    order with McGonigal'S counsel, and we began producing

23    discovery to McGonigal.  Because Shestakov's new attorney is a

24    little more recent to the case, we haven't yet been able to

25    receive all of her views on the order, but hopefully we will

N291MCGC

1   soon and hopefully we'll be able to submit something on

2   consent.

3           And then lastly, as the Court probably saw, yesterday

4   afternoon we filed a request for a conference under Section 2

5   of the Classified Information Procedures Act.  I think for now

6   what's material is, I've already told defense counsel we don't

7   think that whatever issues may or may not exist concerning

8   classified information are going to affect scheduling here.  So

9   we think this Court should set a schedule as it would in any

10  other criminal case, but we will also hopefully take advantage

11  of the procedure just to sort of lay out for the Court in a way

12  we can't do in a public forum what our thinking is, why that

13  is, let the Court ask questions.

14          THE COURT:  I'm aware of that request.  Mr. Scotten,

15  do you anticipate that that proceeding will concern scheduling

16  or will it be substantive?

17          MR. SCOTTEN:  I think -- I think ideally it will not

18  really concern either.  In a sense we'll tell the Court what

19  we've done so far on these issues, what, if anything, there is

20  left to do, and sort of explain to the Court why we think

21  that's not going to otherwise affect scheduling.  But the Court

22  may say, I think you're wrong, and have some questions to see

23  if we're right, and we'd be able to answer them then.

24          THE COURT:  All right.  While you're standing, I need

25  to ask if there are identifiable persons in this case who

N291MCGC

| | |
|---|---|
| 1 | require notification under the Crime Victims' Rights Act. |
| 2 | MR. SCOTTEN:  No, your Honor. |
| 3 | THE COURT:  Would either defense counsel like to be |
| 4 | heard at this time or should we move into scheduling? |
| 5 | MR. DuCHARME:  I think we'd both like to be heard, |
| 6 | your Honor, very briefly.  I can just start, your Honor. |
| 7 | We have begun conversations with the government about |
| 8 | the pace of discovery.  We've run into some technical issues in |
| 9 | reviewing that material, but we signed the protective order, as |
| 10 | Mr. Scotten mentioned, and we'll have I think a better sense |
| 11 | about our theories of the defense once we can review the |
| 12 | discovery materials.  We've made some specific requests to the |
| 13 | government that I think will be relevant to our understanding |
| 14 | of what a schedule would look like and what our expectations |
| 15 | would be with respect to CIPA practice.  Just looking at |
| 16 | similar cases, it's often noted in the public record there are |
| 17 | successive CIPA filings, and that in part is guided by the |
| 18 | defense theory of the case.  So we anticipate a time that we |
| 19 | may come to you to seek an opportunity to explain what the |
| 20 | defense theories are so you can be best positioned, sort of |
| 21 | working with the government, on a realistic schedule. |
| 22 | I think other than that, Judge, everything is on |
| 23 | track.  We expect continued conversations.  We've been moving |
| 24 | forward in good faith with the government, and I think we're |
| 25 | headed in the right direction. |

N291MCGC

1          THE COURT:  All right.  Mr. DuCharme, the technical

2   issues you mentioned, those are on your end or on the

3   government's side?

4          MR. DuCHARME:  Well, we're working to sort those out.

5   They have made available to us large electronic files, and

6   we've been having some challenges, you know, getting those

7   files through our firewall or, for lack of a better term,

8   accessible to us, so it's really more of a technical problem.

9   I think we're going to be able to work through it quickly when

10  we can get our tech folks working together, but they've at

11  least offered evidence and we're trying to access it.

12         THE COURT:  All right.  Ms. Glavin, are you having

13  that issue also?

14         MS. GLAVIN:  Your Honor, I don't have any discovery as

15  yet because we haven't agreed on the protective order.

16         THE COURT:  All right.  Perhaps this is premature, but

17  assuming the technical issues are resolved promptly,

18  Mr. Scotten, how quickly do you anticipate turning over all of

19  the discovery materials?

20         MR. SCOTTEN:  So, your Honor, we think we -- assuming

21  we get the protective order signed and there are no technical

22  glitches, we think we can get substantially everything in our

23  possession over to the defense within the next 30 days.  Now

24  there are, as always, a couple caveats I have to put on the

25  record.

