# BRACEWELL

November 30, 2023

**VIA ECF, Partially Under Seal,**
**Classified Addendum Filed via the Classified**
<u>**Information Security Officer**</u>

The Honorable Jennifer H. Rearden
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *United States v. Charles McGonigal*, No. 1:23-cr-00016-JHR

Dear Judge Rearden,

      We respectfully submit this memorandum on behalf of Charles McGonigal, who is scheduled to be sentenced on December 14, 2023. On August 15, 2023, Mr. McGonigal pleaded guilty, pursuant to an agreement with the government, to a superseding information charging a single count of conspiracy in violation of Title 18, United States Code, Section 371. The objects of the conspiracy were, in sum: (1) to indirectly provide to a Russian oligarch, who had been sanctioned by the U.S. Treasury Department, information about a Russian business competitor; and (2) to help conceal the source of the fees for such service. All of the charged conduct in this case occurred after Mr. McGonigal retired from the Federal Bureau of Investigation ("FBI"). For the work that Mr. McGonigal agreed to perform, he received $17,500, which he has forfeited. Because the unlawful agreement implicated the International Emergency Economic Powers Act

**Mr. Seth D. DuCharme**      T:+1.212.508.6165      F: +1.800.404.3970
31 W. 52nd Street, Suite 1900, New York,New York 10019-6118
seth.ducharme@bracewell.com      bracewell.com

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 2

("IEEPA"), the Court must consider the landscape of sentences imposed in other IEEPA cases. When the specific offense conduct is viewed in context, balanced against the extraordinary service Mr. McGonigal provided to the United States, a non-custodial sentence is sufficient to serve the ends of justice, and it is a reasonable option available to the Court.  *See* PSR ¶ 96.

## I.       BACKGROUND

The government's pre-indictment investigations of Mr. McGonigal were often overt and included multiple teams. More than a year before his arrest, on November 21, 2021, FBI agents conducted a voluntary interview of Mr. McGonigal at Newark airport when he returned home from an overseas business trip. Simultaneously, agents visited his home in lower Manhattan, where they interviewed his wife. Over the following year, Mr. McGonigal was in communication with the United States, through his counsel, as the investigation continued. On January 12, 2023, the U.S. Attorney's Office in the Southern District of New York obtained a sealed indictment, charging Mr. McGonigal with violations of IEEPA and money laundering. At the same time, the U.S. Attorney's Office in the District of Columbia obtained a sealed indictment charging Mr. McGonigal with making false statements in government forms and falsifying government records. On January 21, 2023, while returning to his home in Manhattan, the FBI took Mr. McGonigal into custody on the charges stemming from both offices. Because the arrest was orchestrated to take place on a Saturday afternoon, Mr. McGonigal was detained at the Metropolitan Detention Center in Brooklyn until his arraignment on the following Monday, under extremely restrictive conditions

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 3

in the Special Housing Unit. The underlying indictment remained under seal throughout the weekend. The government did not seek detention at his initial appearance, and Mr. McGonigal has been fully compliant with the terms of his release ever since.

When Mr. McGonigal's employer learned of the investigation while it was still pending in January 2022, Mr. McGonigal was fired from his position at the prestigious international company where he served as global head of security. Mr. McGonigal obtained employment at another company until he was similarly terminated when that company learned of his arrest in January 2023. Mr. McGonigal ultimately found a way to continue to earn a living in the security sector, forming a company that now employs more than 200 people in New York City. During the pendency of this case, Mr. McGonigal has faced a wave of personal attacks, including from high profile public figures. Even more distressingly, his wife, Pam, and their two children also have been the subjects of unwelcome attention. Currently, Mr. McGonigal is devoting his time and energy to his family, which is, in his own words, a top priority in his life: "[a]t this point, I am more concerned about my wife Pamela and children. . . . I wish I could relieve their pain and burden instantly, but I know it will take the remainder of my life to do so, which I am fully prepared to do." Statement of Charles McGonigal, **Exhibit A** (submitted to the United States Probation Officer for the District of Columbia on November 22, 2023). Mr. McGonigal has sought counseling to further his rehabilitation in this regard. PSR ¶ 69.

