UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA                            :

   - v. -                                                        :           23 Cr. 16 (JHR)

CHARLES McGONIGAL,                                   :

                    Defendant.                :

---------------------------------------------------------------x

## THE GOVERNMENT'S  SENTENCING SUBMISSION

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Hagan Scotten
Rebecca T. Dell
Derek Wikstrom
Assistant United States Attorneys
Of Counsel

## **Table of Contents**

I.     The Offense Conduct ................................................................................................. 1

II.    The United States Sentencing Guidelines .......................................................... 5

III.   The 18 U.S.C. § 3553(a) Factors ....................................................................... 6

   A.   The Nature, Circumstances, and Seriousness of the Offense .............................. 6

   B.   The Need to Promote Respect for the Law and to Provide Just Punishment ................... 10

   C.   The Need to Afford Adequate Deterrence to Criminal Conduct ....................................... 12

   D.   The Guidelines Recommendation ............................................................................. 12

   E.   The History and Characteristics of the Defendant ............................................... 13

   F.   The Need to Avoid Unwarranted Sentencing Disparities .................................... 19

IV.    The 18 U.S.C. § 3572(a) Factors ....................................................................... 23

V.     Conclusion ........................................................................................................ 25

The Government respectfully submits this memorandum in advance of the sentencing of defendant Charles McGonigal.  As set forth below, because McGonigal abused the skills and influence his country entrusted him with by secretly working for the very threats he had previously protected it against, this Court should impose a sentence of 60 months' imprisonment and a fine of $200,000—the top of the range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines").

## I.      The Offense Conduct

From 2016 until his retirement, McGonigal served as the Special Agent in Charge ("SAC") of the Counterintelligence Division of the FBI's New York Field Office.  (PSR ¶ 15).  That job is, as McGonigal acknowledges, "one of the most important, preeminent counterintelligence positions in the world."  (Br. 11-12).

Beginning at least in 2017, McGonigal abused his "important, preeminent" position to develop relationships that could enrich him after he left the FBI.  For example, on April 12, 2017, McGonigal bragged to his co-defendant in this case that he had "just secured a very good contact in the Albanian Gov[ernment] for future business development. Always working toward the future."  (PSR ¶ 20).  By 2018, McGonigal had agreed with a friend to participate in a consulting business called Spectrum Risk Solutions while McGonigal was still serving as SAC.  (PSR ¶¶ 20, 48).[1]  McGonigal used a corporate email account and cellphone under a false name in order to conceal the fact that he was working at Spectrum while still employed as the FBI's New York counterintelligence chief.  (PSR ¶¶ 20, 48).

---

[1]      Although these entities were anonymized in the Indictment, their names have since been used in public filings.  (*See, e.g.*, Dkt. 85).

As part of abusing his official position to make business contacts, McGonigal developed a relationship with Yevgeniy Fokin, an agent of Oleg Deripaska. (PSR ¶ 21). Deripaska is a Russian national often referred to as an oligarch, meaning that he has vast wealth and close connections to the Russian state. (PSR ¶ 17). On April 6, 2018, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") imposed sanctions on Deripaska in connection with its finding that Russia's actions toward Ukraine constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. (PSR ¶ 17). OFAC designated Deripaska under Executive Order 13661 for having acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation, among other grounds. (PSR ¶ 17). The District Court for the District of Columbia later affirmed the sanctions finding, among other things, that OFAC's determination that Deripaska acted as an agent of Russian President Vladimir Putin was supported by the evidence. (PSR ¶ 17).

McGonigal knew full well that Deripaska was sanctioned. As SAC, McGonigal supervised and participated in investigations of Russian oligarchs, including Deripaska. (PSR ¶ 19). Among other things, in May 2017, McGonigal received a then-classified email stating that Deripaska was associated with a Russian intelligence agency, and possibly involved in that agency's coup attempt in another country. (PSR ¶ 19). And in January 2018, McGonigal received and reviewed a then-classified list of Russian oligarchs with close ties to the Kremlin who would be considered for sanctions to be imposed as a result of Russia's 2014 attack on Ukraine. (PSR ¶ 19).

In March 2018, McGonigal met Fokin through Sergey Shestakov. (PSR ¶ 21). Fokin had previously served as a diplomat for the Soviet Union and the Russian Federation, and was rumored in public media reports to be a Russian intelligence officer. (PSR ¶ 21). Fokin worked for and

reported to Deripaska, and served as an officer of a corporation that, in 2018, was primarily owned by Deripaska and itself subject to sanctions.  (PSR ¶ 21).

Shestakov asked McGonigal to help Fokin obtain an internship with the New York City Police Department for Fokin's daughter.  (PSR ¶ 22).  McGonigal in turn requested assistance from a contact in the NYPD, telling him "I have an interest in her father for a number of reasons."  (PSR ¶ 22).  McGonigal also told a subordinate that he wanted to recruit Fokin, who was, according to McGonigal, a Russian intelligence officer.  (PSR ¶ 22).  Through McGonigal's efforts, Fokin's daughter received VIP treatment from the NYPD.  (PSR ¶ 22).  An NYPD sergeant assigned to brief Fokin's daughter subsequently reported the event to the NYPD and FBI, in part because Fokin's daughter claimed to have an unusually close relationship to "an FBI agent" who had given her access to confidential FBI files, and it was unusual for a college student to receive such special treatment from the NYPD and FBI.  (PSR ¶ 22).

