NCEVMCGS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                        23 Cr. 16 (JHR)

5  CHARLES McGONIGAL,

6              Defendant.            Sentence

7  ------------------------------x

8                                    New York, N.Y.
                                     December 14, 2023
9                                    1:40 p.m.

10

   Before:
11
                   HON. JENNIFER H. REARDEN,
12
                                     District Judge
13

14                      APPEARANCES

15
   DAMIAN WILLIAMS,
16      United States Attorney for the
        Southern District of New York
17 HAGAN C. SCOTTEN
   REBECCA T. DELL
18 ROBERT B. SOBELMAN
        Assistant United States Attorneys
19
   BRACEWELL LLP
20      Attorneys for Defendant
   SETH D. DuCHARME
21 MEAGAN MALONEY

22 Also Present:  Christina Clark, DOJ-NSD
                  George Murphy, FBI
23                Christopher de Grandpre, Paralegal - USAO

24

25

1           (Case called)

2           THE DEPUTY CLERK:  Counsel, please state your name for

3     the record, starting with the government.

4           MR. SCOTTEN:  Good afternoon, your Honor.

5           Hagan Scotten for the government.

6           Also present at counsel table:  Rebecca Dell, an

7     assistant United States Attorney in this case; Christina Clark,

8     a trial attorney with the National Security Division; Robert

9     Sobelman, who is one of the chiefs of our public corruption

10    unit; Supervisory Special Agent George Murphy of the FBI; and

11    our paralegal Christopher de Grandpre.

12          THE COURT:  Hello, all.

13          MR. SCOTTEN:  Thank you, your Honor.

14          MR. DuCHARME:  For Mr. McGonigal, Seth DuCharme.  And

15    I'm joined today by my colleague Meagan Maloney.

16          Good afternoon.

17          THE COURT:  Good afternoon, everyone.

18          Please be seated.

19          THE DEPUTY CLERK:  I just ask that you guys please

20    speak into the mic for the overflow court.  Thank you.

21          THE COURT:  Why doesn't everyone remain seated today;

22    makes it easier to speak into the mic.

23          All right.  We are here today for sentencing in *United*

24    *States v. Charles McGonigal,* 23 CR 16.

25          On August 15th, 2023, Mr. McGonigal pleaded guilty

pursuant to a plea agreement dated July 24th, 2023, to a

superseding information charging one count, in violation of

Title 18, United States Code, Section 371, of conspiring to

violate the International Emergency Economic Powers Act and to

commit money laundering.

In preparation to today's proceeding, I have received

and reviewed the probation office's presentence investigation

report dated November 6, 2023, including its recommendation and

addendum.  I may sometimes refer to that as the presentence

report or the PSR.

I have also reviewed the following submissions from

the parties:

The defendant's sentencing submission dated November

30th, 2023, including the attachments to that submission

consisting of letters from family members, friends, and former

colleagues, as well as a statement from Mr. McGonigal himself;

and a classified supplement to this submission concerning some

of Mr. McGonigal's work during his time at the FBI.

The government's sentencing submission dated December

7th, 2023, including the attachments consisting of a transcript

of the sentencing proceeding in another case; a printout of

messages between Mr. McGonigal and another individual;

summaries of interviews and other records prepared during the

investigation of Mr. McGonigal between 2020 and 2021; and a

photograph.

1    Let me first confirm that the parties have received

2  and reviewed each of those submissions.

3    Mr. DuCharme?

4    MR. DuCHARME:  Yes, your Honor.

5    THE COURT:  Mr. Scotten?

6    MR. SCOTTEN:  Yes, your Honor.

7    THE COURT:  Are there any other submissions that were

8  made that I did not mention?

9    Mr. DuCharme?

10    MR. DuCHARME:  Not that I'm aware of.

11    THE COURT:  Mr. Scotten?

12    MR. SCOTTEN:  No, your Honor.

13    THE COURT:  I am aware that both parties asked to seal

14  certain portions of their submissions.

15    I'm going to start with Mr. Scotten.

16    The government asked to seal -- to file under seal the

17  interview reports which I believe are Exhibits C through G; is

18  that correct?

19    MR. SCOTTEN:  That is correct, your Honor.

20    THE COURT:  All right.

21    Mr. DuCharme, have you received copies of Exhibits C

22  through G?

23    MR. DuCHARME:  Yes, your Honor.

24    THE COURT:  Okay.

25    Do you have any objection to those exhibits being

1   sealed?

2           MR. DuCHARME:  No, your Honor.

3           THE COURT:  All right.

4           Mr. Scotten, can you confirm that you have received an

5   unredacted copy of Mr. McGonigal's submission, and that you

6   were informed of and given access to the classified supplement?

7           MR. SCOTTEN:  Yes, that's true, your Honor.

8           THE COURT:  All right.

9           I have seen in footnote 11 of the government's

10  submission, there's a comment about Mr. McGonigal's sealing

11  request, which is noted.  But I just want to confirm that you

12  don't have any objection to that proposed redaction; correct?

13          MR. SCOTTEN:  No, we're not opposing it.  If

14  Mr. McGonigal wants it, we have no objection.

15          THE COURT:  All right.

16          I have reviewed the proposed redactions and partial

17  sealing of the parties' respective submissions.  And I find

18  that those redactions are justified and narrowly tailored for

19  the reasons that would justify sealing, so I approve the

20  redactions.  I will file the unredacted versions of the

21  parties' submissions under seal.  In the event of an appeal,

22  those submissions will be available to counsel without further

23  application to me.

24          Mr. Scotten, the PSR indicates that there are no

25  identifiable victims in this case for purposes of the Crime

1   Victims Rights Act; correct?

2         MR. SCOTTEN:  That's correct, your Honor.  The only

3   victim here is the United States.

4         THE COURT:  I'm going to turn now to the presentence

5   report.

6         Mr. DuCharme, you have read the report; correct?

7         MR. DuCHARME:  Yes, your Honor.

8         THE COURT:  All right.

9         And you have discussed the report with your client?

10         MR. DuCHARME:  I have.

11         THE COURT:  Mr. McGonigal, you have read the

12   presentence report, yes?

13         THE DEFENDANT:  Yes, I have, your Honor.

14         THE COURT:  And you have discussed it with your

15   counsel, Mr. DuCharme?

16         THE DEFENDANT:  I have, your Honor.

17         THE COURT:  Have you had sufficient time and

18   opportunity to review the report and discuss it with

19   Mr. DuCharme?

20         THE DEFENDANT:  I have, your Honor.

21         THE COURT:  Have you been able to discuss with

22   Mr. DuCharme any errors that you might have seen in the report?

23         THE DEFENDANT:  There were no errors to -- you know,

24   under my review, your Honor.  So if there would have been, I

25   would have had those discussions.  We have not.

1    THE COURT:  So you do not have any objections to the

2    contents of the presentence report; correct?  In other words,

3    you agree with the report's contents?

4    THE DEFENDANT:  I agree with the report's contents,

5    yes.

6    THE COURT:  Have you also spoken with Mr. DuCharme

7    about anything else that you wish him to take up with me today

8    at sentencing?

9    THE DEFENDANT:  There was nothing additional to take

10   up with you today, your Honor.

11   THE COURT:  Mr. Scotten, have you also reviewed the

12   presentence report?

13   MR. SCOTTEN:  I have, your Honor.

14   THE COURT:  All right.  Before I turn to calculation

15   of the sentencing guidelines, I want to give both parties a

16   chance to weigh in regarding the factual accuracy of the

17   report.

18   I am aware that the government submitted a response to

19   probation regarding the JSIN data, the information from the

20   JSIN database in Appendix A of the presentence report.  I'm

21   also aware that Mr. McGonigal provided what probation

22   characterized as minor comments to the draft PSR; and it

23   appears that all of those comments — there weren't very many —

24   were incorporated into the final report.