N291MCGC

1          One, we recognize that obligations are continuing and

2     will continue to search our files.  We may find some more

3     things that are not in the initial disclosures, but there's

4     nothing we are aware of that's going to hold that up right now.

5          Second, it's possible —— and Mr. DuCharme sort of

6     hinted at this —— that the defense may come with us with

7     questions or theories of the defense we hadn't anticipated and

8     argue something we hadn't disclosed may exist that may be

9     Rule 16.  We may agree with them; we may not.  We may disclose

10     it even though —— I'm not -- what, essentially, I'm saying is,

11     within 30 days —— and, frankly, a lot sooner if we get the

12     protective order signed, because Mr. DuCharme has most

13     everything and we can easily get it to Ms. Glavin —— within 30

14     days we can get over sort of the bulk of the case, what we have

15     now and we're aware that we need to disclose, while we continue

16     to search our files for other things that may need to apply.

17          THE COURT:  And you'll do that on a rolling basis.

18          MR. SCOTTEN:  That's correct.

19          MS. GLAVIN:  If I may be heard briefly.

20          THE COURT:  Yes.

21          MS. GLAVIN:  Just to set the table here, your Honor,

22     in terms of discussions that myself and Mr. DuCharme have had

23     with the U.S. Attorney's Office, to give your Honor some

24     perspective on the questions that we have been asking the

25     government, we have asked the government about when their full

N291MCGC

1  Rule 16 discovery will be completed.  And as the government

2  well knows, Rule 16 requires disclosure to the defense of

3  materials in their possession that are material to the

4  preparation of our defense.  So it's not just the materials

5  that they intend to use in their case in chief but the

6  materials that we would need to defend the case.

7          Along those lines, I raised with the government —— and

8  Mr. DuCharme raised it as well —— that they have an obligation

9  to make inquiry and search of the files of the intelligence

10  community.  We have asked the government, have you made that

11  inquiry, I've asked what agencies; the government has not

12  responded.

13          And to give your Honor a sense about how long the case

14  has been going on, while the indictment was unsealed on

15  January 21st, which was a Saturday —— and I want to get to that

16  in a moment —— the government's been investigating this case

17  for about a year and a half.  The FBI, they spoke to

18  Mr. Shestakov November of 2021.  Mr. Shestakov went in, had a

19  meeting with the government, and the FBI, and spoke to them

20  four, five months ago.  Was represented by counsel.  So they

21  have known for some period of time and had time to go to the

22  intelligence community and should have this buttoned up with

23  respect to classified information that they have to seek if it

24  is material to the preparation of our defense.  Here are some

25  of the issues that we have raised and the government has not

N291MCGC

answered.  And I expect that should your Honor grant the

government's request for an *ex parte* conference under CIPA

Section 2, we are going to ask for a similar conference.  It

might even be to your Honor's benefit to have that conference

in tandem so that you can hear from the government first, when

they tell you what they've done so far —— I think that's what

Mr. Scotten said —— and what we think is left to do, because

they haven't shared that with us.

          So we have raised with them, for instance, to the

extent that they have now made clear in the indictment that

they think my client was working with the Russian oligarch,

Mr. Deripaska, which we vigorously contest, but to the extent

that is their theory of the case, if the NSA was up on wiretaps

of Mr. Deripaska during the time period charged in this

indictment when they claim my client was working with him,

that's Rule 16 material, and we expect to get that.  The day of

the indictment, that it's unsealed, and it's the shot heard

around the world, was NSA or the CIA up on any intercepted

transmissions with Mr. Deripaska, and his associates.  That

chatter is going to be important to our defense.  We are not

getting answers from the government if they have collected it,

and my understanding is it's not going to be in this tranche of

discovery that we are receiving.

          So these are some of the issues that we are facing.  I

think that Mr. DuCharme and I, we have asked them, what

1  intelligence community files have you gone through, is it

2  classified information, and we're not getting answers to any of

3  it.

4          I am mindful that this case is being brought not by

5  the terrorism section of the U.S. Attorney's Office but it's

6  being brought by the public corruption section.  So the lens

7  through which the government is looking at this case, I

8  understand they believe that they can do this.  This is their

9  narrow case, their case in chief.  But there are many doors

10  that they have to open so that we can defend our clients.  To

11  that end, I do want to say something about the issue with the

12  protective order.