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 4

On August 15, 2023, following his review of voluminous discovery and the conclusion of swift negotiations with the government, Mr. McGonigal fully accepted responsibility for his actions and entered a plea to a superseding information charging him with one count of conspiracy, in violation of 18 U.S.C. § 371. The offense of conviction provides for a statutory sentencing range of zero to five years. Similarly, Mr. McGonigal quickly resolved the charges in the District of Columbia and is currently awaiting sentencing in 23 CR 21 (CKK), where he pleaded guilty to one count of violating 18 U.S.C. § 1001 for failing to disclose complete information on FBI travel and financial disclosure forms. Judge Kollar-Kotelly is scheduled to impose sentence in that case on February 16, 2024.[1]

## II.      SENTENCING GUIDELINES CALCULATION

The estimated Sentencing Guidelines calculation set forth in the plea agreement is consistent with the Presentence Investigation Report ("PSR"). *See* Plea Agreement, **Exhibit B**; PSR ¶ 92. The calculation of the Guidelines range is but a first step in the larger sentencing analysis. *See Gall v. United States*, 552 U.S. 38, 49 (2007) ("The Guidelines are the starting point and initial benchmark but are not the only consideration."). Section 2M5.1 applies to offenses

---

[1] Although Mr. McGonigal offered to resolve both cases simultaneously in the Southern District of New York, the United States insisted on keeping the cases in separate districts, on separate tracks.  Accordingly, we respectfully request that Your Honor defer to Judge Kollar-Kotelly as to the consideration of the separate case conduct in connection with the imposition of punishment.  While a sentencing court generally may consider any fact relevant to sentencing, *see* 18 U.S.C. § 3661, here, it is appropriate for the Court to set aside consideration of Mr. McGonigal's separate case conduct to avoid the risk of duplicative punishment.

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 5

involving violations of IEEPA, including, as here, an agreement to engage in conduct that violates IEEPA. Mr. McGonigal's base offense level thus is 26. After a two-level enhancement is applied for use of a "special skill" pursuant to § 3B1.3, and a three-level reduction for timely acceptance of responsibility pursuant to § 3E1.1, the total adjusted offense level is 25. Because Mr. McGonigal has a Criminal History Category I, the applicable advisory range is 57 to 71 months. Because the statutory maximum sentence is five years, however, his adjusted effective Guidelines range is 57 to 60 months. *See* PSR ¶ 94. As noted above, of course, the Guidelines range is merely a starting point and is in no way binding on the Court. *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc) ("A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime.").

## III.     STATUTORY SENTENCING FACTORS

After calculating the applicable advisory Guidelines range, courts next consider the statutory sentencing factors to "impose a sentence sufficient, but not greater than necessary" to meet the ends of justice. 18 U.S.C. § 3553(a). Notably, Section 371 imposes no mandatory minimum sentence. In determining the ultimate sentence to be imposed, within the statutory range of zero to five years, Section 3553(a) requires the Court to consider, in pertinent part:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed
>     (A) to reflect the seriousness of the offense, to promote respect for the law,

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 6

>           and to provide just punishment for the offense;
>           (B) to afford adequate deterrence to criminal conduct;
>           (C) to protect the public from further crimes of the defendant; and
>           (D) to provide the defendant with needed educational or vocational training,
>           medical care, or other correctional treatment in the most effective manner;
>     (3) the kinds of sentences available;
>     (4) the kinds of sentence and the sentencing range established for –
>           (A) the applicable category of offense committed by the applicable category of
>           defendant as set forth in the guidelines
>     (5) any pertinent [US Sentencing Commission] policy statement;
>     (6) the need to avoid unwarranted sentence disparities among defendants with similar
>     records who have been found guilty of similar conduct; and
>     (7) the need to provide restitution to any victims of the offense.

Here, an analysis of the 3553 factors strongly supports the imposition of a non-custodial sentence.

*See, e.g.*, *Gall*, 552 U.S. 38.

### A.   Facts Relevant to 3553(a) Analysis

#### i.   3553(a)(1): The nature and circumstances of the offense and the history and characteristics of the defendant;

In the world of IEEPA, this case is a unicorn. While it is without question impermissible to agree to willfully provide certain services to a Specially Designated National ("SDN") such as Oleg Deripaska without the permission of the United States government, here, Mr. McGonigal understood that any derogatory information he agreed to collect on Deripaska's behalf, which concerned another Russian oligarch and business competitor Vladimir Potanin, ultimately would be used by Deripaska to level the playing field for Deripaska's business activities by *giving the information to the United States government* in hopes that the United States would similarly designate Potanin as an SDN. Thus, while IEEPA is focused on actions that are in tension with

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 7

U.S. foreign policy and national security, in the matter at hand, the ultimate goal of designating another Russian oligarch was at least in part *aligned* with U.S. interests.[2]

Indeed, in the winter of 2022, about a month before Mr. McGonigal's arrest, the United States government chose to designate Potanin as an SDN.[3]  Ironically, the U.S. government's designation of Potanin may have provided some collateral benefit to Deripaska by sanctioning his business rival, but that clearly could not have been the government's intent.  Here, Mr. McGonigal did intend to provide a service to benefit Deripaska, even if indirectly, and he has accepted responsibility for that offense.  It was wrong, and he admits that.  But it is critically important that the Court appreciate, in imposing a just punishment, that Mr. McGonigal understood that the work he agreed to do was consistent with, not in tension with, U.S. foreign policy in the sense that it was in furtherance of potentially sanctioning another Russian oligarch.  *See* PSR ¶ 34–35. The Court may fairly wonder why Mr. McGonigal, a distinguished national security professional, crossed this line.  In short, he was financially motivated to find a way to earn a living given his extensive experience in international investigations, and he made the critical misstep of agreeing to offer his skills to someone he knew was on the U.S. government's "blacklist."