After McGonigal retired from the FBI, Shestakov and McGonigal introduced Fokin to a law firm.  (PSR ¶ 23).  Fokin sought to retain the law firm to work in having the sanctions against Deripaska lifted, work that is not itself illegal under the sanctions.  (PSR ¶ 23).  During negotiations to retain the firm, McGonigal met Deripaska and others at Deripaska's residence in London, and in Vienna.  (PSR ¶ 23).  After Deripaska hired the firm, it paid McGonigal $25,000. (PSR ¶ 23).

In the spring of 2021, Fokin began negotiating with McGonigal and Shestakov to work for Deripaska, without the involvement of the law firm.  (PSR ¶ 24).  Through Fokin, Deripaska hired McGonigal to investigate Vladimir Potanin, a rival Russian oligarch.  (PSR ¶ 24).  McGonigal later said that a goal of the project was to convince OFAC to add Deripaska's competitor to the OFAC sanctions.  (PSR ¶ 24).

In August 2021, McGonigal, Shestakov, and Fokin executed a contract stating that a Cyprus corporation called Pandean would pay Spectrum $51,280 upon execution of the contract and $41,790 per month.  (PSR ¶ 25).  Although the payments in fact would be made to McGonigal and Shestakov at the behest of Deripaska, as negotiated by Fokin, none of those people was named in or signed the contract.  (PSR ¶ 25).  McGonigal and his co-conspirators also took other measures to conceal their crimes, including using encrypted communications and not referring to Deripaska by name.  (PSR ¶ 25).

On August 13, 2021, a Russian bank wired $51,280 to Spectrum, followed by monthly payments of $41,790 between August 18 and November 18, 2021.  (PSR ¶ 25).  McGonigal told Shestakov that he had not informed Spectrum's owner—McGonigal's friend—that he was using Spectrum to receive Deripaska's money.  (*See* PSR ¶ 26).  When the owner later questioned why a Russian bank was wiring thousands of dollars to his company, McGonigal told his friend that it was payment for "legitimate" work McGonigal was performing for "a rich Russian guy."  (PSR ¶ 26).  McGonigal's friend acquiesced, and later transferred funds at McGonigal's direction, including to McGonigal and Shestakov.  (PSR ¶ 26).

In return for Deripaska's money, McGonigal sought to gather derogatory information about Potanin, and his interest in a corporation that he and Deripaska were vying to control.  (*See* PSR ¶ 27).  McGonigal retained subcontractors to assist in this endeavor, without informing them that they were in fact working for a sanctioned Russian oligarch.  (PSR ¶ 27).  On October 28, 2021, one of those subcontractors informed McGonigal that a third-party had located "dark web" files that could reveal "hidden assets valued at more than 500 million us $" and other information that McGonigal believed would be valuable to Deripaska.  (PSR ¶ 27).  The subcontractor told McGonigal that the files could be purchased for $650,000, but McGonigal told Shestakov that the

price would be $3,000,000.  (PSR ¶ 27).  For several weeks, McGonigal and Shestakov negotiated with Fokin to obtain funds from Deripaska to purchase these "dark web" files.  (PSR ¶ 27).  Before McGonigal could complete the transaction—or secure the huge profits it would entail—the FBI seized McGonigal's and Shestakov's cellphones, effectively ending the scheme in late November 2021.  (*See* PSR ¶ 27).

## II.  The United States Sentencing Guidelines

The recommended sentencing range under the Guidelines is described in detail in the Presentence Report.  (*See* PSR ¶¶ 36-51, 92).  The calculations in the Presentence Report are materially the same as those in the plea agreement, and are not disputed by either party.  (*See* PSR ¶ 93; Br. 4-5).[2]  In short, absent the statutory maximum, the Guidelines recommend a sentence of 57 to 71 months' imprisonment for McGonigal's crimes.  (PSR ¶ 93).  But because McGonigal was allowed to plead guilty to a statute carrying a maximum sentence of 60 months as consideration for his timely guilty plea, his recommended sentence is 57 to 60 months' imprisonment.  (PSR ¶ 93).  The Guidelines also recommend a fine of between $20,000 and $200,000.  (PSR ¶ 100).

---

[2]     The Presentence Report assigns one criminal history point to McGonigal, because he has also pled guilty to committing a felony in the District of Columbia, but not yet been sentenced for that crime.  (*See* PSR ¶ 48).  That point is not reflected in the plea agreement because McGonigal had not yet pled guilty in his other case at the time of his plea here.  (*See* PSR ¶¶ 3, 48, 93).  The Presentence Report correctly states that this criminal history point does not affect McGonigal's Criminal History Category under the Guidelines, and thus does not cause any variance between the Guidelines calculations in the plea agreement and those in the Presentence Report.  (PSR ¶ 93).  McGonigal's other conviction is not, however, entirely without consequence under the Guidelines.  Because McGonigal has a criminal history point, he is not eligible for the offense level reduction that the November 1, 2023 amendments to the Guidelines made available to first-time offenders with no criminal history points.  *See* U.S.S.G. § 4C1.1.  Appropriately so:  McGonigal is not a first-time offender; he committed different felonies over multiple years, and merely evaded detection of his earliest crimes until his more recent ones also caught up with him.  (*See* PSR ¶¶ 15-30, 48).

III.    **The 18 U.S.C. § 3553(a) Factors**

Charles McGonigal rose through the ranks of the FBI to gain one its most prestigious titles, and to hold one of its most important national security positions.  He supervised countless investigations and arrests for national security crimes—including for sanctions evasion and money laundering.  At exactly the same time, McGonigal was taking advantage of his position to build a rolodex of rogues to whom he could offer his services after retiring.  Those duplicitous efforts began to bear fruit when he entered a contract with Oleg Deripaska, a notorious henchman of Vladimir Putin, sanctioned by multiple administrations for posing a threat to America's national security.  Although the FBI unraveled McGonigal's scheme before he could reap significant profit, the real damage was already done:  One of America's most "prestigious, important" counterintelligence officials had betrayed his country and manipulated a sanctions regime vital to its national security.  The sentencing factors in 18 U.S.C. § 3553(a) support the highest sentence recommended by the Guidelines.