25   So putting aside those responses from the parties

1    earlier in connection with the report, are there any objections

2    now to the factual accuracy of the PSR?

3              MR. DuCHARME:  None from Mr. McGonigal, your Honor.

4              MR. SCOTTEN:  Not from the government, your Honor.

5              THE COURT:  I will adopt the factual recitation set

6    forth in the presentence investigation report.  The PSR will be

7    made part of the record in this matter; it will be placed under

8    seal.  If an appeal is taken, counsel on appeal may have access

9    to the sealed report without further application to the Court.

10             I'm now going to turn to calculation of the sentencing

11   guidelines in this case.  I'm not bound by the guidelines, that

12   is to say they are advisory; but I do have to accurately

13   calculate the guidelines range and consider what the guidelines

14   recommend before imposing an appropriate sentence.

15             As an initial matter, I note that at the time the

16   parties entered into the plea agreement in July 2023, the

17   November 2021 guidelines controlled.  Having said that, as the

18   parties know, on November 1, 2023, certain amendments to the

19   guidelines went into effect.

20             I have determined — and I have no reason to believe

21   that the parties dispute this — that the November 2023

22   amendments do not alter the computation of Mr. McGonigal's

23   sentence from what it would have been under the November 2021

24   guidelines.  That is to say, I have calculated an offense level

25   of 25 and a criminal history category of I, yielding a

1    guidelines range of 57 to 71 months.  That range is cabined by

2    a statutory maximum penalty of 60 months, which brings the

3    applicable range to 57 to 60 months.  For the avoidance of

4    doubt, I will note that the amended guidelines' two-level

5    offense reduction for zero point offenders does not apply here.

6          In the plea agreement, both parties agreed not to seek

7    a departure from the guidelines range; is that correct?

8          MR. SCOTTEN:  That's correct, your Honor.

9          THE COURT:  I have nevertheless considered whether

10    there is any basis for a departure and find that there are no

11    grounds justifying a departure here.

12          So with that, I would turn to counsel and then to

13    Mr. McGonigal, if he wishes to say anything.

14          I have read everyone's sentencing submissions, all of

15    which were thorough and thoughtful, so you need not repeat

16    anything that you have already shared with me.  That said, I'm

17    happy to hear anything anyone wants to tell me today.  And if

18    there's anything you think would be helpful, then this is your

19    opportunity to express it.

20          So let me start with you, Mr. Scotten.

21          MR. SCOTTEN:  Thank you, your Honor.

22          And I will take a little bit of time here.  I hope

23    it's not unduly repetitive.  I am going to try to get to a

24    focus on what I understand are the points in dispute.

25          But I do think, given the nature of the crime here,

1  it's important to begin with where this began, which is in

2  2016, when Charles McGonigal became Special Agent in Charge of

3  the FBI's New York counterintelligence office.  And because of

4  New York's central place in international affairs, that job is,

5  as Mr. McGonigal acknowledges, one of the most important

6  counterintelligence espionage jobs or counterintelligence jobs

7  in the world.

8  Mr. McGonigal's appointment should have been — should

9  have been — the crowning achievement in a distinguished career

10  with the FBI; and it should also have been an opportunity for

11  him to use his considerable skills to serve his country.  But

12  McGonigal wasn't content with the honor of receiving that

13  position.  He was not content to earn over $200,000 a year in

14  that job or the all-but-guaranteed opportunity to earn more

15  upon retirement.  And most importantly, he was not content to

16  serve only the country that trusted him with one of its most

17  important counter-espionage jobs.

18  Instead, your Honor, as early as 2017, McGonigal began

19  abusing his position to set himself up for a lucrative future.

20  He started using his title and his power to develop contacts he

21  could later go into business with.  And not some new business

22  unrelated to his time at the FBI; he was not looking to set up

23  a restaurant or to have a second career in IT.  He was looking

24  to turn his credentials into cash, to find people who would pay

25  him for the special skills and knowledge the FBI had given him.

1          This Court is familiar with some of the people from

2    the partners he began scheming with:  Sergey Shestakov, a

3    former Russian diplomat and his co-defendant in this case; a

4    friend in Jersey who owned a consulting corporation called

5    Spectrum who gave McGonigal a phone number, an email address

6    under a false name so that Mr. McGonigal could hide the fact

7    that he was working with Spectrum, even while he was supposed

8    to be working only for the FBI.

9          But it is a third business partner who explained why

10   Mr. McGonigal is here today:  Yevgeniy Fokin, another former

11   Russian diplomat, who McGonigal said was still a Russian

12   intelligence officer.  What was really significant about Fokin

13   though, your Honor, was what everybody knew about him and what

14   I don't think Mr. McGonigal denies knowing, and that is who

15   Fokin's boss was:  Oleg Deripaska.

16         Your Honor, Deripaska is a notorious Russian oligarch;

17   a manpower who was powerful not only because of his vast

18   wealth, but because of his close connections to the Russian

19   state and to Vladimir Putin personally; a man who wields power

20   not only because of his bank account, but because he is willing

21   and able to use murder, threats, espionage, all the resources

22   that he has as one of Putin's most trusted henchmen.

23         And your Honor, no one knew better than McGonigal what

24   Deripaska represents.  McGonigal had supervised

25   counterintelligence operations against Russian agents for

1    years.  He had been briefed about Deripaska.

2         Mr. McGonigal knew that Deripaska was to be sanctioned

3    before Deripaska himself knew.  Yet in the spring and summer of

4    2018, which is the very same time United States was imposing

5    sanctions on Deripaska, McGonigal began cozying up to Fokin.

6    He got Fokin's daughter VIP treatment from the FBI and the

7    NYPD; it was treatment so unusual that an NYPD sergeant

8    reported it.  But McGonigal did not care about that.  He cared

9    about cultivating a business contact who could enrich him down

10   the line.

11        At first, McGonigal tried to make that contact payoff

12   legally, when McGonigal received $25,000 from a law firm that

13   he connected Deripaska with.  But in 2021, he saw an

14   opportunity to make far more by breaking the law for Deripaska.

15   As this court knows, your Honor, that was the year McGonigal

16   agreed to work for Deripaska by investigating one of his

17   business rivals for an initial payment of $50,000, and about

18   $40,000 per month after that.  And as the Court read, in

19   McGonigal's own words, he was hoping for far more; he was

20   hoping to make millions in business with Deripaska.

21        Before I talk about how serious that crime was, your

22   Honor, I want to mention briefly how unnecessary it was.

23        When Charles McGonigal chose to commit his crimes, he

24   served as the head of what he's rightly called -- the head of

25   global security for what he's rightly called the prestigious

1    international corporation.  His joint legal income was over

2    $850,000.  He had a Manhattan apartment, which he owned, and a

3    Mercedes.  In other words, your Honor, he was far, far better

4    off than most of the citizens he had sworn to protect at the

5    FBI.  Poverty did not motivate this crime, your Honor.  Greed

6    did.

7            And this was a grave crime, your Honor.  It was a

8    betrayal.  McGonigal learned what oligarchs are, what a threat

9    they pose to our country, and how to investigate them with the

10   FBI; and not just as an agent, your Honor, as one of the people

11   most entrusted with this country's secrets.  McGonigal then

12   turned those skills, that knowledge and his influence, against

13   the law that he had sworn to uphold, selling his loyalty to one

14   of those oligarchs.

15           Your Honor, I want to discuss three reasons why this

16   crime is serious and merits a serious punishment.

17           The first I don't think McGonigal disputes:  Sanctions

18   are important.  They play a critical role in protecting our

19   national interests, in particular, by allowing us to respond to

20   hostile actions without more costly measures, things like

21   breaking off diplomatic relations or even going to war.  And

22   the sanctions here are serving that purpose, your Honor.  The

23   last three American presidents have agreed that Russia's

24   attacks on Ukraine create a national emergency.  But few people

25   want to see America join that war.  The sanctions McGonigal

violated are one of the tools our presidents have chosen to
address that national emergency without making matters even
worse.