13          The holdup that I have had with the government with

14  respect to the protective order really comes down to a single

15  sentence in the order.  The order says that when they give me

16  discovery material, they want representation from me that

17  neither myself nor my client is going to be posting it on

18  Twitter or giving it to the media, and I'm fine with that.

19  Okay?  I'm totally fine with that.  I've signed many of these

20  protective orders agreeing to that.  But what I said to the

21  government is, I want a representation from you that you're not

22  going to do it.  Because if the U.S. Attorney's Office does

23  that, I have to be able to respond.  And this doesn't normally

24  come up in the run-of-the-mill cases that I have had in this

25  district, but in this particular case, given the degree of the

N291MCGC

press interest in this and already public statements made by

the government in a press release issued on the day that my

client was arrested, they've created a media frenzy, and they

have already set the table for lots of people saying and

leaking to the press and lots of stories.  And in particular,

the day that my client was arrested, we have the ADIC of the

FBI coming out with a statement, basically insinuating that my

client, who has been an American citizen for decades, is a

good, loyal United States citizen, the implication from the

public statement in the press release issued by the U.S.

Attorney's Office is that he's some type of traitor and aligned

with the Russians and the Kremlin, and that is simply not true,

and they know that that's not true.  They haven't charged him

with espionage.  He's not a Russian spy.  And, you know, what

happened to him was, on January 21st, which was a Saturday, at

noon -- they did it at noon on a Saturday, okay?  Usually the

arrests happen at 6:00 in the morning because of safety

concerns.  That's what the bureau says.  They'll come at 4, 5

in the morning.  At noon on a Saturday, my client was at home

with his wife.  At least 10 FBI agents show up at his house,

okay?  This is a guy who has a lawyer, who's met with the

government, met with them four or five months ago.  He's spoken

with Mr. Scotten and his colleagues here.  And they show up,

they arrest him at noon on a Saturday.  What that meant, by

arresting him at noon on a Saturday, is that he was never going

N291MCGC

```
1   to be able to appear in this district before a magistrate judge
2   because it was too late.  They weren't going to be able to get
3   him here that day.  And they darn well knew that that meant
4   Mr. Shestakov, who is a good man, was going to spend two days
5   at the MDC.  Two days at the MDC.  And that's what he spent, in
6   the SHU.  Mr. Shestakov, who they've known exactly where he is,
7   who has been an interpreter for their office and this
8   courthouse, they arrested him at noon, and they knew darn well
9   it was going to cause him to be in jail, at the MDC.  And I
10  don't have to educate your Honor about how bad things are at
11  the MDC.  He also had medication that he needed for a serious
12  medical condition that the agents full well knew about, and the
13  MDC wouldn't let him have it on Sunday.  He takes it on a daily
14  basis.  That's the disrespect with which Mr. Shestakov has been
15  treated here when he has been cooperative with the government
16  during this investigation, through counsel.
17          I do want to make a couple of just brief points on
18  Mr. Shestakov's behalf, particularly because of the media
19  firestorm that was caused, and it started with the press
20  release that the government made.  But the media storm, you
21  know, has people insinuating that he's some type of
22  intelligence agent or spy for the Russians.  That's not true.
23  That's never been true.  So I just want to say a few things
24  about Mr. Shestakov to set the record straight, because I'm not
25  going to go out in front of the courthouse; I'm not going to
```

N291MCGC

```
1   issue press releases.  I don't do that.  But I want to say this
2   about Mr. Shestakov.  Yes, he was a Russian diplomat.  He's not
3   a spy.  He's not in the Foreign Intelligence Service.  The
4   government doesn't allege it because they know it's not true.
5   He ended his service 1993, when he retired.  He's been here in
6   the United States for decades.  He went to work -- there's a
7   huge gap in that indictment.  They talk about, oh, he worked,
8   you know, as a Russian diplomat.  Then they say he was an
9   interpreter.  What they're missing is about 20 years in
10  between.  Mr. Shestakov was working with a company called Media
11  Most, which has been an enemy of Vladimir Putin and the Kremlin
12  for decades.  The owner of that company, who Mr. Shestakov was
13  working for -- the government doesn't say anything about
14  that -- is Vladimir Gusinsky, who is a vowed enemy of Putin,
15  who Putin has jailed because of the work of Media Most.
16  Mr. Shestakov worked for almost 20 years for them.
17          The narrative that has been portrayed in this case as
18  to my client has been deeply unfair.  And the reason we are
19  stuck on this protective order is that I just can't agree that
20  I'm not going to say anything to the media that doesn't need to
21  set the record straight if the government won't agree with me
22  that they're not going to be releasing things to the media.
23          And I do also want to put on the record that
24  Mr. Deripaska, this supposed oligarch that my client was
25  working for -- and we will show that this just was not true --
```

N291MCGC

1    but Mr. Deripaska has come out publicly through an agent and

2    said he didn't work with my client.