---

[2] *See* President Joseph R. Biden, State of the Union Address (Mar. 1, 2022), https://www.whitehouse.gov/state-of-the-union-2022/ ("Together, along with our Allies, we are right now enforcing powerful economic sanctions. . . . The United States Department of Justice is assembling a dedicated task force to go after the crimes of the Russian oligarchs. We're joining with European Allies to find and seize their yachts, their luxury apartments, their private jets. We're coming for your ill-begotten gains.").

[3] *See* Press Release, OFAC (Dec. 15, 2022), https://ofac.treasury.gov/recent-actions/20221215 (designating Vladimir Potanin pursuant to Executive Order 14024).

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 8

  To weigh the seriousness of this offense against Mr. McGonigal's personal background, including his extensive work as a national security professional, the Court must carefully consider the totality of his circumstances. As set forth below and in the classified addendum to this submission, Mr. McGonigal's service to the United States has been truly extraordinary, and often at grave personal risk. *See United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006) ("if ever a man is to receive credit for the good he has done . . . it should be at the moment of his sentencing). From humble beginnings, he went on to do truly remarkable things for the safety of our country. Mr. McGonigal was born and raised in Cleveland, Ohio, the eldest of four children. PSR ¶ 56. His father was a steel worker, and his mother a stay-at-home mom. PSR ¶¶ 56–57. He went to school, played baseball and football, vacationed with his family in Florida, and went to church on Sundays. PSR ¶ 59. After graduating from high school, Mr. McGonigal obtained a degree in finance from Kent State University and began work as an accountant for National Bank of Canada in New York City. PSR ¶ 76. Shortly thereafter, he met his future wife Pam at a party. PSR ¶ 62. The two married in 1994 and raised two wonderful, college-educated children, with whom Mr. McGonigal maintains a very close relationship. PSR ¶¶ 62–63.

  In 1996, Mr. McGonigal joined the FBI. PSR ¶ 82. After completing Special Agent training in Quantico, Virginia, he was assigned to the New York Field Office. *Id.* During his service, many

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 9

of his accomplishments were proudly trumpeted by the FBI, and rightly so.[4] For example, during his tenure in New York, he investigated a number of high-profile cases, including the TWA Flight 800 explosion, which tragically killed 230 people on a trip from JFK to Rome.[5] Mr. McGonigal was part of the eight-month investigation, which included 244 eyewitness interviews and over 2000 hours of work.[6] In addition, in 1997, Mr. McGonigal was one of two FBI agents who, alongside the NYPD, raided the Brooklyn apartment of Gazi Ibrahim Abu Mezer and Lafi Khalil, who were plotting to bomb the New York City subway. *Id.* Following a harrowing forced entry of the premises, both defendants were apprehended and charged with terrorism offenses in the Eastern District of New York.[7] *Id.* Further investigation revealed pipe bombs and detailed plans for the attack.[8] *Id.* The lead defendant Abu Mezer was ultimately convicted and sentenced to life in prison.[9] *Id.*

---

[4] Press Release, FBI (Oct. 4, 2016), https://www.fbi.gov/news/press-releases/charles-mcgonigal-named-special-agent-in-charge-of-the-counterintelligence-division-for-the-new-york-field-office.

[5] *A Look Back ... The Crash of TWA Flight 800*, CIA (Aug. 14, 2008), https://web.archive.org/web/20110805081815/https:/www.cia.gov/news-information/featured-story-archive/2008-featured-story-archive/crash-of-twa-flight-800 html.

[6] The U.S. government ultimately concluded that the explosion was not caused by a terrorist attack. According to the CIA, "[h]ad the crash been the result of state-sponsored terrorism, it would have been considered an act of war." *Id.*

[7] Joseph P. Fried, *Two Said to Plot Bombing In a Subway Are Indicted*, N.Y. TIMES (Aug, 30, 1997), https://www.nytimes.com/1997/08/30/nyregion/two-said-to-plot-bombing-in-a-subway-are-indicted.html.

[8] *Id.*

[9] Joseph P. Fried, *Palestinian Gets Life Sentence For Planning to Bomb Subway*, N.Y. TIMES (March 2, 1999), https://www.nytimes.com/1999/03/02/nyregion/palestinian-gets-life-sentence-for-planning-to-bomb-subway.html.