A.      **The Nature, Circumstances, and Seriousness of the Offense**

A 60-month sentence and a $200,000 fine are necessary to reflect "the nature and circumstances of the offense," § 3553(a)(1), and "the seriousness of the offense," § 3553(a)(2)(A).  The sanctions McGonigal violated were imposed in response to crises that three different Presidents found to constitute a national emergency.  *See* Executive Order 13360 (March 6, 2014); (PSR ¶¶ 12-15).  Such sanctions are vital to our national security not only because they can form an effective response to threats, but because they allow America to respond without more drastic steps, such as military force.  (*See* Ex. A (Sentencing Transcript in *United States v. Bahadorifar*, 21 Cr. 430 (RA) (S.D.N.Y. 2021)) at 35 (explaining that if sanctions are ineffective, then "the risk of war increases")).  The specific target of the sanctions here illustrates their importance:

Deripaska is one of Russia's wealthiest oligarchs—tycoons who serve as arms of Vladimir Putin, using their wealth and influence to carry out Putin's will in Russia and abroad. (*See* PSR ¶¶ 17-19). Among other things:

> Deripaska has said that he does not separate himself from the Russian state. He has also acknowledged possessing a Russian diplomatic passport, and claims to have represented the Russian government in other countries. Deripaska has been investigated for money laundering, and has been accused of threatening the lives of business rivals, illegally wiretapping a government official, and taking part in extortion and racketeering. There are also allegations that Deripaska bribed a government official, ordered the murder of a businessman, and had links to a Russian organized crime group.

*Deripaska v. Yellen*, No. 21-5157, 2022 WL 986220, at *2 (D.C. Cir. Mar. 29, 2022) (quoting OFAC announcement of sanctions against Deripaska), *cert. denied*, 143 S. Ct. 117 (2022); *see also Deripaska v. Yellen*, 19 Civ. 00727 (APM), 2021 WL 2417425, at *7 (D.D.C. June 13, 2021) (evidence showed that Deripaska "unquestionably" acted as an agent of Putin). There should be no dispute that violating the sanctions against such a man is a serious crime.

McGonigal also cannot claim that he was unaware that he was selling his services to a scoundrel working against America's interests. As a senior counterintelligence official, McGonigal was responsible for *enforcing* those sanctions at the very same time he began providing special treatment to Deripaska's agent, Yevgeniy Fokin. (*See* PSR ¶¶ 19-22). Indeed, while McGonigal was secretly cozying up to Fokin, his counterintelligence division was being publicly touted for its successes in other sanctions cases. *See, e.g.*, https://www.justice.gov/opa/pr/turkish-banker-covicted-conspiring-evade-us-sanctions-against-iran-and-other-offenses. It is not an overstatement to say that no one knew better the gravity of McGonigal's crimes than McGonigal himself.

McGonigal nonetheless claims his crime was "*malum prohibitum* rather than *malum in se*." (Br. 23). It is entirely unclear how a senior American counterintelligence official offering his

services to an agent of Vladimir Putin "does not amount to moral turpitude," *Korea Life Ins. Co. v. Morgan Guar. Tr. Co. of New York*, 269 F. Supp. 2d 424, 441 (S.D.N.Y. 2003) (explaining *malum prohibitum*).   McGonigal's attempts to suggest otherwise show how indefensible this position is.   He quotes the Government's statement that this case is "simple."   (Br. 22).   So is murder, but that does not make it a mere regulatory offense.   He claims that he provided "indirect services" to Deripaska.   (Br. 22-23).   But Deripaska—who McGonigal met with personally, twice (PSR ¶ 23)—sits atop a massive business empire.   He would no more be expected to directly supervise McGonigal than Putin must directly supervise Deripaska.   And to the extent McGonigal means to imply there is anything novel about this simple case (*see* Br. 22), he contradicts his clear prior admission that he knew what he did was "wrong and unlawful" (Dkt. 59 at 34).

McGonigal most clearly errs in claiming as mitigation that the purpose of his efforts was to convince OFAC to sanction Potanin, Deripaska's rival, thus rendering his crime "consistent with, not in tension with, U.S. foreign policy." (Br. 6-7).   To the contrary, crimes like McGonigal's undermine the legitimacy of American sanctions.   McGonigal has admitted that he tried to help Deripaska manipulate OFAC in order to handicap a rival.   That the rival is now also sanctioned (Br. 7) is irrelevant:   The United States cannot maintain a sanctions regime that the world will accept as a legitimate national security necessity if that regime can in fact be manipulated by foreign oligarchs and their henchmen.[3]   McGonigal can no more claim his mercenary foreign

---

[3]   The targets of American sanctions—Russia, for example—often criticize the sanctions as illegitimate. *See, e.g.*, *Putin rails against 'illegitimate sanctions' on Russia*, THE HILL, Aug. 23, 2023, *available at* https://thehill.com/policy/international/4167413-putin-rails-against-illegitimate-sanctions-on-russia/; *Russia calls U.S. sanctions against Turkey over S-400 system illegitimate*, REUTERS, December 14, 2020, *available at* https://www.reuters.com/article/us-turkey-sanctions-russia/russia-calls-u-s-sanctions-against-turkey-over-s-400-system-illegitimate-ifx-idUSKBN28O2N7/?edition-redirect=uk.

service was "consistent with . . . U.S. foreign policy" than a mobster can claim to be acting "consistent with . . . U.S. law enforcement policy" because the rivals he targets are also criminals. *Cf. United States v. Eppolito*, 543 F.3d 25, 27-33 (2d Cir. 2008) (describing two retired police detectives who went to work for certain organized crime members against their mafia rivals).