Second, your Honor, any sanctions violation undermines
the sanctions.  Sanctions only work if they are followed.  To
choose a different example, nine out of ten western banks might
follow the sanctions and not do business with an oligarch who
is facing them.  But if the tenth bank doesn't do the same,
then the oligarch has access to the western banking system and
the sanctions fail.

And the third I want to stress for your Honor is the
collateral harm McGonigal's crime could have inflicted.  That
was, at the very least, significant.  As we pointed out in our
submission and as your Honor likely knows from the news,
American sanctions are controversial in the international
community.  Countries we disagree with do not like it when we
use our economic might to influence world policy; and they are
happy for any opportunity to criticize the sanctions.

Think about what an opportunity McGonigal gave them, a
former senior FBI official violating the sanctions.  And your
Honor, not just any senior official, an official who used to be
responsible for enforcing the sanctions and, according to him,
doing so to help one sanctioned person gain a business edge
over a business rival.  You could barely script a better story
for someone who wanted to criticize the legitimacy and the

1  probity of our sanctions regime than what McGonigal tried to do

2  here.

3          I do want to be clear, your Honor, that Deripaska's

4  and McGonigal's efforts failed.  FBI agents from the same

5  division that he used to supervise stopped him just a few

6  months into his scheme.  McGonigal never got his millions, and

7  Deripaska never got that dirt he was trying to gather on his

8  rival, so none of that information made its way into the

9  sanctions process.  But still, McGonigal — and I think, more

10 importantly, this Court — know just how serious the conspiracy

11 here was.

12         Your Honor already has our written submission, as you

13 said, and so I'm not going to walk through the detailed

14 analysis of why each of the 3553(a) factors supports a

15 top-of-the-guidelines sentence.  Instead, I want to focus on

16 the major dispute in the parties' papers.  And I think what

17 that is, is how the Court should weigh McGonigal's time with

18 the FBI.  We see it as a substantial aggravating factor for a

19 lot of the reasons I've just discussed.  But McGonigal claims

20 that as a mitigating factor, asking that he receive significant

21 lenience — and, in fact, no jail time at all — based in large

22 part on what he did for his country before he began committing

23 crimes against it.

24         To explain why your Honor should accept our view, I

25 think it helps to start with the law.  The guidelines on which

1  the parties agree here, your Honor, contain a departure

2  provision for exceptional public service.  Everyone agrees that

3  doesn't apply here.  That's not in the plea agreement; everyone

4  has agreed not to seek a departure.

5        The guidelines also contain an enhancement for abuse

6  of a special skill.  Everyone agrees that does apply here, and

7  I don't think there's any dispute that the special skills in

8  question are the investigative and counter-espionage skills

9  that McGonigal learned with the FBI.  So the guidelines here

10  support our view and provide no support for McGonigal's.

11        Now, this Court is, of course, free to consider

12  McGonigal's arguments under Section 3553(a).  But there is, as

13  your Honor saw in our submission, a lot of precedent rejecting

14  those arguments.  Whether it's other judges in this district,

15  the Second Circuit, or other circuits, time and again, courts

16  have explained that when someone who rose high in our society,

17  uses that position to commit a crime, he cannot turn around and

18  claim as mitigation the good deeds who got him that high

19  position.  McGonigal's time as SAC was supposed to be the

20  reward itself for all his good deeds.  When he abused that

21  position, the good works lost their value, your Honor.  They

22  became the means by which he advanced himself to the perch that

23  made his crimes possible, as many courts have said in rejecting

24  similar arguments for leniency that McGonigal is making here.

25        And your Honor, I think those courts were right.

1  Their decisions give force to society's notions of just

2  punishment and respect for the law, which are factors this

3  Court considers under Section 3553(a).  One way to look at it,

4  I think, your Honor, is that everyone who is going to speak in

5  court today has or has had a position in our justice system.

6  And there is a temptation to think of those jobs in terms of

7  sacrifice, to think that we could make more money or work less

8  hours or have more time with our families if we were in the

9  private sector.  But that is not how the public thinks of it,

10  your Honor.

11      No one driving an Uber in the Bronx or sweeping

12  hallways in Manhattan is pitying McGonigal's opportunity to do

13  an incredibly interesting, rewarding, and prestigious job.

14  None of them feels pangs of sympathy because their tax dollars

15  let him earn about five times what they make.  None of them are

16  saying, I hope this Court goes easy on him given all that

17  sacrifice.

18      Your Honor, they are thinking about what an awesome

19  privilege and opportunity their country gave McGonigal; about

20  how much better off than them he is in return for his promise

21  to serve them.  And they are worried that high officials like

22  McGonigal abuse that trust; that they are serving themselves

23  rather than all the drivers and janitors and school teachers

24  who don't have his power.  So they are expecting us, I think,

25  to do what the Court said in *Sampson*:  To hold our public

1    officials to a higher standard.

2          Your Honor, I want to be clear that McGonigal

3    committed the crime before this Court after he retired.  It

4    would be far worse if he did this while still at the FBI.  But

5    that does not support his request for a below-guideline

6    sentence.

7          The guidelines here do not contain the enhancement for

8    abusing a public position.  McGonigal faces the same guidelines

9    any private citizen would face if he used a special skill to

10   violate our national security sanctions.  For example, an

11   Iranian engineer who used his technical skills to violate the

12   sanctions against Iran would face the same guidelines

13   recommendation that McGonigal does.  So we think the fact that

14   McGonigal laid the groundwork for his crimes while serving as a

15   special agent in charge, and then went to work for the very

16   same criminals he had been investigating makes his crimes far

17   worse.

18         But the Court does not have to agree with us to impose

19   the sentence we seek.  The Court does not have to conclude that

20   McGonigal deserves the same punishment it would impose if he

21   were an active duty government officials who secretly went to

22   work for Deripaska.  It need only agree with the Sentencing

23   Commission's recommendation for anyone who did what he did; to,

24   at the very least, your Honor, reject McGonigal's claim for

25   special leniency based on the same public service that enabled

1    his crimes.

2           Your Honor, the last thing that I want to do is

3    respond to McGonigal's argument that his crimes are less

4    serious than a case in which someone exported goods with

5    military uses.  And we laid out in detail on our submission why

6    we think that's wrong; but I want to suggest another way of

7    looking at it.

8           Your Honor could imagine that if Deripaska or even

9    Putin himself was offered a choice of buying one of two things

10   with the several million dollars McGonigal hoped to make.

11   Choice one is military supplies, night vision goggles, carbon

12   fiber, even weaponry.  Choice two is having a former FBI

13   counterintelligence chief on their payroll.  Which of those two

14   things would they choose?  What is more valuable to them?

15          I don't think that's a hard question to answer.  I

16   think McGonigal himself said so why.  When he was addressing

17   the corruption of Russia's security services less than a year

18   before he took Deripaska's money, he told the Atlantic Council

19   that when a counterintelligence agency sells its services to

20   the highest bidder, it erodes any rule of law in that country.

21          Your Honor, how much would Putin ask his oligarchs to

22   pay to do that here?  How much would that be worth to them?

23          Your Honor, our enemies have guns and they know where

24   to buy more.  What they do not have is the rule of law.  We do.

25   That is what McGonigal tried to sell.  And that is why his

1    crime merits the highest punishment the law will permit this

2    Court to impose.

3          Thank you, your Honor.

4          THE COURT:  Mr. Scotten.

5          Mr. DuCharme.

6          MR. DuCHARME:  Thank you, your Honor.

7          I think I'll start out just by saying I was a little

8    bit surprised that the government opened with some of the

9    conduct that I think really relates more to the D.C. cases.  I

10   think you know in D.C. Mr. McGonigal pled guilty to failing to

11   disclose things relating to business relationships he had.  We

12   actually tried to combine those cases for resolution over the

13   summer; the United States didn't want to do that.  So I'm not

14   really going to respond to things outside the scope of the

15   offense here, which is the post-employment agreement to conduct

16   research for Deripaska.