3         So this is very critical that we are given access to

4    core Rule 16 defense materials that only the government knows

5    about and won't tell us about, whether they have them, whether

6    they don't have them, and they have an obligation to search.

7         THE COURT:  All right.

8         MS. GLAVIN:  Thank you, Judge.

9         THE COURT:  Mr. Scotten.

10        MR. SCOTTEN:  Briefly, your Honor.  Sort of an

11   unfortunate note to get misstated on.  There were some

12   inaccurate statements in Ms. Glavin's presentation.

13        I guess I should say the idea that the government is

14   stonewalling her is absurd.  We've been really trying to get

15   her to come forward.  We've been asking Mr. DuCharme to get her

16   to reach out to us but she did not until two days ago, at which

17   point --

18        THE COURT:  Just a second.  Ms. Glavin, when did you

19   enter your appearance in the case?

20        MS. GLAVIN:  Monday afternoon, 48 hours ago.  No,

21   three days ago.  72 hours.

22        MR. SCOTTEN:  And we were aware that Mr. Shestakov had

23   an attorney before this, but she wouldn't come forward so we

24   could discuss it with her.  As soon as she -- I'd like to

25   finish.

N291MCGC

1           As soon as she appeared on the docket, we reached out.

2    It took some work to schedule time to appear -- to talk to her.

3    When she made time to speak with us, she told us she had not

4    yet been able to review the protective order, so we put it off

5    for another day.

6           We had a conversation yesterday with Mr. DuCharme,

7    where the objection just discussed was raised, but again, we

8    were informed she hadn't thoroughly reviewed the protective

9    order and the resolution at the end was that she and

10   Mr. DuCharme were going to talk and get back to us on any

11   requested changes.  We haven't heard those yet.  We're happy to

12   consider them.  We'll get back promptly as soon as we hear

13   them.

14          Similarly, with respect to this issue of requests on

15   discovery, it is accurate that Ms. Glavin, the last few times

16   we spoke, briefly mentioned things she would want, but far from

17   saying we're not going to tell you or anything like that, we

18   said, please send us a letter so we can see exactly what you

19   want and we'll send you a considered written response that

20   tells you what we can tell you and what we've done, and we

21   haven't received that letter either.  We look forward to

22   receiving it.  We'll respond promptly as soon as we do receive

23   it.

24          So there is no legitimacy to this idea that she's made

25   requests that haven't been honored.  We'd really like to get

N291MCGC

those requests, and we'll address them as soon as we can.

With respect to the press issue, I do think this is somewhat premature because hopefully the parties can reach consent on what the protective order will say.  So all I'm going to say for now is, there are safeguards in place to prevent the government from doing anything that would prejudice her client in terms of inappropriate release of nonpublic information.  I think most prominently is Local Rule 23.1, which applies both to us and government agents, such as the FBI, and I can tell the Court that I've informed the investigating agents and their supervisor of Rule 23.1, its prohibitions on disclosure of nonpublic information, and they've agreed to abide by it.  I understand the defense may want more assurances, but hopefully we can work those out and bring something to the Court on consent rather than prelitigating what may turn out not to be a dispute.

I think that's enough from me on this for now, unless the Court has questions.

MS. GLAVIN:  I just want to be briefly heard, your Honor, about when I entered the case, because I don't want the Court to think that I've been somehow hiding in the background here.

THE COURT:  I also want to hear why Local Rule 23.1 doesn't address your concerns about the protective order.

MS. GLAVIN:  Well, the reason I don't think it

N291MCGC

1  addresses my concern is that in my view, the statement by the

2  assistant director of the FBI that was issued in the press

3  release by the government on January 21st I think runs afoul of

4  Rule 23.1.  And the Justice Department issued that press

5  release.  I was surprised that it got through and wasn't edited

6  out in the office.  So that's my concern about Rule 23.1.  But

7  I'm with you on that.  Rule 23.1 governs me as well.  So why do

8  we need that in the protective order?  I'm with the government.