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 10

Mr. McGonigal also served as a member of the FBI's Rapid Deployment Team to Dar Es Salam to investigate the 1998 terrorist bombings of the U.S. Embassies in Tanzania and Kenya, which killed more than 220 people and wounded more than 4,500.[10] The investigation— at the time, the largest deployment in FBI history—resulted in the indictment of more than 20 individuals involved in the attack, including Osama Bin Laden, seven of whom are now serving life sentences.[11] In addition, Mr. McGonigal was assigned to the New York Field Office during the infamous terrorist attacks on September 11, 2001. After participating in the investigation of the September 11 attacks, Mr. McGonigal joined an investigative response squad that focused on international terrorist threats in the New York City area, at a time when the Bureau was engaged in a post-9/11 transformation from a "reactive, investigative-led model to a proactive, intelligence-driven one."[12]

In 2002, Mr. McGonigal was assigned to the FBI's Cleveland office. *Id.* There, he investigated the disappearance of 14-year-old Kristen Jackson in Wooster County, Ohio, which led to a five-day manhunt culminating in the arrest of Joel Yockey and his confession to a gruesome rape and murder. *Id.* Yockey was sentenced to life imprisonment.[13] Afterwards, between

---

[10] FBI, *supra* note 5; *East African Embassy Bombings*, FBI, https://www.fbi.gov/history/famous-cases/east-african-embassy-bombings.

[11] *East African Embassy Bombings*, FBI, https://www.fbi.gov/history/famous-cases/east-african-embassy-bombings.

[12] *Remembering 9/11*, FBI (Sept. 9, 2016), https://www.fbi.gov/news/stories/remembering-911.

[13] David Tell, *The Once and Future Offender*, WASH. EXAMINER (Dec. 9, 2002), https://www.washingtonexaminer.com/weekly-standard/the-once-and-future-offender.

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 11

2002 and 2006, Mr. McGonigal served as a Supervisory Special Agent in the Counter-Espionage Section at FBI-Headquarters, as Chief of the Asia-Near East Counterintelligence Unit, and later as a field supervisor of a counter-espionage squad at the Washington Field Office.[14] In these roles, he supervised a number of high-profile espionage and media leak investigations, including the investigation of former National Security Adviser Samuel "Sandy" Berger for the mishandling of highly classified material.[15] *Id.* The Berger investigation consisted of over 50 interviews, inspections of the breached facilities, review of thousands of pages of documents, and concluded with Berger's conviction.[16]

Mr. McGonigal later led the FBI's WikiLeaks Task Force investigating the release of over 200,000 classified documents to the WikiLeaks website—the largest in U.S. history—ultimately resulting in the 20-count conviction of Chelsea Manning for espionage and related charges.[17] In 2014, he was promoted to Assistant Special Agent in Charge over the FBI Baltimore Field Office's cyber, counterintelligence, counterespionage, and counterproliferation programs.[18] In 2016, Mr. McGonigal was promoted to Special Agent in Charge of Counterintelligence for the New York

---

[14] FBI, *supra* note 5.

[15] *Id.*

[16] Letter from Acting Assistant Attorney General to Chairman Henry A. Waxman of the Committee on Oversight and Government Reform (Feb. 16, 2007), https://www.justsecurity.org/wp-content/uploads/2022/10/Deputy-AG-letter-in-response-to-Committee-report-February-16-2007.pdf.

[17] FBI, *supra* note 3; Julie Tate & Ernesto Londoño, *Judge finds Manning not guilty of aiding the enemy, guilty of espionage*, WASH. POST (July 30, 2013), https://www.washingtonpost.com/world/national-security/2013/07/29/e894a75c-f897-11e2-afc1-c850c6ee5af8_story html.

[18] FBI, *supra* note 5.

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 12

Field Office, one of the most important, preeminent counterintelligence positions in the world.[19]

In that role, where he served until his retirement in 2018, he supervised, among other cases, the multi-year investigation of Huawei Technologies Co., Ltd. and its CFO Wanzhou Meng in connection with a scheme to defraud numerous global financial institutions concerning the company's business activities in Iran. *Id.* The investigation led to a multi-count indictment against the company and executives, for violations including the Racketeering Influenced and Corrupt Organization ("RICO") Act, which remains pending in the Eastern District of New York.[20]

When Mr. McGonigal retired in September 2018, the FBI held a celebration at 290 Broadway, just a few blocks from this courthouse, to honor his more than 22 years of service to the United States of America. After leaving government service, Mr. McGonigal entered the private sector as the head of global security for a prominent international corporation in Manhattan. PSR ¶ 81. Even after retirement, he made a lasting positive impression on many with whom he worked. A former agent describes Mr. McGonigal as "the best supervisor" he had in the FBI. Letter of Tom Shaughnessy, **Exhibit C**. He describes what it was like working under Mr. McGonigal's leadership as follows:

> He was far and away the best supervisor I had in the FBI, maybe a factor of ten.
> Remarkable and extraordinary are the correct adjectives. . . . His squad was a safe

---

[19] *Id.*

[20] Press Release, *Chinese Telecommunications Conglomerate Huawei and Subsidiaries Charged in Racketeering Conspiracy and Conspiracy to Steal Trade Secrets*, Office of Public Affairs (Feb. 13, 2020), https://www.justice.gov/opa/pr/chinese-telecommunications-conglomerate-huawei-and-subsidiaries-charged-racketeering.