No one knows this better than McGonigal. During an October 5, 2020 forum at a prominent think tank, McGonigal—who was one of the panelists—explained that members of Russia's equivalent to the FBI were causing "an erosion . . . in any rule of law" in Russia by "operating at the behest of the highest bidder" becoming "effectively private contractors to those who were trying to eliminate . . . rival businessmen," among other targets.[4] McGonigal's own words thus prove the damage to the rule of law he did by using the contacts, skills, and influence he gained at the FBI to help Deripaska target a rival businessman, including by seeking to manipulate an American government agency. *See United States v. Alston*, 899 F.3d 135, 151 (2d Cir. 2018) ("Society is victimized in a particularly malign way when a police officer aids crime instead of stopping it.").

Finally, the small monetary gain that McGonigal achieved—$17,500—should not create the impression that his crimes were small in scale. McGonigal had only begun to profit from his scheme when the FBI broke it up. (PSR ¶ 27). To that point, McGonigal had spent most of the money paid to him on expenses (PSR ¶ 30)—which is to say, on actually trying to help Deripaska. McGonigal had promised a subcontractor that work for this "client"—who the subcontractor did not know was Deripaska—would eventually lead to "much more . . . to the tune of millions."

---

[4]     McGonigal's statements are recorded at https://www.atlanticcouncil.org/event/report-launch-lubyanka-federation, at approximately 30:10 to 31:00.

(Ex. B).[5]  And at the moment his scheme came to an end, McGonigal was negotiating a purchase of information for Deripaska, which he planned to pass on to his employer with a multimillion-dollar markup.  (PSR ¶ 27).  In short, McGonigal would have profited handsomely from turning his skills against his country, had the agents he used to supervise not stopped him.  (*See* PSR ¶ 15 (noting that McGonigal supervised the New York Counterintelligence Division); Dkt. 85 at 23, Dkt. 87 at 8 (noting that this case was investigated by the same division)).

**B.    The Need to Promote Respect for the Law and to Provide Just Punishment**

Given the seriousness of McGonigal's crimes, the maximum available sentence is also necessary "to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2)(A).  McGonigal did not simply violate sanctions emplaced to protect U.S. national security.  He did so after having previously held a position of trust in enforcing those sanctions. And he did so using the special investigative skills he developed with the FBI to *prevent* violations of our national security laws—not to participate in them.  (*See* PSR ¶ 40).  Moreover, McGonigal laid the groundwork for this plan while serving as an SAC, using that critical position to advance himself at the expense of his country.  (PSR ¶¶ 20-22).  Promoting respect for the law and providing just punishment thus demands a stern sentence, so that the American public knows that its government will not allow its officials to exploit their power in service of self.  *See, e.g.*, *United States v. Sampson*, 898 F.3d 287, 314 (2d Cir. 2018) (finding above-Guidelines sentence justified by district court's reasoning that "there has to be a sense that we give to the public that we are

---

[5]    Exhibit B is an excerpt of a WhatsApp message chain between McGonigal—"Charlie" in the exhibit—and the subcontractor—"Michael" in the exhibit—discussed in paragraph 27 of the Presentence Report.  The full message chain was provided to McGonigal in discovery and can be provided to the Court upon request.

going to safeguard the integrity of our system . . . .  That we will hold our public officials to a higher standard . . . .").

McGonigal, however, asks for a "non-custodial sentence" (Br. 2)—meaning his total term of imprisonment would be the weekend he spent waiting to be arraigned.  Such meager punishment would hardly comport with society's understanding of just punishment, and would undermine respect for the law.  McGonigal's contrary arguments have already been rejected by the Second Circuit.  According to him, it is enough that his conviction has cost him his job, his reputation, and embarrassed him before his family.  (Br. 23).  But as the Court of Appeals has explained, that does not constitute just punishment because "[t]hose are consequences generally suffered by anyone accused and convicted of a crime," especially a serious one.  *United States v. Cutler*, 520 F.3d 136, 170-71 (2d Cir. 2008) (holding district court erred as a matter of law in imposing non-incarceratory sentence on grounds that humiliation and loss of law license adequately punished convicted attorney).[6]  To suggest that McGonigal can be adequately punished merely by loss of status is to reward him for the very privileges he abused, by suggesting that only less fortunate defendants need to be jailed, because they have so much less to lose.  *See id.*  ("[T]he imposition of a nonincarceratory sentence on the basis that a defendant has suffered sufficiently simply because he was prosecuted and convicted would create unwarranted disparities among similarly situated defendants.").

---

[6]     The Second Circuit later abrogated *Cutler* because its review of the district court's sentencing analysis was unduly searching.  The Circuit has, however, continued to rely on *Cutler*'s substantive reasoning in explaining why privileged defendants like McGonigal do not deserve lenient treatment.  *See Watts v. United States*, No. 21-2925, 2023 WL 2910634, at *3 & n.2 (2d Cir. Apr. 12, 2023) (citing *Cutler* and holding that sentencing court should not place undue emphasis on wealthy defendant's ability to pay restitution, to avoid creating unwarranted sentencing disparities with less well-off defendants).