17         Judge, you know, the statute of conviction gives you

18   discretion to impose a sentence within zero to five years.  And

19   we've tried to take a very reasoned approach in helping to

20   guide the Court to what is an appropriate sentence in the case.

21         You know the 3553(a) factors.

22         Fundamentally, what it boils down to is what

23   specifically did he do, who is he, and what's a punishment

24   that's greater -- sufficient, but, not greater than necessary,

25   to meet the ends of justice when you look at other IEEPA cases.

1    And Ms. Maloney is going to talk a little bit in a

2  moment about some unique circumstances relating to

3  Mr. McGonigal.  But I think, particularly in light of the

4  government's presentation, it bears me focusing a little bit on

5  the specific conduct.  And I just really want to be crystal

6  clear about this.

7    After Charlie left the FBI, he met Oleg Deripaska.  He

8  met him in London in a prestigious international law firm with

9  a lawyer.  But I think the government agrees that that part

10  would have been legal, because there is the carve-out for

11  certain legal representations.

12    That didn't go through.

13    So this person, Fokin, reaches out to Charlie after

14  that at some point.  And just to be clear, as far as

15  Mr. McGonigal knows, Fokin is not, as I guess is rumored in the

16  media, to be a Russian intelligence officer.  That's not his

17  understanding.  But he certainly knows him to be associated

18  with Oleg Deripaska; and he certainly knows that Deripaska is

19  on the sanctions list.

20    And what he's pitched is, you know, will you agree to

21  conduct some research for Deripaska relating to another Russian

22  oligarch, this guy Vladimir Potanin.  And ultimately, if we

23  find derogatory stuff, we'll give it to the U.S. government.

24  And that's essentially to level the playing field for

25  Deripaska.  Presumably — and rightly so — he's feeling the heat

1    of some of these U.S. sanctions, and he's frustrated.

2            So that's what Charlie is offered and that's what,

3    unfortunately, Charlie agrees to do.

4            And to the government's credit, the efforts didn't get

5    very far.  Charlie is interviewed coming back from a business

6    trip around Thanksgiving.  His wife is separately interviewed.

7    And they disrupt him.  He stops.  He made about $17,500.  And

8    you know, interestingly in this what is bad for America, what

9    is good for America, and I'm very sensitive to this, and I

10   think it's important to Charlie's motive, which is not an

11   element here, but I think it's relevant for your consideration.

12   He agrees to do this research.  Ultimately, he thinks it's

13   going to go to the Treasury Department to level the playing

14   field.  The U.S. government actually ultimately sanctions

15   Vladimir Potanin.

16           So this is a very unusual case in the sense that had

17   the defendant's plan succeeded, the same thing happened that

18   the U.S. government would have done.  And I get that's not the

19   whole case and there are significant government interests here,

20   principally, the need to promote respect for the law, like we

21   get that.

22           But the conduct itself, I mean, I think the government

23   even notes in its brief, the thing he was actually asked to do

24   didn't seem particularly nefarious.  And by agreeing to do the

25   work, he breaks the law.  But I think what's going on here —

1    and I appreciate it, and I heard it from the government this

2    morning too.  What's going on here is that there's a great

3    concern for what Charlie could have done if there had been more

4    taskings from this very nefarious person.  And given the

5    special skills and the abilities that he has, and you know in

6    detail about some of those skills from a top secret submission.

7    And that's fair.  They disrupt him.  They are worried about

8    what he could have done.  But I think we've got to stay focused

9    on what he actually did.

10          And with respect to crimes that implicate IEEPA, IEEPA

11   is an important statute; it does encompass a broad range of

12   conduct.  And some of the examples, you know, that Mr. Scotten

13   gave, and if you look at the cases, yeah, there's IEEPA cases

14   where -- finish trying to build a stealth fighter plane for the

15   Chinese, trying to help the Iranians build a nuclear reactor.

16   I respectfully submit that while this case is serious, that

17   kind of conduct is more serious than what Mr. McGonigal

18   actually agreed to do.  So you've got to look at his conduct in

19   some context.

20          The government has also said, which we agree with, no

21   one knows better than Charlie McGonigal the gravity of his

22   crime.  That's true.  And I think it raises a question that may

23   well be on your mind; it's been on our minds, the public ask,

24   people ask us all the time:  How could Charlie have agreed to

25   do this?  Twenty-two years in the FBI, senior position.  How

1  could he have agreed to provide a service to somebody like Oleg

2  Deripaska, who's on the sanctions list?

3        And we've thought a lot about that.  And I think some

4  of it goes to the scope of work, right.  So it's he's not,

5  thankfully, agreeing to do some of the things that Deripaska

6  may have ultimately asked him to do.

7        But I think another thing that's really going on here,

8  Judge — and I think you'll appreciate this, you know, because

9  you've read the top secret submission and you've seen the life

10  that Charlie lived for 22 years.  I think what's going on here

11  to some extent is that he's out of the FBI, but now he's

12  confronting a situation that looks somewhat familiar to him

13  based on his experience.  You know, he's got a significant

14  Russian -- he's got a view that maybe work that he does will

15  benefit the U.S. government.  There's risk involved, there's

16  sensitivities to it, and there's a financial incentive.

17        And so he makes a terrible decision.  He says, This

18  looks exciting.  This looks enough like what I used to do.

19  There's risk, there's reward, there's maybe U.S. national

20  security interest at the end of the day.  So he makes a

21  terrible decision to work for Deripaska.  He breaks the law.

22  He destroys his own life.  Causes great distress in his family.

23  And he causes -- I mean, let's be frank, he causes

24  embarrassment to the FBI.  Charlie still loves the FBI as an

25  institution, dedicated his whole life to it, and it's a

1    terrible, terrible decision.

2              And one of the critical mistakes he makes in embracing

3    this is that he no longer has the public authority that he had

4    as an FBI agent to operate in this space.  He's not the SAC

5    anymore; he's not a special agent doing counterintelligence

6    work.  He's out, and he's in the private sector.  Doesn't

7    excuse what he did, but I think, you know, we've thought long

8    and hard about this, why would Charlie McGonigal commit a

9    serious federal offense after that distinguished career?

10             Look, on his 22 years of service, Judge, of course you

11   can consider it.  I don't think there's any dispute that you

12   can consider it.  It's a highly unusual case.  Courts

13   routinely -- they're compelled to consider the personal

14   circumstances of the defendant.  And just never seen a case

15   where a defendant had a record like Charlie's.  And you've seen

16   it.  I can't obviously talk about it; it's top secret.  We've

17   been very respectful, and rightly so, of the sensitivities of

18   his work.  But it's different in kind.  And we're just asking

19   you to consider it like any other 3553(a) factor.

20             And I don't think it's fair to compare.  You know,

21   even though he got to be the SAC and he had these prestigious

22   positions, it's not high society.  I mean, he has prestige and

23   he has respect, but it's not like a white-collar defendant

24   who's a billionaire in a country club and has these

25   relationships.  It's just different in kind.  So this is an

1   unusual case.

2          Now, the meeting, your Honor, that we had with the

3   government after his plea, I filed the paragraph under seal

4   after talking, you know, to the prosecutor who coordinated that

5   meeting.  It made sense to me.  We spent seven hours with seven

6   different U.S. government offices at their invitation.  We

7   answered all their questions.  It felt very serious; it felt

8   very sensitive.  I'm not going to talk about the substance of

9   it unless you ask me about it because that was clearly

10  communicated to me.  I couldn't bring Ms. Maloney.  I couldn't

11  bring a laptop.  And I understood it was sensitive.