9  It governs them and it governs me.  And so I'm with them on

10  that.

11         I do want to make a point about this, to the extent

12  Mr. Hagan thinks that there was any type of game playing.

13         MR. SCOTTEN:  Scotten.

14         MS. GLAVIN:  Mr. Scotten.  Thanks.  -- that there was

15  some type of gamesmanship here.  I entered the appearance once

16  I had agreed on engagement with my client, which was Monday,

17  and we filed a notice of appearance Monday.

18         Secondly, the reason it took me some time, like a day,

19  to get back to Mr. Scotten about the protective order is I had

20  a three-hour-plus oral argument in the Eastern District of New

21  York on Tuesday.  Immediately following that -- which I had

22  been prepping for for some time, and then immediately following

23  that argument, I had to drive to upstate New York for the wake

24  of a very good friend, childhood friend of mine, and I only got

25  back into the city yesterday afternoon, at which point I had

N291MCGC

1    the discussion with Mr. Scotten.  There's no gamesmanship going

2    on here.

3          With respect to the protective order, I made it very

4    clear to him that I have an issue with that sentence.  They

5    should be bound by it, I said to him; he said come up with

6    language.  But I want your Honor to understand that is what the

7    issue is in the protective order.

8          The second issue with respect to the requests that I

9    have made to the government, it's not just a matter of us

10   putting it in a letter.  I'm actually taken aback that that's

11   the position of the government about what we want.  They have

12   had a year and a half to know what is going to be relevant to

13   our defense.  They should know it better than I do.  The fact

14   that they need for me to put in a letter, have you intercepted

15   Mr. Deripaska, have you inquired of the intelligence community,

16   and they can't answer that question to me on the phone means

17   I'm going to have to have apparently a very lengthy letter to

18   them.  And yes, it's going to take some time.  I just got into

19   the case on Monday.  I have other professional

20   responsibilities.  Mr. Shestakov is an enormous priority, and I

21   want to get it right.  And he deserves a fair trial.  Just

22   because I'm not moving at the pace that the government would

23   like this to move, it's because I'm spending the time that is

24   necessary and that is my professional responsibility.

25         THE COURT:  All right.  Well, let's try to get the

N291MCGC

1    protective order done so that discovery can proceed, and I

2    trust that the two sides will work it out.  If you can't, then

3    I will decide from among your competing versions.

4           Mr. Scotten, what do you expect to be your principal

5    sources of proof at trial?

6           MR. SCOTTEN:  Sure, your Honor.

7           So not necessarily in order of priority, but some of

8    the evidence at trial, the primary evidence at trial, I think,

9    would include electronic communications involving the

10   defendants in which they plan and conduct the charged offenses.

11   That's going to include messages from the defendants' phones,

12   which were searched pursuant to search warrants; messages found

13   on the phone of a man described in the indictment as Agent 1,

14   which was searched by Customs and Border Patrol as he passed

15   through JFK; also messages involving the defendants and the law

16   firm mentioned in the indictment, which were provided by the

17   law firm pursuant to subpoena.  There will be some materials in

18   those electronic devices that maybe don't constitute

19   messages —— for example, drafts of the contract discussed in

20   the indictment which was passed among the defendants and Agent

21   1 as they sort of revised it and passed the document, and,

22   eventually, as Mr. Shestakov forged the signature of the

23   corporate owner and then took a photograph of it and sent it to

24   Agent 1.

25           There are other materials provided by the law firm,

N291MCGC

1    things like billing records and so on, that helped show these

2    defendants were aware Mr. Deripaska was sanctioned at the time

3    they entered business with him.   There are certain emails,

4    essentially bureau emails from McGonigal's time as a special

5    agent in charge, again, primarily relevant to showing knowledge

6    of Deripaska's status.

7            There will be Shestakov's statements to law

8    enforcement, probably most prominently a recorded interview in

9    November of 2021, which forms the basis of Count Five, charging

10   him with false statements during that interview.   There will be

11   statements that both defendants made to third parties offered

12   through witnesses, and obviously there will be witness

13   testimony, which I'm not going to get into in as much detail,

14   but obviously we expect to call all manner of witnesses,

15   including many percipient witnesses to some of the events

16   described in the indictment.

17           There will be financial records, bank records,

18   background stuff to show the movement of money among the

19   parties.