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 13

> and secure place to work sometimes impossible national security cases. . . . [he was] like an experienced older brother who knew his way around and took complete ownership of your professional success. Charlie was ambitious but believed that his success depended on your success.

*Id.* Moreover, another former Special Agent recalls that Mr. McGonigal "always conducted himself with honesty, integrity, and professionalism," noting that, despite present circumstances, many of his mentees "still steadfastly support him citing the positive impact he had in their lives and careers." Letter of Thomas Donlon, **Exhibit D**; *see also* Letter of Thomas Fitzgerald, **Exhibit E** (describing Mr. McGonigal as a "hardworking, mission oriented, patriot").

Similarly, Mr. McGonigal finds support and appreciation in his personal community. His neighbors and friends describe in great detail the selflessness, compassion, and generosity he often displays to those around him, particularly in times of need:

> Charlie has been a compassionate, caring, and steady friend and has always been willing to help when needed without hesitation. . . . [o]n countless occasions he has driven through several states to be present for family members in their time of need or to celebrate an achievement, he opened his home to family members when they needed a place to stay for extended periods of time, and was there to provide support when my husband and I suffered the loss of our baby.

Letter of Dana Debski, **Exhibit F**. In addition, Mr. McGonigal's cousin-in-law details how Mr. McGonigal's "generosity and kindness was absolutely critical" to her and her sons on the "darkest day" of her life, when her husband was missing and the family feared the worst:

> My kids were home and I didn't know what to do, so I called Charlie. Charlie was at my house in less than an hour. He stayed with me, took the boys to get lunch, and had the Washington and Baltimore FBI offices put out a search. . . . What Charlie did that day for me and my boys is impossible to understate how important it was to us. Please know I absolutely hate revisiting this memory, but I am doing

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 14

it for Charlie. I write this through tears, but it is worth it to help give you a sense of the man he is.

Letter of Susan Shuback, **Exhibit G**.

Although his many responsibilities kept Mr. McGonigal traveling for much of his career, his neighbors consistently describe him as an "important fixture" of the community. Letter of John Spain, **Exhibit H**. Maryland neighbor and friend John Spain describes a time when Mr. McGonigal organized an annual neighborhood softball tournament to raise money in honor of a friend who died of cancer, and another time when he stepped up to coach Wednesday night swim team when no one else would. *See id.* Christopher Debski, a neighbor and friend of Mr. McGonigal in Ohio, notes his knack for encouraging others to give back to the community in the same way he does:

> Canton Montessori [School] always needed volunteers for one thing or another, and Charlie made sure to help whenever he could. One time he enlisted me in a project to help paint all the classrooms. We showed up and worked hard, and the whole time Charlie genuinely enjoyed the work, engaged with school staff and other volunteers, and made us all feel good about the work that we did.

*See* Letter of Christopher Debski, **Exhibit I**; *see also* Letter of Lawrence Hirsh & Joan Melner, **Exhibit J** (describing how Mr. McGonigal would "regularly help shovel snow from the street when the snow plows were not there, and he would cut the grass of an elderly neighbor without being prompted"); Letter of Viktorya Evelkin, **Exhibit K** (describing Mr. McGonigal's "constant willingness to help others, going out of his way to provide emotional comfort or valuable advice when needed"); Letter of Anat Goldstein, **Exhibit L** ("His actions have always been selfless, always thinking of others before himself.").

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 15

At home, Mr. McGonigal "is and has always been a tremendous father," a sentiment echoed in numerous letters from friends and family. Letter of Pamela McGonigal, **Exhibit M**; *see also* PSR ¶ 64, 61; Letter of Lawrence Hirsh & Joan Melner, **Exhibit J** ("As a dedicated and committed father Charlie made concerted efforts to be present in his kid[']s lives."); *See* Letter of Christopher Debski, **Exhibit I** (describing Mr. McGonigal as "family-oriented," and noting that the McGonigal family "genuinely loved the time they spent together"); Letter of Roberto Morgado Jr., **Exhibit N** ("His integrity and commitment to his family and his country are qualities that I hold in the highest regard."). In addition to being a caring father to his own two children, he is also godfather to two boys, and a "role-model" to many others. Letter of Dana Debski, **Exhibit F**; *see also* Letter of Susan Shuback, **Exhibit G**.