### C.      The Need to Afford Adequate Deterrence to Criminal Conduct

Deterring former government officials—particularly those responsible for our national security—from abusing their positions in the service of hostile foreign actors also requires a sentence at the top of the Guidelines range.  *See* § 3553(a)(2)(B).  Crimes such as McGonigal's "are hard to detect and prosecute, and so the sentence imposed must be sufficient to deter conduct of this sort."  *United States v. Burman*, 16 Cr. 190 (PGG), 2020 WL 3182766, at *5 (S.D.N.Y. June 13, 2020) (internal quotation marks omitted). Many counterintelligence professionals may believe—not entirely without reason—that they have the skills and inside knowledge to commit national security crimes while evading detection.  McGonigal also believed he could profit "to the tune of millions"—certainly a sum Deripaska could afford to pay.  Preventing others from following in McGonigal's footsteps thus supports a sentence at the top of the Guidelines.  *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

### D.      The Guidelines Recommendation

Although McGonigal gives short shrift to the recommended Guidelines sentence (Br. 23-24), it is among the factors this Court considers by statute.  *See* § 3553(a)(4).  And although the Court cannot presume that a sentence within the Guidelines will always be reasonable, "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."  *United States v. Bryant*, 976 F.3d 165, 181 (2d Cir. 2020). Precedent thus commends the Guidelines "as a

'benchmark or a point of reference for departure.'"  *United States v. Bershan*, 845 F. App'x 37, 41

(2d Cir. 2021) (quoting *United States v. Villafuerte*, 502 F.3d 204, 210 (2d Cir. 2007)).

None of the facts of this case warrant a variance from the Guidelines.  McGonigal was a

senior official in America's justice system.  He then turned the skills and influence he gained there

against America's laws.  The justice system should not now be seen to treat one of its own with

particular leniency.

### E.     The History and Characteristics of the Defendant

The most important aspect of McGonigal's history and characteristics, § 3553(a)(1), is that

he was a senior FBI official who engaged in a sustained pattern of crime and misconduct in a bid

to enrich himself.  As discussed throughout, he began laying the groundwork for the crimes here

while serving as SAC, and through the use of that position.  (PSR ¶¶ 20-21).  At the same time, he

was also lying to the FBI in order to conceal foreign travel connected to receiving an unreported

$225,000 loan, "engaging in personal business development efforts while still working for the

FBI," and establishing an unreported, ongoing relationship with the Prime Minister of Albania.

(PSR ¶ 48).[7]  McGonigal also used an email address in a fake name, and a phone number registered

under that name, to conceal his illegal conduct, precisely because he knew it was wrong.  (PSR

---

[7]     This conduct forms the basis for McGonigal's separate conviction before the Honorable
Colleen Kollar-Kotelly, United States District Judge, in the District of Columbia.  (PSR ¶ 48).  The
Government agrees with McGonigal that the punishment for that conduct should be determined
by Judge Kollar-Kotelly.  (*See* Br. 4 n.1).  With respect to McGonigal's history and characteristics,
however, it is appropriate for this Court and Judge Kollar-Kotelly to consider all of McGonigal's
misdeeds, because they show that McGonigal did not commit a single aberrant act, but rather
engaged in a sustained pattern of crime for multiple years.  *See Witte v. United States*, 515 U.S.
389, 403 (1995) (increasing sentence for instant crime based on prior crime for which defendant
was separately sentenced does not violate double jeopardy clause); *United States v. Santiago*, 806
F. App'x 32, 34 (2d Cir. 2020) (sentencing court's examination of defendant's criminal history
was appropriate inquiry into history and characteristics of the defendant, not "double counting").

¶ 20). In short, from at least 2017 until he was caught in 2021, McGonigal abused a position of great public trust, and the prestige that job gave him even after retiring, putting himself above his country and his fellow citizens.

McGonigal describes his motive as trying "to find a way to earn a living." (Br. 7). That is absurd. In 2021—the year he went on Deripaska's payroll—McGonigal and his wife reported an adjusted gross income of over $850,000. (PSR ¶ 84). Even now, after the considerable expenses of litigating this case, he boasts nearly $1.5 million dollars in assets, including ownership of a Manhattan apartment, a luxury car, and over $500,000 in cash. (PSR ¶ 84). That is, even without the millions he sought to earn from Deripaska, McGonigal would have been far better off than most Americans. He thus bears no resemblance to those criminal defendants who can legitimately claim financial hardship as a mitigating circumstance. *Cf., e.g.¸ United States v. Sanchez*, 433 F. App'x 44, 45 (2d Cir. 2011) (district court did not abuse discretion in considering defendant's "poverty" as mitigating factor).

As another mitigation argument, McGonigal points to his service with the FBI in the period before he began committing crimes. (Br. 8-12). His factual claims here appear accurate, if not entirely unvarnished.[8] There is, at least, no dispute that McGonigal had a successful career in the

---

[8]     The law enforcement and counterintelligence agents who reviewed McGonigal's cited exploits noted that he often claims credit for operations in which his personal involvement was less significant than the operation itself. For example, in both his classified and unclassified submissions, McGonigal may describe a significant investigation where he—along with many other officials—was simply somewhere in a lengthy chain of command. (*See* PSR ¶ 82). Thus, to the extent this Court is inclined to parse McGonigal's career achievements, the Government respectfully submits that it should limit its analysis to the specific actions that McGonigal personally took. *See United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (Guidelines departure for exceptional public service warranted where defendant served as volunteer firefighter "sustaining injuries in the line of duty three times," "entering a burning building to rescue a three-year old," "participated in the successful delivery of three babies," and administered CPR to persons in distress both while volunteering as a firefighter and as a civilian).