12         It's ultimately up to the United States government to

13  decide of what help it was.  When I talked to the prosecutor,

14  she said, We have no reason to think he was anything other than

15  truthful.  We don't need to talk to him again.  I said I would

16  file it under seal for reasons that were obvious to me.  And I

17  still want to respect that.  But it's really not our equity in

18  that being sealed.  I still think it's the government's.  It's

19  up to you whether or not the substance of that is relevant, but

20  I just needed to be clear about that.

21         So I think you can at least consider it.  Other courts

22  have considered good-faith efforts by a defendant to cooperate

23  that were short of substantial assistance.  I think the fact

24  that when he went in for seven hours and talked to the seven

25  offices that you're aware of matters.

1          Now the case law.  We cannot find a case obviously

2     that's on point with this case.  There's no case just like

3     this.  We started with the sentencing data, as the probation

4     department did.  It's relevant.  The Sentencing Commission data

5     indicates that, you know, similarly situated defendants under

6     this guideline have an average sentence of 18 months.  It's a

7     starting point.

8          There are plenty of low sentences in IEEPA cases.

9     Sometimes they are harder to find.  We found one since we filed

10    our submission, because they are not highly publicized.  We

11    found a case called *Gaillard* where Judge Ross sentenced the

12    defendant to probation in an IEEPA case.  The facts are

13    distinguishable.  Though I think the cases that are closest to

14    this one, Judge, that we could find are probably the

15    *Sheikhzadeh* case and the *Cabelly* case.

16         *Sheikhzadeh* was a guy who was providing information

17    for a period of five years to Iranian government officials.  It

18    wasn't classified, but it had strategic value.  He was paid

19    $50,000.  He lied on some government forms.  And Judge Chen had

20    a very long sentencing hearing in that case.  And she said, you

21    know, it's espionage-ish, but it's not really espionage.  And

22    she gave him three months.

23         In *Cabelly*, that defendant actually had worked for the

24    state department.  You know, like Charlie, he pled guilty to a

25    371 that implicated IEEPA, where he had been doing business

1    with Sudan and, you know, he got eight months in prison.

2           So these are data points.  But the things missing from

3    *Sheikhzadeh* and from were *Cabelly*, you know, is the

4    extraordinary 22 years of service.  It's really hard to

5    quantify how that distinguishes Mr. McGonigal.  And I don't

6    think, Judge, you know, it's fair to say that Charlie brought

7    all of the skills and abilities that he developed in the FBI to

8    bring to the advantage of Oleg Deripaska, a man with whom he

9    did not deal directly, even in connection with the agreement to

10   conduct this research.

11          So simply put, Judge, his work has got to count for

12   something.  And if you look at IEEPA cases in coming up with a

13   fair sentence, I think it's fair to distinguish agreeing to

14   conduct this research with some of the other conduct which, we

15   respectfully submit, is more serious.

16          Ms. Maloney is just going to talk briefly about some

17   personal characteristics of Charlie beyond what we've said in

18   the submission, and then I'm going to wrap it up.

19          MS. MALONEY:  Good afternoon, your Honor.

20          I'll be addressing just briefly two of the sentencing

21   factors:  the history and characteristics of the defendant and

22   the need for just punishment, both of which weigh strongly in

23   favor of a noncustodial sentence in this case.

24          As Mr. DuCharme mentioned, Charlie is not your average

25   defendant.  No one here disputes that.  What is in dispute is

1    how much weight your Honor should give to what makes Charlie so

2    unique, which is his over 22 years of service to this country.

3         In those 22 years, Charlie did some truly remarkable

4    things, many of which we can't even discuss in open court today

5    because of the sensitivities.

6         He began as a line agent in New York City

7    investigating suspected terrorist attacks, and played an

8    instrumental role in preventing at least one planned attack on

9    the New York City subway.  He spent four months boots on the

10   ground in Tanzania digging through the rubble at the site of

11   the U.S. Embassy bombings alongside Marines of Somalia, and

12   later helped track down a confessed child rapist and murderer

13   after a five-day manhunt near his hometown in Ohio.

14        Charlie had just left for a paternity leave when the

15   devastating attacks on 911 took place, and spent the following

16   weeks helping with recovery and cleanup at Ground Zero.

17        Just a few months ago, your Honor, this very

18   prosecution team sat before you and asked for a below-guideline

19   sentence for another defendant who also helped.  They were

20   cited in favor of the below-guideline sentence, his work,

21   volunteer work cleaning up the 9/11 site.

22        That's not happening today.  Today, the government is

23   arguing that Charlie's contribution to these investigations was

24   less significant than the investigations themselves; and that

25   he was simply somewhere in a lengthy chain of command.  Your

Honor, the FBI clearly disagreed.  Charlie didn't simply happen

upon some of the highest-ranking positions in the bureau.  He

earned those positions through years of hard work and dedicated

service.  The government doesn't dispute those facts or those

in our classified addendum, but instead argues that the reward

for such a career should not be leniency at one's sentencing.

Your Honor, the government's argument does harm to the

plain language of Section 3553(a) and case precedent which

requires this Court to consider the defendant's history and

characteristics at sentencing.  As Judge Rakoff wrote in *U.S.*

*v. Adelson*:  If ever a man is to receive credit for the good he

has done, it should be at the moment of his sentencing, when

his very future hangs in the balance.

For Charlie, that moment is now.

Contrary to the government's assertions, the FBI was

more than just Charlie's job; it was his life's work.  His

wife, Pam, details the sacrifices made by Charlie and his

family as a result of that choice.  She describes the

excitement and pride he felt at being accepted to the academy,

giving up a position at a prestigious international bank in the

process.  She describes the months that he spent away from

their newborn children, the late nights and weekend work, the

missed vacations, and the heavy emotional toll it took on him,

all without complaint because he honored the responsibility he

was given to serve this country.

1    As Mr. DuCharme mentioned, he continues to honor that

2 responsibility, even after his arrest and conviction, meeting

3 with the seven independent offices within the Justice

4 Department.

5    Your Honor, even under the pre-*Booker* mandatory

6 guidelines system, the Supreme Court recognized that military

7 or civic service warranted a below-guideline sentence if the

8 service was present to an exceptional degree.  Mr. McGonigal's

9 service is nothing short of exceptional and we believe it

10 weighs strongly in favor of a noncustodial, significantly below

11 guideline sentence at the least in this case.

12    Section 3553(a) also requires this Court to consider

13 the need for just punishment here.

14    Your Honor, for the last two years, Mr. McGonigal has

15 lived with the consequences of his actions, which has included

16 the loss of two jobs, his reputation, and strained

17 relationships with family and friends.  Contrary to the

18 government's arguments, the consequences have been felt far

19 more keenly in this case than in most due to the extraordinary

20 level of media attention that this case has achieved, no doubt

21 deterring any member of the public who's been following along

22 from future violations of U.S. sanctions.

23    As a result of this media attention, Charlie has been

24 demonized for far more than the conduct that he pleaded guilty

25 to.  He has been referred to as Red Charlie, a traitor and a

1  Russian spy, not by only strangers on the internet, but also by

2  prominent public and political figures.

3        The overwhelming hate hasn't stopped with Charlie

4  though.  His wife and 24-year-old daughter have become the

5  target of personal harassment in the news and on social media.

6  A former White House staffer went so far as to call his

7  daughter sexist and vile names on social media simply because

8  of her relationship to Charlie.  Despite all of this, Pam and

9  his children remain steadfast in their support, describing him

10  as an irreplaceable presence in their daily lives.

11        Your Honor, a custodial sentence in this case would

12  only wreak further havoc on the McGonigal family when other

13  options are available and far more appropriate here.

14        Moreover, a noncustodial sentence does not equate to

15  an insignificant one.  The Second Circuit in *U.S. v. Stewart*

16  said that it is difficult to see how a court can properly

17  calibrate a just punishment if it does not consider the

18  collateral effects of a particular sentence.