20           And there will be surveillance photographs depicting,

21   among other things, the meetings between these defendants and

22   Agent 1 at various times significant to the charged conduct,

23   such as very shortly before Shestakov attempted to fabricate

24   the nature of his relationship with Agent 1, photographs with

25   him meeting with agent McGonigal shortly before that.

N291MCGC

1        That's not everything, but I think that's a fair

2   summary of the principal evidence.

3        THE COURT:  All right.  And does the government

4   anticipate filing any superseding indictments, adding

5   defendants, or adding further charges?

6        MR. SCOTTEN:  Always possible, but no anticipation of

7   that on our part right now, your Honor.

8        THE COURT:  Have counsel, pursuant to my order,

9   consulted with each other about a month for trial?

10        MR. SCOTTEN:  So we consulted about scheduling, your

11   Honor.  My understanding is requests from both defense counsel

12   was simply to review the discovery and come back to this Court

13   in 90 days.  I suppose I can let them make that request in

14   greater detail, but we don't think that's an unreasonable

15   request, given the volume of discovery.

16        THE COURT:  Defense counsel, are you on the same page?

17   You want 90 days to review discovery before --

18        MR. DuCHARME:  Yes, your Honor.  We simply don't know

19   what we're up against in terms of the volume of materials, the

20   complexity of the case, so the time will I think benefit us.

21   And also, with respect to the potential application we may make

22   to educate you on the defense theories, we think that may take

23   a little time and could implicate some further delay.  So the

24   short answer is yes, your Honor, 90 days is agreeable to

25   Mr. McGonigal.

N291MCGC

1          THE COURT:  All right.

2          MS. GLAVIN:  The same with Mr. Shestakov as well, your

3     Honor.

4          THE COURT:  Okay.  Let's set a date for another

5     conference, and I'm going to make it for sooner than 90 days

6     just to see where you are.

7          Thursday, March 9th, at 11:30.

8          MR. SCOTTEN:  That works for the government, your

9     Honor.

10          THE COURT:  Ms. Glavin?

11          MS. GLAVIN:  One moment, your Honor.

12          Yes, your Honor, that works for me.  Thank you.

13          THE COURT:  Does that work for you, Mr. DuCharme?

14          MR. DuCHARME:  Yes, your Honor.

15          THE COURT:  Mr. Scotten, I think you said that in your

16     view, no days have elapsed yet under the Speedy Trial Act; is

17     that right?

18          MR. SCOTTEN:  Yes, your Honor, because they were

19     excluded first at the initial appearance and then, when this

20     conference had to be postponed, a letter was filed and your

21     Honor endorsed it, excluding time.

22          THE COURT:  Right.  All right.  So does the government

23     now wish me to exclude time from today through March 9th?

24          MR. SCOTTEN:  Yes, please, your Honor.

25          THE COURT:  Yes.

N291MCGC

1        MR. SCOTTEN:  Yes.  The government believes it would

2   be in the interests of the parties to give the defense, as they

3   requested, time to review discovery and prepare potential

4   defenses.  We therefore think it would be in the interest of

5   justice and outweigh the needs of the defendants and the public

6   in a speedy trial.

7        THE COURT:  Any objection?

8        MS. GLAVIN:  No, your Honor.

9        MR. DuCHARME:  No, your Honor.

10       THE COURT:  Hearing no objection, I hereby exclude

11  time between today and our next conference date of March 9,

12  2023, under the Speedy Trial Act pursuant to 18 U.S.C. Section

13  3161(h)(7)(A), in order to permit counsel to confer about the

14  protective order, review discovery, and for defense to be

15  prepared.  I find the exclusion to be in the best interests of

16  justice and it outweighs the best interests of the public and

17  the defendants in a speedy trial.

18       I believe that is all we need to cover today.  Does

19  anyone want to be heard on anything else?

20       MR. SCOTTEN:  No, thank you, your Honor.

21       MR. DuCHARME:  Not for Mr. McGonigal, your Honor.

22       MS. GLAVIN:  Not for Mr. Shestakov.  Thank you, your

23  Honor.

24       THE COURT:  All right.  So we are adjourned until

25  Thursday, March 9th.  And I hope to see a protective order

N291MCGC

1    submitted promptly.

2              MR. SCOTTEN:  Yes, your Honor.

3              THE COURT:  Thank you.

4              THE DEPUTY CLERK:  All rise.

5                          o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25