Moreover, after Mr. McGonigal entered his plea, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 16

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

The facts set forth above, alongside the truly extraordinary public service detailed in the classified sentencing addendum, must be considered holistically with respect to the nature of his offense of conviction as part of determining a fair punishment in this case.

**ii.     3553(a)(2): The need to avoid unwarranted sentence disparities;**

3553(a)(2) requires the Court to consider "the need for similar sentences among similarly-situated defendants." *United States v. Goffer*, 721 F.3d 113, 130 (2d Cir. 2013). According to the United States Sentencing Commission's Judiciary Sentencing Information resource, in the last five years, the average sentence for defendants who, as here, were subject to Guidelines Section 2M5.1, with a final offense Level of 25 and a Criminal History Category of I, was 18 months' imprisonment. PSR App. A. While there of course have been IEEPA cases in which much higher sentences were imposed, those cases are inapposite and readily distinguishable. *See* PSR Add.

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 17

(incorporating the government's citation to IEEPA cases that resulted in sentences well above 18 months).

For example, in *United States v. Bahadorifar*, 1:21-cr-00430-RA (S.D.N.Y. 2021), the defendant pleaded guilty to one count each of conspiracy to violate IEEPA, in violation of 50 U.S.C. § 1705(c), and structuring financial transactions, in violation of 31 U.S.C § 5324(21)(3). The charges were based on a payment the defendant made on behalf of an Iranian intelligence service, which, alarmingly, was part of a plot to kidnap a prominent Iranian dissident living in Brooklyn, New York. *See* Government's Sentencing Submission, Dkt. No. 55. The defendant was sentenced to 48 months' imprisonment on both counts, running concurrently, and criminal forfeiture of $476,000.

In *United States v. Gavidel, et al*, 1:01-cr-00417-TPG-1 (S.D.N.Y. 2001), the defendant was convicted of conspiring to commit money laundering, laundering purported narcotics proceeds, violating IEEPA, and structuring cash transactions. Evidence adduced at trial established that the defendant had funneled $277,045 from the sale of illegal narcotics to Iran. On those facts, proven at trial, the defendant was sentenced to 70 months' imprisonment and a $614,000 criminal forfeiture.

The vast majority of IEEPA cases in which substantial custodial sentences are imposed involve the overseas export—to potentially hostile foreign nations— of controlled materials that have applications in the development of nuclear or military technology. In *United States v. Zhang*,

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 18

1:12-cr-00666-NGG (E.D.N.Y. 2012),[21] the defendant pleaded guilty to one count of IEEPA for attempting to export multiple tons of high-grade carbon fiber to China, in violation of 50 U.S.C. § 1705. The carbon fiber was destined for use in the construction of Chinese military stealth aircraft. On those facts, Judge Garaufis imposed a sentence of 57 months' imprisonment, noting the significant threat the defendant's conduct posed to national security. Similarly, in *United States v. McKeeve*, 131 F.3d 1 (1st Cir. 1997), the defendant was convicted of violating IEEPA and making false statements to a government official arising out of a scheme to acquire large amounts of computer equipment for the Libyan government, where it likely was destined for use in munitions factories. There, the defendant was sentenced to 51 months' imprisonment.

Another IEEPA case that stands at the very high end of sentences imposed, *United States v. Phillips*, 1:11-cr-00757-SJ (E.D.N.Y. 2011)[22], involved a defendant who pleaded guilty to attempting to violate IEEPA based on his efforts to ship nuclear centrifuge-grade carbon fiber to Iran, via the Philippines. The defendant, who had a Criminal History Category of VI and who was on supervised release at the time of the offense, was sentenced to 92 months' imprisonment. In imposing sentence, Judge Townes expressly considered the defendant's extensive criminal history in fashioning a sentence she believed was necessary to deter him from future criminal acts. *See also United States v. Kuyumcu*, 1:16-cr-00308-DLI (E.D.N.Y. 2016) (defendant sentenced to 57

---

[21] Undersigned counsel prosecuted the *Zhang* case.

[22] Undersigned counsel prosecuted the *Phillips* case.

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 19

months, a fine of $7,000, and $5,000 in forfeiture for a scheme to ship hundreds of pounds of Cobalt Power, which is used in the development of nuclear weapons, to Iran); *United States v. Tamimi*, 1:12-cr-00615-JPO (S.D.N.Y. 2012) (defendant sentenced to 46 months for scheme to ship military helicopter parts to Iran); *United States v. Hashemi et al*, 7:12-cr-00804-VB (S.D.N.Y. 2012) (defendant sentenced to 46 months for scheme to export U.S.-origin carbon fiber to Iran); *United States v. Woodford et al*, 1:03-cr-00070-SJ (E.D.N.Y. 2003) (defendant sentenced to 46 months, a fine of $12,500, and $500,000 forfeiture in connection with a scheme to export aircraft parts to Iran); *United States v. Taherkhani et al*, 3:13-cr-04228-DMS (S.D.C.A. 2013) (defendant sentenced to 78 months for scheme to ship U.S.-origin marine navigation equipment and military electronic equipment to Iran through a front company in Dubai); *United States v. Liang*, 8:10-cr-00116-DOC (C.D.C.A. 2010) (defendant sentenced to 46 months for exporting thermal imaging cameras to Iran).