FBI.  But the reward for such a career is not supposed to be leniency at one's sentencing.  And McGonigal had already been amply compensated for his service:  The Bureau promoted him to one of its most preeminent positions (Br. 12), where he also received significantly more compensation than the average agent and much more than the average taxpayer (*see* PSR ¶ 82). Based on his experience at the FBI, McGonigal's retirement led immediately to a lucrative position as head of global security for a "prestigious international company."  (Br. 3; *see also* PSR ¶¶ 81, 84).  Moreover, McGonigal was able to commit the instant crimes, and those crimes were so damaging, precisely because of the senior position he occupied at the FBI, and McGonigal became SAC precisely because he convinced the FBI that his prior performance was exceptional.

It is thus perverse for McGonigal to seek leniency based on the same achievements that laid the foundation for his crimes.  As one court in this District explained when denying a white-collar defendant credit for his prior public service:

> It is precisely the defendant's mantle of integrity and benevolence that serves as cover for an invidious end, enabling him to move about his game undetected, the better to prey upon those who least expect it.  In other words, it is the widespread recognition in the community that the defendant enjoys for strong character, integrity, sound values and good public deeds that facilitates his hidden life of crime.  The two aspects go hand in hand.

*United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009); *see also United States v. Repking*, 467 F.3d 1091, 1096 (7th Cir. 2006) (denying bank president credit for charitable works where those "charitable works [we]re entirely consistent with a bank's business development plan.").

McGonigal also touts letters from a handful of former employees, proclaiming him to have been a great boss and an exemplary agent.  (Br. 12-13).  The Court should not give these letters great weight, for two reasons.  *First*, one should expect a senior leader in the FBI to be a good manager and a successful agent, and so it would be of limited import if McGonigal had

15

competently performed the job which he also used to commit his crimes.  *See United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (good works as a legislator "reflect[] merely the political duties ordinarily performed by public servants" and "if a public servant performs civic and charitable work as part of his daily functions, these should not be considered in his sentencing because we expect such work from our public servants").

*Second*, there is reason to think that McGonigal did not draw his letters from a representative sample of former subordinates.  In the course of the investigations into McGonigal, many agents who formerly worked for McGonigal were interviewed.  A significant number reported that his management style was unethical, condescending, inappropriate, or marked by favoritism.  (*See, e.g.*, Ex. C, D, E).[9]  The point is not that this Court must determine whether McGonigal was, or was not, a good leader.  Any supervisor will have both fans and detractors.[10] The point is that there is nothing so exceptional about McGonigal's leadership record that it should distract from the proper focus of sentencing, his serious crimes.

For similar reasons, McGonigal should not obtain a light sentence on the ground that he was an upstanding member of the community, when not committing felonies to enrich himself. (*See* Br. 13-15).  Courts are rightly reluctant to give those who rose high in society, then abused

---

[9]     The attached reports of interviews are requested to be filed under seal because some of the interviewees continue to work in counterintelligence, and some of the information they contain is the subject of continued investigation.  In the interviews, McGonigal is referred to as "Deacon Blues" or "DB," which were pseudonyms used to mask his identity during the course of the investigation.

[10]    For example, media interviews of a third set of former employees revealed one who characterized McGonigal's leadership style as "kiss up, kick down"—meaning he ingratiated himself with superiors but abused subordinates—while another saw his abrasive style as merely par for the course in a rough-and-tumble law enforcement organization.  *See* https://www.businessinsider.com/fbi-charlie-mcgonigal-labyrinth-oleg-deripaska-russia-trump-allison-guerriero-2023-2.

their positions, too much credit for having impressed their friends and neighbors along the way. As one court explained, "excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her." *United States v. McClatchey,* 316 F.3d 1122, 1135 (10th Cir. 2003); *see also Repking*, 467 F.3d at 1095 ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives … to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts."); *United States v. Morgan*, No. 13-6025, 2015 WL 6773933, at *22 (10th Cir. Nov. 6, 2015) (district court imposing sentence on senior public official erred in giving undue weight to letters of support. "One does not become President Pro Tem without the confidence of many supporters, some quite influential.").

Moreover, anyone who would describe McGonigal as "selfless, always thinking of others before himself" (Br. 14) has plainly seen only one side of his character.  Most obviously, McGonigal's crimes in this case and the case before Judge Kollar-Kotelly can in no way be described as selfless.  But even in less felonious matters, McGonigal seemed to view his lofty title as a means to self-indulgence.  While in office, McGonigal misused his position to, for example, have an FBI agent chauffeur a woman who described herself as McGonigal's girlfriend.  (*See* Ex. F).  When he retired, McGonigal improperly kept his FBI credentials, continuing to use them until November 2021.  (*See* Ex. F, G).  McGonigal also continued to use his FBI placard—a sign that active law enforcement agents can place inside their windshield to avoid being towed or ticketed when they are required to park illegally for operational reasons.  (*See* Ex. H (photograph taken during the course of this investigation, showing McGonigal's parked car displaying his placard years after his retirement)).  Although hardly significant compared to his criminal offenses,

17

such petty abuse of the fruits of his service refutes any notion that he has "always conducted himself with honesty, integrity, and professionalism" (Br. 13), even leaving aside the instant offense.