19        Your Honor, with or without a prison term here,

20  Mr. McGonigal will never again hold a position with the federal

21  government, maintain a security clearance, or serve on a

22  federal jury.  He'll be ineligible to vote for any period of

23  probation that your Honor imposes, and he'll be a convicted

24  felon for the rest of his life.

25        In sum, your Honor, just punishment comes in a variety

of forms, and we respectfully ask this Court to consider all of
the collateral consequences at play here in crafting an
appropriate sentence.

MR. DuCHARME:  Just in closing, Judge, we've done our
best to marshal the facts and the evidence to assist you
through this.  I think it is fair to say it's an unusual case.
We're confident you understand the conduct.  You've got a swift
acceptance of responsibility.  You've got the landscape of
IEEPA cases, his history of service, his good-faith efforts to
cooperate.

In closing, I'll just say, Judge, I'm reminded of a
sentencing before Judge Vitaliano, which bears some
similarities to this.  It was a former serviceman who had
admirably served his country, and then he started smuggling
guns to China; he got mixed up in some criminal conduct.

And when he appeared for sentencing, Judge Vitaliano
said to him:  Sir, any person who has served your country the
way you have is welcome in my courtroom regardless of the
circumstances that brought you here.

And I was taken aback, because we were asking for
quite a tough sentence.  But of course the judge considered his
history of service.  And Judge Vitaliano imposed a sentence of
time served, even though the conduct was serious and the
offense was serious.

And we take the law seriously, Judge.  We have respect

1  for IEEPA.  We appreciate the hard work the government put into

2  this case.  We're grateful that Mr. McGonigal never went beyond

3  the conduct.  But we have no indication that there was any

4  particular thing more nefarious that he was going to do before

5  he was disrupted.  And that puts him in the position where he

6  now finds himself:  Ready to finally and fully accept

7  responsibility for what he's done, and to move forward with his

8  life the best he can to regain the trust of his country, his

9  friends, his family, and his colleagues.

10       And Mr. McGonigal is prepared to address you directly

11  if you'll hear him, your Honor.

12       THE COURT:  Yes, of course.

13       Mr. McGonigal.

14       THE DEFENDANT:  Good afternoon, your Honor.

15       Thank you for giving me the opportunity to speak to

16  you today.  As you can imagine, my situation and this entire

17  process has been very painful, both mentally and physically

18  exhausting, not only for me, but for my wife, my family, as

19  well as my friends, and I have many of them.

20       In feeling this way and reflecting on my actions, I

21  stand before you today with a deep sense of remorse and sorrow

22  for my actions.  I fully acknowledge the mistakes I have made,

23  and I appear before you taking full responsibility for my

24  conduct and actions.

25       In taking responsibility for my actions and reflecting

1   on my situation, I recognize the pain, suffering, and

2   disappointment I have brought on myself, my family, my wife, my

3   friends, and my former colleagues at the FBI.  And for this I

4   am deeply sorry.

5         During my time of reflection, I have developed a

6   better appreciation for changes I need to make to be a better

7   person.  I recognize more than ever that I betrayed the

8   confidence and trust of those closest to me; and for the rest

9   of my life I will be fighting to regain that trust in becoming

10   a better person.

11         In reflecting on my conduct, I fully recognize where

12   and why I went astray and how my actions solely have brought me

13   before you today.  Your Honor, I am humbly asking for a second

14   chance to prove to you and those that I have caused pain,

15   suffering, and harm — and again to you, this Court — that I

16   will continue to be a law-abiding member of society going

17   forward for the remainder of my life.

18         I, more than anyone, know that I have committed a

19   felony.  And as a former FBI special agent, it causes me

20   extreme mental, emotional, and physical pain, not to mention

21   the shame I feel in embarrassing myself and the FBI, the

22   organization that I love and respect.

23         As you know, most recently I met with the government

24   for approximately seven hours in trying to be helpful and

25   provide any requested assistance.  In stating this, I am

1    committed to focusing on being a better person, tending to my

2    personal health, and continuing to love and support my wife,

3    family, and friends.

4            I have sought counseling and spiritual support in

5    bettering myself as a person.  I am willing to take whatever

6    steps necessary to assure you and this Court that I can change

7    and that I can be a productive and sympathetic member of

8    society going forward for the remainder of my life.

9            I am prepared and promise to fully comply with the

10   Court's decision and conditions, and that I am remorseful and

11   wanting to make things right.

12           Your Honor, I ask you today for leniency in

13   administering my sentence.  I am prepared to accept the

14   consequences for my actions and will take the necessary steps

15   to live a respectful and responsible life going forward.

16           Thank you for your consideration.

17           THE COURT:  All right.  Thank you, Mr. McGonigal.

18           Counsel, is there any reason why a sentence should not

19   be imposed at this time?

20           MR. SCOTTEN:  No, your Honor.

21           MR. DuCHARME:  No, your Honor.  We're ready.

22           THE COURT:  All right.  I just need a minute to absorb

23   what I've been hearing.  I don't think it's worth taking a

24   recess though.

25           Before I start, I just want to thank very able counsel

1   on both sides for their written submissions and oral

2   presentations.

3           I'm now going to describe the sentence that I intend

4   to impose.  I will give the attorneys an opportunity to make

5   legal objections before the sentence is actually imposed.

6           In imposing a sentence, I am required to consider the

7   factors that are set forth in 18 U.S.C., Section 3553(a).

8   These factors include:

9           First, the nature and circumstances of the offense and

10  the history and characteristics of the defendant.

11          Second, the need for the sentence imposed to advance

12  the purposes of sentencing, namely, one, to reflect the

13  seriousness of the offense, promote respect for the law and to

14  provide just punishment for the offense; two, to afford

15  adequate deterrence to criminal conduct; three, to protect the

16  public from further climbs of the defendant; four, and to

17  provide the defendant with needed educational or vocational

18  training, medical care, or other correctional treatment in the

19  most effective manner.

20          Third, I must consider the kinds of sentences

21  available.

22          Fourth, the guidelines range.

23          Fifth, any pertinent policy statements.

24          Sixth, the need to avoid unwarranted sentencing

25  disparities.

1    And seventh, the need to provide restitution to any

2    victims of the offense, although that factor is not applicable

3    here.

4    Ultimately, I am required to impose a sentence that is

5    sufficient, but not greater than necessary, to comply with the

6    purposes of sentencing that I mentioned a moment ago.

7    With respect to the guidelines, I've already

8    calculated the applicable range and we have been over that so I

9    will not rehash it here.

10    In short, the range in this case is 57 to 60 months'

11    imprisonment.

12    The defense requests a noncustodial sentence; the

13    government seeks a sentence of 60 months' imprisonment; and

14    probation recommends a sentence of 42 months.  So we have one

15    party recommending a sentence well below the guidelines range,

16    that being Mr. McGonigal; another party requesting a sentence

17    at the very top of the guidelines range, that being the

18    government; and probation making a recommendation that falls

19    somewhere in between the parties' diametrically opposed

20    requests.

21    On that note, I am aware that the parties' widely

22    disparate positions are hardly a product of mere happenstance;

23    they are a reflection of the competing principles underlying

24    the statutes and judicial decisions in this area.

25    On the one hand, the government impresses upon the

1    Court the significant national security interests; that the

2    International Emergency Economic Powers Act was enacted to

3    safeguard interests that the defendant in this case not only

4    endangered over a yearslong period, but which he did by

5    leveraging with impunity for some time his position as one of

6    the country's highest-ranking intelligence officials, all in

7    the name of personal enrichment.

8            The extraordinary seriousness of this conduct calls

9    for significant punishment.  That is the theme or stance, so to

10   speak, of the government's arguments.