In each of the IEEPA cases case cited above, which applied the same Guidelines provision at issue here, the sanctioned activities were part of a larger scheme to either export materials that could be used for the proliferation of military-grade weapons to a sanctioned country, or worse— including plans to kidnap a U.S. resident for repatriation to Iran. While still an IEEPA-related offense, Mr. McGonigal's case is clearly distinguishable on its facts, and thus the Court should not consider those sentences as reasonable here, notwithstanding the fact that they were imposed under the same Guidelines provision that applies to his plea to conspiracy under Section 371. The conduct at issue is materially different and, frankly, the Guidelines provision is blunt.

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 20

IEEPA cases that do not involve the export of military-grade technology are far more appropriate for comparison. For example, in *United States v. Groos*, No. 06 CR 420, 2008 WL 5387852 (N.D. Ill. Dec. 16, 2008), the court imposed a **60-day sentence** for the defendant's export of $25,000 worth of fire sprinkler equipment to Iran, noting that the "harshest punishment should be reserved for cases where weapons or military technologies are at issue and where the threat to national security is apparent." *Id.* at *5. The court further observed that "courts generally do not impose harsh punishment for sanction crimes that involve nonmilitary goods," and that "a long period of incarceration is not necessary to serve the goals of sentencing." *Id.* at *8, *10.

In *United States v. Sheikhzadeh*, 1:15-cr-00182-PKC (E.D.N.Y. 2015)[23], the defendant pleaded guilty to one count of conspiracy to violate IEEPA under 50 U.S.C. § 1705, and one count of filing false income tax information, pursuant to 26 U.S.C. § 7206(2). The charges arose from the defendant's agreement to work for Iran's Permanent Mission to the United Nations (IMUN) in exchange for cash, which he failed to accurately report on his tax returns for six years. The services the defendant provided to the Iranian government included gathering information about U.S. politicians and scholars and preparing reports designed to further the development of Iran's nuclear enrichment capabilities. The defendant also provided money remitting services to co-conspirators in the United States, whereby he facilitated investments in Iran and direct disbursements from Iranian bank accounts, in violation of U.S. sanctions. *See* Government's Letter re Sentencing, Dkt.

---

[23] Undersigned counsel supervised the prosecution of Sheikhzadeh and was present for his sentencing.

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 21

No. 34. After a lengthy hearing at which Judge Chen carefully considered all relevant facts, she imposed **a sentence of three months,** and restitution of $63,844.92.

In *United States v. Anvari-Hamedani*, 3:04-cr-00786-JGC (N.D.O.H. 2004), the defendant pleaded guilty to 36 counts of IEEPA violations, money laundering, and filing false tax returns, among other crimes, for the transfer of more than $1 million to Iran through a series of intermediary banks, which the defendant contended were donations to a medical university in Tehran. The court imposed a 3-year term of **probation** and a fine of $500,000.

In *United States v. Cabelly*, 1:09-cr-00278-JDB (D.D.C. 2009), the managing director of a D.C.-based consulting firm and former State Department employee pleaded guilty to, as here, conspiring to violate IEEPA under 18 U.S.C. § 371, for brokering business contracts and transactions with the Government of Sudan, a sanctioned entity. He further misrepresented to U.S. officials the nature of his relationship with the foreign entities doing business in Sudan and provided the Government of Sudan with sensitive and controlled U.S. Department of Defense information. There, the District Court imposed a term of **8 months'** imprisonment.

In sum, to avoid an unwarranted sentencing disparity, the Court should carefully consider the sentences imposed in other cases that implicate violations of IEEPA to arrive at a just result. *See United States v. Singh*, 877 F.3d 107, 116 (2d Cir. 2017) (vacating a 60-month sentence as substantively unreasonable when it "drastically exceeded nationwide norms" compiled by the Sentencing Commission). In the body of IEEPA cases, typically only the most serious national security threats justified the imposition of a Guidelines-range sentence. Where, as here, the

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 22

conduct was more akin to a regulatory violation, the sentences imposed were far below the Guidelines, and in many cases less than a year, which further explains how the Sentencing Commission has promulgated data to support the proposition that the typical sentence under Section 2M5.1 is 18 months. The work Mr. McGonigal agreed to provide is not on par with the export of military technology to a hostile foreign power.