Finally, McGonigal describes an interview with other government agencies, at which he answered questions about misconduct others may have committed and his own conduct.  (Br. 15-16).  The U.S. Attorney's Office conducting this prosecution did not request that meeting, did not attend that meeting, and has little knowledge of what was said there, beyond a brief summary from one of its participants—who characterized the contents of McGonigal's statements as, in substance, insignificant.  There thus appears to be no basis for McGonigal to "presume" that his statements were "of some assistance."  (Br. 16).[11]  Nor can McGonigal seek sentencing credit for this meeting by citing *United States v. Fernandez,* 443 F.3d 19, 33 (2d Cir. 2006), *abrogated by Rita v. United States*, 551 U.S. 338 (2007).  As McGonigal notes, that case states that a sentencing court could consider a defendant's efforts to cooperate with the Government even if those efforts did not result in a cooperation agreement.  (Br. 16).  But its holding was that the district court was within its discretion to conclude "that the cooperation was fitful and that it should not be used to lighten [the defendant's] sentence."  *Fernandez*, 443 F.3d at 34 (internal quotation marks omitted).  This Court should reach the same conclusion with respect to McGonigal's attempt to obtain a lenient sentence by attending a single meeting.

---

[11]    The Court should not infer from McGonigal's sealing of the corresponding paragraph in his submission that he has provided information of any value.  The Government did not ask that this paragraph be sealed.  Rather, McGonigal's attorney informed the undersigned and the Washington, D.C. prosecutors that he intended to seal the paragraph, and neither objected.

**F.      The Need to Avoid Unwarranted Sentencing Disparities**

The need to avoid unwarranted disparities in sentences imposed on similarly situated defendants, § 3553(a)(6), also supports a 60-month sentence and $200,000 fine.  McGonigal dedicates a significant portion of his brief to distinguishing other sanctions cases in which similar sentences were imposed, in an effort to show that his conduct was less serious.  (Br. 16-22).  Those cases are different, but not in a way that helps McGonigal.

As McGonigal correctly notes, many sanctions cases in which significant sentences were imposed concerned the export of goods with potential military uses.  (Br. 17-19).  But none of the cases McGonigal describes involved a former high-ranking American government official selling his services to an agent of Vladimir Putin.  To the contrary, each concerned a private person with little or no duty of loyalty to the United States.  (*See* Br. 18-19 (citing *Bahadorifar* (Iranian national employed at department store providing financial services to Iranian intelligence agent); *United States v. Gavidel, et al*, 01 Cr. 417 (TPG) (S.D.N.Y. 2001) (Iranian national violating sanctions against Iran in conduct of illegal business); *United States v. Zhang*, 12 Cr. 666 (NGG) (E.D.N.Y. 2012) (Chinese national who operated private business violating sanctions against China); *United States v. McKeeve*, 131 F.3d 1, 5 (1st Cir. 1997) (United Kingdom national who operated private business violating sanctions against Libya); *United States v. Phillips*, 11 Cr. 757 (E.D.N.Y. 2011) (career criminal working odd jobs in construction violating sanctions against Iran); *United States v. Kuyumcu*, 16 Cr. 308 (DLI) (E.D.N.Y. 2016) (Turkish national who operated private businesses violating sanctions against Iran); *United States v. Tamimi*, 12 Cr. 615 (JPO) (S.D.N.Y. 2012) (Iranian national working as engineer violating sanctions against Iran); *United States v. Taherkhani et al*, 13 Cr. 4228 (DMS) (S.D.C.A. 2013) (agent of Emirati corporation violating sanctions against Iran); *United States v. Woodford*, 03 Cr. 070 (E.D.N.Y. 2003) (businesswoman who owned

Singaporean company violating sanctions against Iran); *United States v. Liang*, 10 Cr. 116 (DOC) (C.D.C.A) (businessman who owned California company violating sanctions against China)).

That distinction matters.  McGonigal's crimes represent a direct abuse of the public's trust in him:  He laid the groundwork for his offenses through his official position, while serving in it, and used the special skills he gained with the FBI to commit those crimes. (*See* PSR ¶¶ 20-22, 30). Courts should "hold our public officials to a higher standard," *Sampson*, 898 F.3d at 314, than foreign nationals violating the sanctions imposed against their country of origin.  McGonigal's crimes are thus better compared with the sentences imposed on former public officials who abused their positions than, for example, an Iranian businessman selling carbon fiber to Iran.  And such officials have received harsher sentences than the Government seeks here.  As one Court in this District explained when imposing an 84-month sentence on a state senator who paid bribes in an effort to obtain a nomination for New York City Mayor, in punishing such crimes: "the law takes into consideration the fact they're public servants. That's what makes the crime so serious. It is that we are entitled to expect our public officials to only engage in selfless good deeds and to only legislate in the best interests of their constituents and to act in a way that is exemplary." *United States v. Smith*, 13 Cr. 297 (KMK), Dkt. 461 at 21-22 (S.D.N.Y. July 1, 2015).

McGonigal also cannot reasonably analogize his case to instances in which foreign businessmen violated U.S. sanctions by selling innocuous goods.  (Br. 20-21).[12]  McGonigal

---

[12]     Even less reasonable is McGonigal's invocation of *United States v. Singh*, 877 F.3d 107, 116 (2d Cir. 2017).  (Br. 22).  In that case, a district court sentenced the defendant to 60 months' imprisonment for unlawfully re-entering the country after having been previously deported.  In cataloguing the many reasons that sentence was inappropriate, the Second Circuit noted that the Guidelines Range was 15 to 21 months' imprisonment, the Government had sought a within-Guidelines sentence, and most sentences for illegal re-entry are far below 60 months.  77 F.3d at 116.  Here, by contrast, the Guidelines recommend a sentence of 57 to 60 months, the Government

provided services, not goods.  And the value of those services should not be underestimated: the investigative skills, contacts, and influence of a former senior American counterintelligence officer are of obvious, and dangerous, value to an agent of Vladimir Putin.  Although the first task Deripaska assigned his new recruit may not have appeared particularly nefarious, McGonigal was hoping to do millions of dollars in future work for the oligarch.  (Ex. B).  And regardless of the particular task at hand, McGonigal was selling something just as useful to America's enemies as military grade technology:  the "erosion . . . in any rule of law" that ensues when a nation's counterintelligence professionals begin "operating at the behest of the highest bidder," to use McGonigal's description of his own crimes.  (*Supra* at 3 & n.3).  Thus, should this Court accept McGonigal's invitation to "consider *the degree to which the violation threatened a security interest of the United States*" (Br. 24 (quoting U.S.S.G. § 2M5.1 app. n.2)), that consideration supports imposing the maximum sentence allowed by law.