11           For its part, the defense urges the Court to remember

12   that before it stands a human being whose full professional and

13   personal record should be taken into account, including a

14   decades-long record of otherwise exceptional public service

15   which the government itself has referred to as a distinguished

16   career; the indelible role the defendant has played in his

17   family; and his accountability and deep repentance for his

18   deeper conduct.  That conduct, in any event, did not involve

19   the kind of direct assistance to hostile foreign nations that

20   was provided by defendants in many other IEEPA cases where

21   custodial sentences were imposed.  According to the defense,

22   this holistic picture of the defendant must be taken into

23   account today, that is the crux of their position.  Under

24   3553(a), I must consider both.

25           To start, it is unquestionable that the offense for

1  which Mr. McGonigal stands convicted was extraordinarily

2  serious and compels a substantial term of incarceration.

3  Through his actions, Mr. McGonigal repeatedly flouted and

4  manipulated a sanctions regime that is vital to our country's

5  national security and foreign policy interests.

6       Indeed, the sanctions relevant to this case were

7  considered so important that they were imposed by three

8  different presidential administrations.  These sanctions

9  crucially allow our government to put economic and political

10  pressure on bad actors to achieve peaceful outcomes without

11  need to resort to more drastic steps such as military force.

12  If nations such as Russia can avoid or influence these

13  sanctions through conduct like Mr. McGonigal's, then the

14  sanctions will be ineffective, increasing the risk of war.

15       While Mr. McGonigal very well may not have intended to

16  harm America's national security by agreeing to work with a

17  known sanctioned individual in a way that violated the law,

18  that is precisely what he ended up doing.  That in and of

19  itself renders Mr. McGonigal's conduct very serious.

20       The gravity of Mr. McGonigal's conduct is exacerbated

21  by the manner in which he carried it out.  As the special agent

22  in charge of the counterintelligence division of the New York

23  FBI field office, Mr. McGonigal occupied what by all accounts

24  is one of the highest-ranking, most important intelligence

25  positions in the country.  It was while serving in that role

that Mr. McGonigal began a concerted yearslong effort to

exploit the information, his skills, and the contacts he had

cultivated for the purpose of developing relationships that

could financially enrich him after he left the FBI.  This

culminated in work beginning in or around 2021 for Russian

national Oleg Deripaska, in violation of sanctions the United

States had imposed on Deripaska in 2018.

Mr. McGonigal well knew that his actions violated

those sanctions, in part because while serving as the special

agent in charge, he had received then-classified information

that Deripaska would be added to a list of Russian oligarchs

with close ties to the Kremlin who would be considered for

sanctions as a result of Russia's 2014 attack on Ukraine.  In

the face of that knowledge, Mr. McGonigal forged ahead with his

work for Deripaska and, in the process, actively took steps to

conceal his crimes, including using encrypted communications

and not referring to Deripaska by name.

Through these actions, Mr. McGonigal posed great risk

to national security, undermined the legitimacy of American

sanctions, and flouted the rule of law.  And he did so after

having previously held a position of trust in enforcing those

sanctions and upholding the law, using the very special

investigative skills he developed with the FBI to prevent

violations of our national security, not to participate in

them.

1    The undeniable seriousness of this and the need to

2  promote respect for the law, to provide just punishment for the

3  offense, and to ensure general deterrence compels a meaningful

4  custodial sentence.

5    At the same time, there are some notable factors that,

6  in my review of the history and characteristics of the

7  defendant pursuant to 18 U.S.C., Section 3553(a), should not be

8  discounted.  Courts have expressly recognized consideration of

9  prior good acts in determining a defendant's sentence.

10   Mr. McGonigal had a long distinguished career as a law

11  enforcement professional and public servant, making some

12  profoundly important contributions to our government in the

13  process.  This is borne out by information I reviewed in

14  Mr. McGonigal's classified supplement, as well as in letters in

15  support from former colleagues.

16   While with the FBI, Mr. McGonigal played leading roles

17  in sensitive high-stakes intelligence and counter-espionage

18  operations, both in the United States and in high-risk areas

19  abroad which yielded valuable information.  The serious

20  criminal acts Mr. McGonigal later went on to commit — and

21  again, I stress the word "serious" — do not altogether stamp

22  out those contributions in earlier years.  Under Section

23  3553(a), a defendant's sentence rests on more than the offense

24  in and of itself.

25   I also want to note the numerous thoughtful and

1   emotional letters submitted by family members and friends who

2   consistently describe Mr. McGonigal as deeply compassionate and

3   caring with a steadfast generosity and kindness.  In addition,

4   I will mention Mr. McGonigal's contrition and the

5   accountability he has taken, including in his statements during

6   his plea allocution and the statement he submitted with his

7   sentencing submission and in his overall manner here in court.

8   His decision to proactively seek counseling relating to alcohol

9   consumption reflects a commendable degree of introspection.

10  While these factors certainly do not neutralize Mr. McGonigal's

11  criminal conduct, they are worthy of consideration and, taken

12  together, support a sentence modestly below the applicable

13  guidelines range.

14          With all of that said, I will state the sentence I

15  intend to impose.

16          Mr. McGonigal, would you please rise.

17          Mr. McGonigal, after considering the factors set forth

18  in Section 3553(a) of Title 18 of the United States Code, I

19  find that a sentence of 50 months' imprisonment is sufficient,

20  but no greater than necessary, to comport with the purpose of

21  sentencing.  I will order a term of three years of supervised

22  release to be completed upon your release from prison.

23          You may be seated, if you wish, as I read the

24  remaining conditions.

25          I'm now going to read the conditions of supervised

1    release that you must comply with along with other details of

2    your sentence.

3        During your term of supervised release, you will be

4    subject to the mandatory conditions set forth on pages 32 to 33

5    of the presentence report.  Those include the following:

6        You must not commit another federal, state, or local

7    crime; you must not unlawfully possess a controlled substance;

8    you must refrain from any unlawful use of a controlled

9    substance; and you must submit to one drug test within 15 days

10   of your release from prison and at least two periodic drug

11   tests thereafter; and you must cooperate in the collection of

12   DNA as directed by the probation officer.

13       In addition, the standard conditions of supervised

14   release shall apply.  Those are listed on pages 33 and 34 of

15   the PSR and will be set forth in the judgment.

16       Mr. McGonigal, would you like me to read those

17   standard conditions to you?

18       THE DEFENDANT:  No, your Honor.

19       THE COURT:  You must also meet certain specialized

20   conditions of supervised release that I will impose.

21       The first is that you must participate in an

22   outpatient mental health treatment program approved by the

23   United States Probation Office.  You must continue to take any

24   prescribed medications unless otherwise instructed by the

25   healthcare provider.  You must contribute to the cost of

1    services rendered based on your ability to pay and the

2    availability of third-party payments.

3            Second, you shall participate in an outpatient

4    treatment program approved by the United States Probation

5    Office, which program which include testing to determine

6    whether you are using drugs or alcohol.  You must contribute to

7    the cost of services rendered based on your ability to pay and

8    the availability of third-party payments.  The Court authorizes

9    the release of available drug treatment evaluations and

10   reports, including the presentence report, to the substance

11   abuse disorder treatment provider.

12           Third, you must provide the probation officer with

13   access to any requested financial information.

14           Fourth, you must not incur new credit charges or open

15   additional lines of credit without the approval of the

16   probation officer unless you are in compliance with the

17   installment payment schedule that I will address in a few

18   moments.

19           Finally, I'm going to recommend that you be supervised

20   by the district of wherever you reside upon your release.

21           There is no restitution in this case.

22           Regarding forfeiture, on August 15th, 2023, I entered

23   a consent preliminary order of forfeiture pursuant to which

24   Mr. McGonigal agreed to the forfeiture of $17,500 representing

25   the amount of proceeds traceable to the instant offense.  That

1   order will become part of the judgment in this case.

2           As for a fine, the guidelines range is 20,000 to

3   200,000.  I note that Mr. McGonigal completed a financial

4   affidavit, and that is in paragraph 84 of the presentence

5   report.