### iii.    3553(a)(3): the need for just punishment, deterrence, and public safety;

The Court also must consider the need for the sentence imposed to: (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; and (B) afford adequate deterrence to criminal conduct. As applied to Mr. McGonigal, these factors strongly favor a sentence far below the advisory Guidelines range. First, any agreement to violate IEEPA or conceal the source of funds is serious, but when compared to other conduct for which the government has brought criminal charges, it bears repeating that here the crime was clearly *malum prohibitum* rather than *malum in se*—in other words, the defendant's intent in agreeing to provide an SDN with information to be used for business competition purposes is far less serious than the criminal conduct in other IEEPA-related cases. As the government itself asserted, this is "generally speaking, on the scale of . . . white collar case[s] . . . a simple case." Dkt. 38, p. 4. This prosecution is also a notable move by the Department to establish nearer boundaries for providing indirect services to an SDN. Given how closely the case has been watched in the media, it unquestionably promotes respect for the IEEPA statute and serves as a stark deterrent to anyone tempted to follow Mr. McGonigal's path towards professional and

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 23

personal ruin. Mr. McGonigal has been disrupted and deterred by the government's bringing of this case, and the treatment he immediately received upon his arrest.

To the heart of the matter, Your Honor, just punishment may be imposed upon Mr. McGonigal without the need for a lengthy term of incarceration. His fall from grace has been precipitous, having lost his job, his reputation and the peace of his family life. *See* Letter of Pamela McGonigal, **Exhibit K** ("I never knew or believed this level of hate, evil and outright lack of compassion for humanity existed until experiencing it first-hand. . . . This combined with Charlie's legal situation has only compounded the pain and emotional trauma we continue to endure as his situation unfolds").

This Court has broad discretion to tailor an appropriate, non-custodial sentence for Mr. McGonigal. *See United States v. Ingram*, 721 F.3d 35, 37 (2d Cir. 2013); *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) ("A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime"). The advisory Guidelines range is of course not binding on the Court and is but one of the many factors the Court must consider in determining a just and reasonable sentence. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curium). Indeed, district courts "may not presume that the Guidelines range is reasonable." *Id.* The Court "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and the defense." *Cavera*, 550 F.3d at 189. Moreover, a sentence well below the Guidelines range does not require the Court to find "extraordinary" circumstances, because such requirement would "come too close to creating an

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 24

impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Gall*

*v. United States*, 552 U.S. 38, 47 (2007). As such, a district court need only find a "sufficiently

compelling" reason to issue a sentence below the Guidelines range, in light of the individualized

assessment under § 3553(a). *Id.* at 50. "District judges are, as a result, generally free to impose

sentences outside the recommended range." *Cavera*, 550 F.3d at 189.

Here, especially when considered against the truly extraordinary service Mr. McGonigal

provided to the United States throughout his distinguished 22-year career as a law enforcement

and counterintelligence professional, a very low sentence is fair. Only through a personalized

inquiry of all the sentencing factors can a district judge reach "an informed and individualized

judgment in each case." *Id*. Also, it is worth noting that, in fashioning its recommendation for a

below-Guidelines sentence, the Probation Department did not have the benefit of the material set

forth in the classified sentencing submission, which the United States determined was only

disclosable to Your Honor for the limited purpose of sentencing, and even then only in summary

fashion to protect the extremely sensitive facts underlying Mr. McGonigal's service.

Moreover, Guideline Section 2M5.1 expressly recognizes that not all violations of IEEPA

are equal. Application to Note 2 provides:

> In determining the sentence within the applicable guideline range, the court may
> consider *the degree to which the violation threatened a security interest of the
> United States*, the volume of commerce involved, the extent of planning or
> sophistication, and whether there were multiple occurrences. Where such factors
> are present in an extreme form, a departure from the guidelines may be warranted.

# BRACEWELL

Hon. Jennifer H. Rearden
November 30, 2023
Page 25

U.S.S.G. § 2M5.1, app. note 2 (emphasis added). Here, where the offense conduct is weighed along with the 3553(a) factors, a non-custodial sentence of probation would be within the range of reasonable sentences. Even the three-month sentence imposed on the witting asset of the Iranian government, who provided sensitive information to his handlers, would be excessive here. *See Sheikhzadeh*, Judgment and Commitment, 1:15-cr-00182-PKC, Dkt. No. 41 (imposing sentence of 3 months' custody in IEEPA and tax fraud case). In consideration of all the relevant facts, a non-custodial sentence would be "sufficient, but not greater than necessary" to serve the ends of justice. As the United States Supreme Court has observed, "We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Gall,* 552 U.S. at 48. Here, the Court has the discretion to impose a non-custodial sentence that will satisfy all of the factors enumerated in Section 3553(a).

## IV.     CONCLUSION

For the reasons set forth above, we respectfully request that the Court impose a noncustodial sentence.

Respectfully submitted,


  /s/  Seth D. DuCharme

Seth D. DuCharme
Meagan Maloney