The first sanctions case McGonigal discusses (*see* Br. 17) helps illustrate why this Court should sentence him to five years in prison.  In *Bahadorifar*, Judge Abrams sentenced a woman whom the court viewed as "sympathetic in many respects" because Bahadorifar (1) "has no criminal history"; (2) "is beloved by friends and family"; and (3) "has faced many serious challenges in her life"—including escaping from Iran's "terror regime" and a forced, abusive marriage, and enduring serious health issues.  (Ex. A (*Bahadorifar* sentencing transcript) at 34, 36).  Bahadorifar's crimes were also "egregious" (*id.*)—but not quite so egregious as the Court might infer from McGonigal's submission (*see* Br. 17).  Bahadorifar violated the sanctions against Iran by providing financial support to someone she knew to be an Iranian intelligence agent.

---

is seeking a sentence at the top of that range, and similar sentences are—as the cases catalogued by McGonigal show (Br. 17-19)—hardly uncommon for serious sanctions violations.

(Ex. A at 35).  The extreme danger of that crime was made clear by the fact that the agent was engaged in a plot to kidnap an Iranian dissident.  (*Id.* at 36).  But—as the Government repeatedly emphasized during sentencing—Bahadorifar had no knowledge of that plot.  (*Id.* at 9-10, 36).  Judge Abrams nonetheless found that Bahadorifar's crimes required a four-year sentence of imprisonment because bad actors such as the Iranian intelligence services depend on people like Bahadorifar to evade sanctions, and Bahadorifar profited from aiding someone she knew to be a bad actor, even if she did not know exactly what he was up to.  (*Id.* at 35-36).

Comparing this case to *Bahadorifar* further shows why McGonigal's conduct warrants at least the five-year sentence the law allows.  McGonigal claims some of the same mitigating factors as Bahadorifar—both have loving families and no prior convictions.  He lacks others—in particular, he has led a fortunate life, and was secure in his wealth and prestige when he nonetheless chose to embark on his crimes.  Also unlike Bahadorifar, McGonigal's crimes were serial:  While she aided one agent who she knew personally, McGonigal spent years seeking out opportunities to monetize his FBI credentials, committing both the crimes charged here and those for which he was convicted in Washington, D.C.  The gravamen of the two defendants' crimes were similar:  They both aided people they knew full well were enemies of the United States, capable of terrible crimes.  But whereas Bahadorifar's knowledge came from personal experience, McGonigal gained his knowledge because his country had entrusted him with classified information, so that he could protect it from exactly the enemies he was now helping.  And Bahadorifar enjoyed none of the power, prestige, or trust that this country awarded McGonigal.  Bahadorifar was an Iranian national who worked in a department store.  That in no way excuses her, but it means that she could not shake the public's faith in its officials in the "particularly malign way," *Alston*, 899 F.3d at 151, that McGonigal has.  If Bahadorifar's crimes merited a four-year sentence—and Judge Abrams

rightly concluded that they did—at least one more year is warranted to promote respect for the law, ensure just punishment, and avoid unjust sentencing disparities here. *See* 18 U.S.C. § 3553(a).

## IV.     The 18 U.S.C. § 3572(a) Factors

This Court should also impose a fine of $200,000, the top of the Guidelines recommendation. McGonigal cannot dispute that he has the funds to pay, and the motive for his crimes was indisputably financial. A significant financial penalty should thus be imposed.

The statutory factors to be considered before imposing a fine, in addition to the factors in Section 3553(a), include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and any of his dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the Government of any imprisonment. 18 U.S.C. § 3572(a). The Guidelines provide that district courts "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). The pertinent factors are:

> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;
> (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;
> (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;
> (4) any restitution or reparation that the defendant has made or is obligated to make;
> (5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;
> (6) whether the defendant previously has been fined for a similar offense;
> (7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and
> (8) any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d).  The Guidelines further provide that, "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."  *Id.* The defendant bears the burden of demonstrating an inability to pay a fine.  *See United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001); *United States v. Camargo*, 393 F. App'x 796, 798 (2d Cir. 2010).

Many of the pertinent factors are already covered by the Section 3553(a) analysis above. With respect to the considerations unique here:  McGonigal has more than sufficient income and assets to pay a significant fine and still support himself in retirement.  (PSR ¶ 84).  McGonigal's children are fully grown, McGonigal's wife earns slightly more than he does, and her retirement savings are apparently separate from his own.  (PSR ¶¶ 84-85).  Because of the nature of the offense, McGonigal will not be required to pay restitution, reparation, or civil penalties.  (*See* PSR ¶¶ 102-03).  And if this Court imposes the five-year term of imprisonment that the Section 3553(a) factors urge, a $200,000 fine will still fall well short of the cost of imprisoning McGonigal for his crimes.  (PSR ¶ 101).

## V.       Conclusion

For the reasons set forth above, this Court should sentence McGonigal to a term of 60 months' imprisonment and impose a fine of $200,000.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     /s/ Hagan Scotten
Hagan Scotten
Rebecca T. Dell
Derek Wikstrom
Assistant United States Attorneys
(212) 637-2410 / 2198 / 1085

Cc:     Defense Counsel (by ECF)