6           Based on the information available to me, I conclude

7   that Mr. McGonigal has not demonstrated an inability to remit a

8   fine.  The probation department has recommended that I impose a

9   fine of $20,000.  The government urges that I impose a fine of

10  $200,000.  I find that a fine is appropriate.  Under the

11  circumstances, I am imposing a fine of $40,000.

12          Additionally, I must impose a mandatory special

13  assessment of $100 which shall be due and payable immediately.

14          Mr. DuCharme, do you have a request for a designation

15  recommendation to BOP?

16          MR. DuCHARME:  I guess we have two requests, really.

17          The first is a recommendation for a facility in the

18  New York area where his family is.

19          And related to that, because, you know, we're

20  preparing for another sentencing in February in D.C., if

21  Mr. McGonigal could be permitted to voluntarily surrender to

22  the BOP facility that's designated after your Judgment and

23  Commitment is entered, sometime after his sentencing in D.C.,

24  we'd appreciate that, Judge.

25          THE COURT:  All right.  I'll give the government a

1    chance to respond to that in a moment.

2           Mr. DuCharme, is Mr. McGonigal a candidate for the

3    Residential Drug Abuse Program?

4           MR. DuCHARME:  He doesn't have a -- I mean he's -- I

5    don't know, to be frank, your Honor.  Beyond his alcohol use,

6    which he's addressed himself, we don't have concerns about

7    other substance abuse.

8           THE COURT:  I'm aware of that.  I'm thinking of the

9    references in the presentence report to the alcohol use.

10          MR. DuCHARME:  I think he would be a good candidate

11   for ongoing treatment with respect to that, your Honor.

12          THE COURT:  Would you like him to be recommended for

13   RDAP or --

14          MR. DuCHARME:  Yes, your Honor.

15          THE COURT:  All right.

16          All right, now --

17          MR. SCOTTEN:  Your Honor, I have some concerns on

18   that.  I too am not familiar with the -- whether the parameters

19   of RDAP apply simply to someone who has claimed that they drank

20   too much wine on occasion.  But it does allow for a significant

21   decrease in sentence when completed, and I don't want that to

22   undermine the gravity of the Court's sentence.  If he qualifies

23   for it, we're certainly not begrudging it; but I'm concerned

24   that that program applies for, to hypothesize, a heroin addict

25   who's committing crimes because of their addiction.  The theory

1    being, well, they can get out of prison earlier because, having

2    cured their addiction, they won't commit crimes.

3          I don't think there's any argument here that

4    Mr. McGonigal was committing crimes because of his alcohol use.

5    So I think the Court should leave that to the assessment of

6    BOP.  If he qualifies for it and they really think he needs it,

7    we're not objecting, but I don't want it to come in with a

8    judicial recommendation that's going to undermine the sentence

9    the Court just imposed.

10          THE COURT:  Mr. DuCharme?

11          MR. DuCHARME:  I think, Judge, the defendant has

12   recognized his own problems with alcohol.  While he's out of

13   custody, he's been seeking treatment.  I think it would be in

14   the collective interest to provide Mr. McGonigal with the

15   opportunity — and we appreciate your recommendation — for him

16   to continue treatment in the RDAP program or, as the government

17   suggests, as the BOP sees fit.  But your recommendation, I

18   think, is consistent with a positive step that he's taken to

19   try to mitigate some of the poor decisions he's made in his

20   life.  So we support your recommendation and appreciate it.

21          THE COURT:  I will note that according to the PSR, the

22   issue arose more than 12 months before his arrest.  It dates

23   back to almost two years, which is relevant.  And I do think

24   there is precedent for recommending the treatment in the RDAP

25   program, so I am going to recommend it.  Of course, it is up to

1    BOP ultimately whether he qualifies and whether they want to

2    put him in that program.

3            Let's talk about voluntary surrender and positions on

4    that.  I know Mr. DuCharme --

5            MR. SCOTTEN:  We don't have objection to a surrender

6    date, your Honor.  I suppose the Court -- and we agree it

7    should be after his sentencing in Washington, D.C.; that's just

8    going to be logistically better for everyone.  So I would ask

9    the Court to set a date something like 30 days after that.  And

10   of course, if complications arise in the D.D.C. sentencing,

11   Mr. DuCharme could always petition the Court to move it, and we

12   might not object if it was reasonable.

13           THE COURT:  All right.  So I am looking at a surrender

14   date of approximately two and a half months out from now, which

15   is February 26, 2024.  That's a Monday.  And I believe that is

16   after the sentencing that's scheduled in the D.D.C. case, which

17   is going forward on February 16th, Mr. DuCharme.

18           MR. DuCHARME:  That's correct, your Honor.

19           THE COURT:  All right.  I'm going to provide for a

20   surrender date of February 26, Mr. McGonigal, by 2 p.m. on that

21   day, February 26, 2024.  You will surrender to the designated

22   institution.  If you have not been designated to an institution

23   by February 26, 2024, you will surrender by 2 p.m. to the

24   United States Marshal for this district.  If you were to fail

25   to appear for surrender on February 26, 2024 at 2 p.m., you

1  would be committing a separate federal offense for which you

2  can receive a separate and consecutive sentence.

3      In addition, the conditions on which you have been

4  released will continue to apply up until the time you report

5  for your sentence.  If you violate the conditions of release,

6  you run the risk, among other things, of the Court remanding

7  you right away.  Do you understand all of that?

8      THE DEFENDANT:  Yes, your Honor.

9      THE COURT:  Does either counsel know of any legal

10  reason, other than anything we have already discussed, as to

11  why the sentence should not be imposed as stated?

12      MR. SCOTTEN:  No, your Honor.

13      MR. DuCHARME:  No, your Honor.

14      THE COURT:  Mr. McGonigal, for the reasons previously

15  stated, it is the judgment of this Court that you be sentenced

16  to 50 months' imprisonment and three years' supervised release.

17  Your term of supervised release will be subject to the

18  mandatory, standard, and special conditions I described.  You

19  are ordered to pay a fine of $40,000 and a special assessment

20  of $100.  As set forth in the consent preliminary order of

21  forfeiture, you are directed to forfeit $17,500 to the

22  government.

23      I do recommend to the Bureau of Prisons that

24  Mr. McGonigal be designated to a facility in the New York area

25  as close as possible to his residence so that he may maintain

1  ties with his family during the period of his incarceration.

2          I also recommend that Mr. McGonigal participate in the

3  RDAP program during his term of incarceration, which will

4  ultimately be determined by BOP.

5          I'm going to turn now to some final matters before we

6  adjourn.

7          I don't think there are any open counts, Mr. Scotten,

8  is that true?

9          MR. SCOTTEN:  There are underlying counts in the

10  initial indictment, your Honor.  And we move to dismiss any

11  counts on which Mr. McGonigal was not convicted.

12          THE COURT:  All right.  I will dismiss those counts at

13  this time.

14          Mr. McGonigal, I advise you that you have the right to

15  appeal from the judgment imposing the sentence to the extent

16  you haven't waived it.  If you are unable to pay the cost of an

17  appeal, you may apply for leave to appeal *in forma pauperis*.

18  If that application were granted, you would be permitted to

19  appeal without the payment of any fees.  The notice of appeal

20  must be filed within 14 days of the Judgment of Conviction.

21          Mr. Scotten, is there anything else we should discuss

22  today?

23          MR. SCOTTEN:  I don't think so, your Honor.

24          Thank you.

25          THE COURT:  Mr. DuCharme, anything else?

1           MR. DuCHARME:  No, your Honor.

2           THE COURT:  All right.  Mr. McGonigal, I hope that you

3   pass the time ahead without issue; that your family and friends

4   and community continue to support you in the manner that they

5   have; that you are reunited with them afterwards; and that you

6   continue to live a life that does not involve criminal

7   activity.  And I wish you well in that regard.

8           Thank you.  We are adjourned.

9                         *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25