**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

SERGEY SHESTAKOV,

                 Defendant.

Case No. 23 Cr. 16 (JHR)

**MEMORANDUM OF LAW IN SUPPORT OF
SERGEY SHESTAKOV'S MOTION TO COMPEL
THE GOVERNMENT TO CONDUCT A PRUDENTIAL SEARCH OF THE
U.S. INTELLIGENCE COMMUNITY AND PRODUCE DISCOVERY**

**GLAVIN PLLC**
Rita M. Glavin
Katherine E. Petrino
Leo S. Korman
156 W. 56th Street, Ste. 2004
New York, NY 10019
Tel: (646) 693-5505
Email: rglavin@glavinpllc.com

*Counsel for Sergey Shestakov*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................................ ii

I.     BACKGROUND ................................................................................................................ 4

     A.    The 2018 U.S. Sanctions on Mr. Deripaska and the USAO's Investigations of Mr. Deripaska's Efforts to Evade those U.S. Sanctions ................................... 4

     B.    USAO Charges Mr. McGonigal and Mr. Shestakov ............................................ 8

II.    APPLICABLE LAW ........................................................................................................ 9

III.   ARGUMENT ................................................................................................................... 10

     A.    The Court Should Order a Prudential Search for Information That Is Relevant and Helpful to the Defense Within the Possession of the United States Intelligence Community ............................................................................ 10

     B.    Alternatively, the Court Should Issue Mr. Shestakov's Rule 17(c) Subpoena to the NSA ....................................................................................... 17

           i.     NSA Subpoena Request Number 1 ......................................................... 20

           ii.    NSA Subpoena Request Number 2 ......................................................... 22

           iii.   NSA Subpoena Request Number 3 ......................................................... 23

     C.    The Court Should Further Order the Government to Produce the Narrow Subset of Rule 16 Materials Set forth in Mr. Shestakov's July 15, 2024 Letter Motion ......................................................................................................... 25

IV.   CONCLUSION ............................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Brady v. Maryland*,
  373 U.S. 83 (1963) ................................................................................................ 9
*Deripaska v. Yellen*,
  2021 WL 2417425 (D.D.C. June 13, 2021) ................................................. 4, 5, 18
*Giglio v. United States*,
  405 U.S. 150 (1972) .............................................................................................. 9
*Kyles v. Whitley*,
  514 U.S. 419 (1995) ......................................................................................... 9, 10
*United States v. Akhavan*,
  505 F. Supp. 3d 289 (S.D.N.Y. 2020) ................................................................ 19
*United States v. Avellino*,
  136 F.3d 249 (2d Cir. 1998) ............................................................................... 10
*United States v. Kuciapinksi*,
  2022 WL 3081928 (D. Colo. Aug. 3, 2022) ....................................................... 10
*United States v. Nachamie*,
  91 F. Supp. 2d 552 (S.D.N.Y. 2000) ............................................................. 20, 22
*United States v. Oseguera Gonzalez*,
  507 F. Supp. 3d 137 (D.D.C. 2020) .................................................................... 11
*United States v. Osorio*,
  929 F.2d 753 (1st Cir. 1991) .............................................................................. 12
*United States v. Rajaratnam*,
  753 F. Supp. 2d 299 (S.D.N.Y. 2010) ................................................................ 25
*United States v. Raymond*,
  2023 WL 7611601 (D.D.C. Nov. 14, 2023) ................................................... 16, 18
*United States v. Soliman*,
  2009 WL 1531569 (W.D.N.Y. May 29, 2009) .................................................... 21
*United States v. Stein*,
  488 F. Supp. 2d 350 (S.D.N.Y. 2007) ................................................................ 10
*United States v. Stevens*,
  985 F.2d 1175 (2d Cir. 1993) ............................................................................... 9
*United States v. Tucker*,
  249 F.R.D. 58 (S.D.N.Y. 2008) ......................................................................... 19
*United States v. Ulbricht*,
  858 F.3d 71 (2d Cir. 2017) ................................................................................... 9
*United States v. Woewiyu*,
  2018 WL 2304042 (E.D. Pa. May 21, 2018) ...................................................... 10

**Executive Orders**

Exec. Order No. 13660 ............................................................................................. 5
Exec. Order No. 13661 ............................................................................................. 5
Exec. Order No. 12333 ........................................................................................... 18

Exec. Order No. 13355 ............................................................................................. 18
Exec. Order No. 13470 ............................................................................................. 18

**Statutes**

50 U.S.C. § 1801 ...................................................................................................... 18

**Rules**

Federal Rules of Evidence Rule 406 ........................................................................ 26
Federal Rules of Evidence Rule 806 ............................................................... 22, 23, 25
Federal Rules of Evidence Rule 801 ........................................................................ 22
Federal Rules of Criminal Procedure Rule 16 ................................................... *passim*
Federal Rules of Criminal Procedure Rule 17 ................................................... *passim*

Defendant Sergey Shestakov respectfully submits this brief in support of his motion to compel the government to produce records that are both material to preparing his defense and exculpatory. Given the importance of these issues to Mr. Shestakov's defense, we respectfully request oral argument.

As the Court is aware, the defense moved to compel the production of certain Rule 16 materials that are material to the preparation of the defense on October 19, 2023. ECF No. 85. The Court summarily denied that motion without stating any basis on June 21, 2024, and informed the parties that the Court would explain the basis for the ruling at an August 1, 2024 pretrial conference in advance of the August 6, 2024 trial date. ECF No. 123. On July 15, 2024, the defense requested that the Court: (1) hold an immediate hearing to reconsider its summary denial of Mr. Shestakov's motion to compel; (2) consider directing the government to produce a narrower subset of the materials requested in the October 19, 2023 motion to compel, and set forth such narrower subset of materials; and (3) adjourn the August 6, 2024 trial date for numerous reasons, including to allow the defense time to consider and seek an appeal to the Second Circuit of the Court's complete denial of the motion to compel discovery material to the preparation of the defense. The Court has still not ruled on that application.[1] On July 16, 2024, the government moved to adjourn the trial date because of a discovery issue that belatedly came to the government's attention, which the Court granted at a July 23, 2024 conference. ECF No. 144.

In this motion, Mr. Shestakov requests that the Court enter an order to:

1.      Compel the U.S. Attorney's Office for the Southern District of New York ("USAO") to conduct a prudential search for certain information concerning communication records involving Oleg Deripaska and Evgeny Fokin that are relevant,

---

[1]      The Court also has not ruled on the defense's February 16, 2024 motion to dismiss the Indictment.

material, and helpful to the defense that is within the possession of the United States intelligence community; or alternatively, grant Mr. Shestakov's request to serve a Rule 17(c) subpoena on the National Security Agency ("NSA"), as set forth in the defense's July 5, 2024 pending application to this Court, ECF No. 135, for (i) communications and records of communications between Mr. Deripaska and Mr. Fokin; (ii) communications and records of communications between Mr. Fokin and Mr. Shestakov; and (iii) communications and records of communications between Mr. Fokin and officials of En+ Group International ("EN+") or United Company RUSAL PLC ("Rusal");[2] and

2.      Compel the USAO to produce (i) records and information concerning entities, individuals, and accounts with whom or through which Mr. Deripaska conducted business or financial transactions from 2018 to 2022; (ii) the "contacts" lists stored in the seized electronic devices and/or messaging accounts of Olga Shriki, Graham Bonham-Carter, Natalia Bardakova, and Ekaterina Voronina; (iii) communications concerning the manner in which Mr. Deripaska conducted business and financial transactions from 2018 through 2022; (iv) any information or records reflecting that Mr. Deripaska, Mr. Bonham-Carter, Ms. Shriki, Ms. Bardakova, and Ms. Voronina had no dealings with Pandean Ltd. ("Pandean"), Pandean's Gazprombank account, or Arina Lazarou from 2018 through 2022; and (v) any information or records reflecting that Mr. Deripaska did not communicate with Mr. Fokin between July 1, 2021 and November 30, 2021, and/or did not communicate with Mr. Fokin about Pandean, Charles McGonigal or the business intelligence work to be

---

[2]      Should the Court grant the NSA subpoena, the NSA will have an opportunity to object to the subpoena and/or move to quash the subpoena and be heard by this Court. To the extent any classified information is contained within responsive documents, as part of any potential objection, the Court, if needed, may hear such information in an *ex parte* hearing. Similarly, the Court can require the NSA to produce responsive records for the Court to review *in camera* before ordering the production of any such classified documents.

performed regarding Norilsk Nickel ("Nornickel") and its CEO, Vladimir Potanin, between July 1, 2021 and November 30, 2021.

Records responsive to these requests are material to preparing Mr. Shestakov's defense as the responsive materials show that (a) there was no conspiracy with Mr. Deripaska (or anyone else) to violate U.S. sanctions laws as charged in the Indictment and/or (b) the business intelligence work was done on behalf of EN+/Rusal. Even assuming the records were to show such a conspiracy, the documents (particularly the NSA records) would be critical to proving that Mr. Shestakov was not knowingly involved in any such conspiracy. Despite the fact that the prosecutors in this case admitted, "as a general matter, the government . . . conducts prudential searches with other agencies in the intelligence community,"—Conference Tr., 13:17-20, Aug. 8, 2024—the USAO has refused to even acknowledge whether they have performed or requested a search of records of the NSA or the Central Intelligence Agency ("CIA") for the records set forth above *in this case*, thereby necessitating the need for this Motion. Moreover, records held by the U.S. intelligence community as well as the records relating to Mr. Deripaska are required to be produced by the USAO pursuant to Federal Rules of Criminal Procedure Rule 16 and *Brady v. Maryland* as such records are exculpatory.

Mr. Shestakov was not part of any conspiracy to violate U.S. sanctions. And there was no such conspiracy. Indeed, as we now know from the attorneys for EN+ and Mr. Fokin's attorney, Mr. Fokin—who is still a high-ranking official at EN+—repeatedly confirmed and will testify that the business intelligence work at issue was done on behalf of EN+/Rusal, as Mr. Shestakov has insisted from the beginning. ECF No. 190 at 1 ("Mr. Fokin has consistently stated that the business intelligence work at issue was done on behalf of En+—not Oleg Deripaska as wrongly charged in

the Indictment.").  The materials sought in this Motion to Compel are essential in refuting the government case and in establishing Mr. Shestakov's innocence at trial.[3]

## I.  BACKGROUND

### A.  The 2018 U.S. Sanctions on Mr. Deripaska and the USAO's Investigations of Mr. Deripaska's Efforts to Evade those U.S. Sanctions

On April 6, 2018, the U.S. Government subjected Russian oligarch Mr. Deripaska to economic sanctions based on the U.S. Department of the Treasury's Office of Foreign Assets Control's ("OFAC") finding that Mr. Deripaska "acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation" (*i.e.* Russian President Vladimir Putin).[4]  OFAC's findings were based on an "Evidentiary Memoranda," in which most of the information relied upon for designating Mr. Deripaska was classified.  *See Deripaska v. Yellen*, 2021 WL 2417425, at \*5 (D.D.C. June 13, 2021) (the "Evidentiary Memoranda substantiat[e] [OFAC's] sanctioning of Deripaska").  The fact that the U.S. government relied so extensively on classified information in designating Mr. Deripaska demonstrates the interest of the intelligence community in closely tracking Mr. Deripaska's activities, given his ties to the Kremlin and Russian organized crime.  At the same time that

---

[3]  Any assertion by that these materials are not in its possession, custody, or control is blatantly wrong.  Indeed, the government admitted that because "personnel within [the Counterintelligence Division of the FBI's New York Field Office] sometimes move between squads," the "fact-finding [needed to explain why the materials are not in its possession, custody, or control] would be granular and time consuming."  ECF No. 87, at 9.  Indeed, in a recently unveiled a Verified Civil Complaint for Forfeiture involving Mr. Deripaska and AUSAs from this USAO, the government admitted "FBI's investigation into Deripaska has included, among other topics, services provided by U.S. citizen Olga Shriki, and others, to and for the benefit of Deripaska and certain Deripaska-owned entities."  Verified Civil Compl. for Forfeiture ¶ 14, *United States v. $3,435,676.57 United States Currency Held in General Ledge Account No. 4050720 at Wells Fargo Bank, N.A.*, No. 24-cv-09189 (S.D.N.Y. Dec. 2, 2024).  Given the government's numerous discovery failures that have plagued this case—*see* ECF No. 153 (detailing government's history of grave discovery missteps and failures in this case)—the Court should not and cannot accept the government's baseless assertions at face value.

[4]  Press Release, U.S. Dep't of the Treasury, *Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity* (Apr. 6, 2018), https://home.treasury.gov/news/press-releases/sm0338.

Deripaska was placed on the sanctions list, the U.S Government also subjected EN+ to economic sanctions "for being owned or controlled by, directly or indirectly, Oleg Deripaska" in addition to two other companies controlled by Mr. Deripaska.[5] Rusal was also "designated for being owned or controlled by, directly or indirectly, EN+," which was controlled by Mr. Deripaska.[6] Consequently, Mr. Deripaska, EN+, and Rusal were added to OFAC's List of Specially Designated Nationals ("SDN List").

The sanctions prohibited Mr. Deripaska, EN+, and Rusal from transferring, paying for, exporting, and withdrawing "all property and interests in property that are in the United States, that [thereafter] come within the United States, or that are or [thereafter] come within the possession or control of any United States person."[7] The sanctions further prohibited individuals from providing money, goods, or services to or for the benefit of Mr. Deripaska, EN+, and Rusal, or receiving money, goods, or services from Mr. Deripaska, EN+, and Rusal.[8] Soon thereafter, the USAO and the Federal Bureau of Investigation ("FBI") began investigating Mr. Deripaska and his efforts to evade those sanctions through shell corporations and with the assistance of others.

On January 27, 2019, sanctions imposed on EN+ and Rusal were lifted and each entity was removed from the SDN List because OFAC found EN+ and Rusal "reduced Oleg Deripaska's direct and indirect shareholding stake in these companies and severed his control."[9]

---

[5]     *Id.*

[6]     *Id.*

[7]     Exec. Order No. 13661, 79 Fed. Reg. 15535 (Mar. 16, 2014).

[8]     Exec. Order No. 13660, 79 Fed. Reg. 13493 (Mar. 6, 2014).

[9]     Press Release, U.S. Dep't of the Treasury, *OFAC Delists En+, Rusal, and EuroSibEnergo* (Jan. 27, 2019), https://home.treasury.gov/news/press-releases/sm592.

Days after Russia's invasion of Ukraine on February 24, 2022, United States Attorney General Merrick B. Garland announced the Department of Justice's ("DOJ") creation of Task Force KleptoCapture, "an interagency law enforcement task force dedicated to enforcing the sweeping sanctions, export restrictions, and economic countermeasures that the United States has imposed . . . in response to Russia's unprovoked military invasion of Ukraine."[10] In the press release, United States Deputy Attorney General Lisa O. Monaco stated: "Oligarchs be warned: we will use every tool to freeze and seize your criminal proceeds."[11] Until in or about August 2023, an Assistant United States Attorney from the USAO was detailed as the head of Task Force KleptoCapture.

In the year following Russia's invasion, DOJ touted its success in forfeiting, freezing, or otherwise restraining over $500 million in assets belonging to individuals linked to the Russian regime.[12] DOJ also reported that its efforts led to the indictments of over 30 individuals and two corporate entities "accused of sanctions evasion, export control violations, money laundering, and other crimes—and arrested defendants in over a half-dozen countries in 2022." *Id.* DOJ specifically lauded the indictments of Mr. Deripaska and British businessman Mr. Bonham-Carter, and noted the launch of the Task Force KleptoCapture aimed at enforcing "sweeping sanctions" through investigations and prosecutions. *Id.*

---

[10]     Press Release, United States Dep't of Justice, *Attorney General Merrick B. Garland Announces Launch of Task Force KleptoCapture* (Mar. 2, 2022), https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-announces-launch-task-force-kleptocapture.

[11]     *Id.*

[12]     United States Dep't of Justice, *Fact Sheet: Justice Department Efforts in Response to Russia's February 2022 Invasion of Ukraine* (Feb. 24, 2023), https://www.justice.gov/d9/press-releases/attachments/2023/02/24/2023.02.23_doj_ukr_fact_sheet_final_1.pdf.

Though Mr. Deripaska was in the sights of U.S. Attorney's Office for the Southern District ("USAO") long before the Russian invasion of Ukraine in 2022, Russia's aggression increased pressure to bring criminal charges against Russian oligarchs and those allegedly close to them. Consequently, the USAO's investigations into Mr. Deripaska culminated in three indictments for sanctions violations involving Mr. Deripaska in close succession in the fall of 2022 and early 2023. This included the following: *United States v. Graham-Carter*, *United States v. Deripaska*, and *United States v. McGonigal*.

Investigations by the USAO related to these indictments examined Mr. Deripaska's business and financial activities to circumvent sanctions going back at least as far back as 2019. *See United States v. Graham Bonham-Carter*, No. 22 Cr. 503 (PAE) (S.D.N.Y.) (charging British businessman Mr. Bonham-Carter in a three-count indictment alleging he was in a conspiracy with Mr. Deripaska from at least 2020 through at least 2021 to violate the International Emergency Economic Powers Act ("IEEPA"), a substantive violation of IEEPA, and one count of wire fraud); ECF No. 2 (*Deripaska* Indictment); *United States v. Deripaska*, 22 Cr. 518 (PKC) (S.D.N.Y.) (indicting Mr. Deripaska, Ms. Bardakova, Ms. Voronina, and Ms. Shriki for conspiring from at least 2019 through 2022 to violate sanctions imposed on Mr. Deripaska and one of his corporate entities).[13] These cases overlap with the same time period as the indictment against Mr. Shestakov.

---

[13]     This USAO investigation went on for at least two years before the indictment, because the USAO served a grand jury subpoena on Ms. Shriki, a U.S. citizen, on September 23, 2020 for records relating to the investigation of Mr. Deripaska. The indictment reveals numerous investigative steps taken, including border stops, the apparent seizure of electronic devices of Ms. Voronina and Ms. Bardakova in or about 2022, and the seizure of electronic communications with and involving Mr. Deripaska between 2020 and 2022. *See* Sealed Indictment ¶¶ 5, 18-19, *United States v. Deripaska*, No. 22 Cr. 518 (S.D.N.Y. Sept. 29, 2022), https://www.justice.gov/usao-sdny/pr/russian-oligarch-oleg-vladimirovich-deripaska-and-associates-indicted-sanctions-evasion.

### B. USAO Charges Mr. McGonigal and Mr. Shestakov

On January 12, 2023, a grand jury in the Southern District of New York returned a sealed indictment, No. 23 Cr. 16, against Mr. McGonigal and Mr. Shestakov, charging Mr. Shestakov with: (i) conspiracy to violate IEEPA; (ii) violation of IEEPA; (iii) conspiracy to commit money laundering; (iv) money laundering; and (v) making false statements. *See* ECF No. 2, *Shestakov* Indictment. The indictment alleges that Mr. Shestakov conspired with co-defendant Mr. McGonigal and unindicted co-conspirators Mr. Deripaska and Mr. Fokin to violate the sanctions imposed on Mr. Deripaska. Specifically, the indictment alleges that, beginning in the spring of 2021, Mr. Deripaska's "agent" Mr. Fokin hired Mr. McGonigal and Mr. Shestakov to investigate a rival Russian oligarch, Mr. Potanin, *on behalf of Mr. Deripaska*. Mr. Potanin—who had not been placed on the U.S. sanctions list until 2022—had a controlling stake in Nornickel.

What the Indictment does not mention is EN+ was keenly interested in Mr. Potanin and Nornickel because EN+'s subsidiary, Rusal, is the second largest shareholder of Nornickel (second to Mr. Potanin himself). At the time, there were serious concerns/accusations that Mr. Potanin was self-dealing and/or diluting or misusing assets at the expense of other Nornickel shareholders such as EN+. Therefore, EN+, as the second largest shareholder of Nornickel, had an enormous financial interest in how Nornickel was managed, how its assets were utilized, and whether Mr. Potanin was self-dealing and/or diluting or misusing assets at the expense of other Nornickel shareholders. The business intelligence services Fokin was seeking were for the purpose of an anticipated corporate battle and potential lawsuit concerning the mismanagement and misuse of Nornickel assets by Mr. Potanin.

Notably, unindicted co-conspirator Mr. Fokin was employed by EN+ as its director of international cooperation at all relevant times, and, though previously under sanctions, EN+ was

no longer under any U.S. sanctions.[14]  According to the USAO, Mr. Deripaska, through Mr. Fokin, contracted with a New Jersey-based corporation associated with Mr. McGonigal, Spectrum Risk Solutions ("Spectrum"), for "business intelligence services, analysis, and research relevant to [the Russian Corporation], its business operations, and shareholders."  ECF No. 2 ¶¶ 18-19.  Mr. Deripaska then purportedly caused money to be sent from a Russian bank—Gazprom Bank—through a Cyprus corporation, Pandean, to Spectrum.  Spectrum then paid Mr. McGonigal and Mr. Shestakov.  *Id.* ¶ 19.  The Indictment is simply wrong: Mr. Fokin engaged Mr. McGonigal's services for corporate intelligence work about Nornickel and Potanin on behalf of EN+/Rusal, not Deripaska.

## II.   **APPLICABLE LAW**

The USAO's discovery obligations are governed largely by Federal Rules of Criminal Procedure Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963).  Rule 16 requires the government to produce certain enumerated categories of information, including records "material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E)(i).  Evidence is material if it "could be used to counter the government's case or to bolster a defense."  *United States v. Ulbricht*, 858 F.3d 71, 109 (2d Cir. 2017) (quoting *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)).  Similarly, under *Brady* and its progeny, the government must disclose evidence favorable to an accused when such evidence is material to guilt or punishment because it is exculpatory or impeaching.  *Brady*, 373 U.S. at 87-88; *Kyles v. Whitley*, 514 U.S. 419, 432-440 (1995); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

---

[14]     *See* En+ Group, *Annual Report 2018* at 2 (Apr. 26, 2018), https://enplusgroup.com/upload/iblock/bb8/EN_AR2018_ENG__FINAL.pdf; *Evgeny Fokin Business Leaders Biography*, Marketscreener (last visited Oct. 19, 2023) https://www.marketscreener.com/business-leaders/Evgeny-Fokin-0CNHF6-E/biography/; U.S. Customs and Border Protection, *TECS-Secondary Inspection Report Evgeny Fokin* (Aug. 16, 2021) (on file with counsel) ("[S]ubject stated that he has been working for En+ for about the past 10 years. Subject stated that he is the Director for international government relations.").

The Government's obligations under Rule 16 apply to any information "within the government's possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E). The scope of the obligation has been described as follows: "Legal ownership of the requested documents or things is not determinative, nor is actual possession necessary if the party has control of the items. Control has been defined to include 'the legal right to obtain the documents requested upon demand.' The term 'control' is broadly construed." *United States v. Stein*, 488 F. Supp. 2d 350, 361 (S.D.N.Y. 2007) (citation omitted). The Government's *Brady* obligation is similar; it has a duty to "learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437; *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).

### III.  ARGUMENT

#### A. The Court Should Order a Prudential Search for Information That Is Relevant and Helpful to the Defense Within the Possession of the United States Intelligence Community

Mr. Shestakov requests that the USAO perform a prudential search of files within the possession of the United States intelligence community, including the NSA and CIA, for the following information that is relevant and helpful to the defense: (i) communications and records of communications between Mr. Deripaska and Mr. Fokin; (ii) communications and records of communications between Mr. Fokin and Mr. Shestakov; and (iii) communications and records of communications between Mr. Fokin and officials of En+ or Rusal. Prudential searches are routinely conducted at agencies within the intelligence community that may possess discoverable material. *See, e.g.*, *United States v. Kuciapinksi*, 2022 WL 3081928, at *6 (D. Colo. Aug. 3, 2022) ("Pursuant to CIPA, the Counterintelligence and Export Control Section made a Prudential Search Request with the federal agencies—including the NRO, NSA, and Army Tencap—controlling the discovery that that [Defendant] requested.); *United States v. Woewiyu*, 2018 WL 2304042, at *3 (E.D. Pa. May 21, 2018) ("[T]he Assistant United States Attorney assigned to prosecute

[Defendant's] case, 'requested that the Department of Justice's National Security Division (NSD) ask another government entity to conduct a prudential search request, in order to determine whether the entity possessed classified documents relating to [Defendant].'"); *United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137, 170 (D.D.C. 2020) (noting that the prosecution "has reviewed OFAC records related to the defendant to determine whether they contained any evidence that would be discoverable under Rule 16 or as impeachment or exculpatory material . . . includ[ing] classified and privileged material").  Indeed, the AUSAs in this case affirmed that, "as a general matter, the government . . . conducts prudential searches with other agencies in the intelligence community."  Conference Tr., 13:17-20, Aug. 8, 2024.  Nonetheless, the government has refused to inform the defense if they requested any such searches or searched for and/or reviewed records that the defense specifically requests here and also seeks via a Rule 17(c) subpoena to the NSA.

Pursuant to the DOJ Criminal Resource Manual, Section 2052(B)—regardless of the classification status of the discovery material—AUSAs *are required* to search for discovery material within intelligence community files when the intelligence community has been an active participant in the investigation or prosecution of the case.[15]  This occurs when the intelligence community "has served in a capacity that exceeds the role of providing mere tips or leads based on information generated independently of the criminal case" or "where an intelligence agency has provided information to a law enforcement agency or to the prosecution, which information

_____
[15]     U.S. Department of Justice, Criminal Resource Manual § 2052(B) (updated April 2018), https://www.justice.gov/jm/criminal-resource-manual-2052-contacts-intelligence-community-regarding-criminal-investigations.

serves independently as a factual element in support of a search warrant, arrest warrant, indictment, etc."[16]

Even where the intelligence community had no active involvement in the criminal investigation, the DOJ Criminal Resource Manual provides that the AUSAs search "<u>must</u> extend to sources that are readily available to the government and that, because of the known facts and nature of the case, should be searched as a <u>function of fairness to the defendant</u>."[17]

Despite the Government refusing to state whether or not they conducted a prudential search of the intelligence community or to what agency and what records were specified to be searched for—if any such search was actually conducted or documents reviewed—this is the precisely the type of case for which a prudential search is appropriate and mandated by DOJ policy. *See United States v. Osorio*, 929 F.2d 753, 761 (1st Cir. 1991) ("prosecutor charged with discovery obligations cannot avoid finding out what 'the government' knows, simply by declining to make reasonable inquiry of those in a position to have relevant knowledge"). The Indictment expressly refers to matters of national security that reasonably implicate the equities of multiple intelligence community agencies. *See, e.g.*, ECF No. 2 ¶¶ 4, 13, 15.

Discovery in this case has shown that the U.S. intelligence community was keenly interested in, monitored, and surveilled Mr. Shestakov's alleged co-conspirators: Mr. Fokin and Mr. Deripaska. Regarding Mr. Fokin, discovery has shown that the U.S. intelligence community conducted physical surveillance of Mr. Fokin during trips to the U.S. in 2019 and 2021 and documented who he met with. This included the U.S. Department of Homeland Security ("DHS") stopping, seizing, and searching his electronic devices, and interviewing Mr. Fokin on August 16,

---

[16]     *Id.*

[17]     *Id.* § 2052(B)(2) (emphasis added).

2021 upon Mr. Fokin entering the United States. The Department of Homeland Security ("DHS") partially imaged Mr. Fokin's phone and took certain screen captures of his laptop. While the USAO has refused respond to our request and inform us as to why DHS took these steps against Mr. Fokin at that time, it is indisputable that DHS was acting at the request of the U.S. intelligence community given that this is not usual DHS procedure—DHS was tipped off and asked to do the interview and search by another agency. Moreover, in one document produced to Mr. Shestakov—which was unclassified for purposes of the USAO providing discovery to the defense—there is reference to speculation that Mr. Fokin may have been associated with Russian Intelligence. In particular, the document stated: "Additional information pertaining to *Fokin is maintained at a higher classification*." USAO_00000047 (emphasis added). Given the intelligence community's intense focus and monitoring of Mr. Fokin, the intelligence community—*i.e.*, the NSA, CIA, and FBI—undoubtedly would have intercepted communications involving Mr. Fokin, including capturing communications and/or records of communications of Mr. Fokin and Mr. Deripaska. Such records are vital to the defense because they will show who Mr. Fokin communicated with, and most importantly did not communicate with, during the relevant time period charged in the Indictment,

Moreover, it is widely known that the U.S. intelligence community and DOJ have been keenly interested in and monitored Mr. Deripaska and his global business connections that include his large ownership stake in the world's aluminum supply. Indeed, Mr. Deripaska has been in the sights of U.S. intelligence and law enforcement officials since at least 2006 when the United States revoked an entry visa to Mr. Deripaska due to his alleged ties to organized crime in Russia.[18] In

---

[18]     Jim Wolf, *U.S. revoked Deripaska visa - State Dep't official*, REUTERS (Aug. 9, 2007), https://www.reuters.com/article/idUSN1143738620070511/.

addition to being sanctioned by the United States and numerous foreign countries, Mr. Deripaska's

relative's homes in Washington, D.C., and New York were raided by the FBI in 2019 as part of a

criminal investigation into Mr. Deripaska's activities.[19]  Moreover, it is widely reported that Mr.

Deripaska is a key ally of Mr. Putin and has been identified by OFAC for helping Mr. Putin illicitly

launder money.[20]  Mr. Deripaska's wealth as a Russian oligarch, his aluminum empire and

tremendous influence in the world's aluminum industry, and his connections to Mr. Putin have

been of great interest to the intelligence community for years. Indeed, the FBI tried to recruit

Mr. Deripaska as an informant between 2014 and 2016 as part of a classified program, which

would have necessarily entailed surveilling and assessing Mr. Deripaska to determine his

usefulness and credibility.[21]  Indeed, Mr. Deripaska purportedly worked with the U.S. Government

in an effort to rescue an FBI agent captured in Iran and purportedly spent $25 million of his own

money in that effort.[22]  Notably, *British intelligence*, who had Mr. Deripaska under surveillance,

surveilled a meeting in London between Mr. McGonigal, Mr. Deripaska, and others in 2018, and

then provided that information to the U.S. intelligence community because of their well-known

interest in Mr. Deripaska.[23]  This incident was purportedly part of the basis for the government

---

[19]     Devlin Barrett et al., *FBI searches D.C., NYC homes connected to Russian oligarch Oleg Deripaska*, The Washington Post (Oct. 19, 2021), https://www.washingtonpost.com/national-security/fbi-searches-oleg-deripaska-property/2021/10/19/ff151070-30f6-11ec-9241-aad8e48f01ff_story.html.

[20]     *Id.*

[21]     Rebecca Davis O'Brien, *How an Oligarch May Have Recruited the F.B.I. Agent Who Investigated Him*, The N.Y. Times (Jan. 28, 2023), https://www.nytimes.com/2023/01/28/nyregion/fb-indictment-mcgonigal-deripaska.html; Veronica Stracqualursi, *NYT: DOJ's Bruce Ohr, Dossier Author Christopher Steele Involved in Efforts to Flip Russian Oligarch*, CNN (Sept. 4, 2018), https://www.cnn.com/2018/09/01/politics/bruce-ohr-christopher-steele-efforts-flip-russian-oligarch/index.html.

[22]     O'Brien, *supra* note 21.

[23]     Mattathias Schwartz, *Exclusive: British Intel Caught FBI Spy Chief Secretly Meeting a Russian in London*, Business Insider (Feb. 16, 2023), https://www.businessinsider.com/british-uk-london-deripaska-charles-mcgonigal-fbi-meeting-russia-surveillance-2023-2.

opening up the investigation that led to the Indictment in this case. Mr. Deripaska has also been alleged to have been involved in Russian efforts to interfere with the 2016 presidential election and illegally wiretapping a government official.[24]

There is no question that the U.S. intelligence community—which viewed Mr. Deripaska as an asset to be recruited—has carefully surveilled and monitored Mr. Deripaska over the years and would have records material to the defense here, *i.e.*, that Mr. Fokin did not contract for the business intelligence work on behalf of Mr. Deripaska and payment for that work was not done by Mr. Deripaska. As the Court is aware, Mr. Deripaska was indicted by the USAO in September 2022 for allegedly evading sanctions.[25] And, as discussed *infra*, a civil forfeiture action was filed by USAO on December 2, 2024, in which the government stated: the "FBI's investigation into Deripaska has included, among other topics, services provided by U.S. citizen Olga Shriki, and others, to and for the benefit of Deripaska and certain Deripaska-owned entities."[26] That civil forfeiture complaint provided specific minute details on how Mr. Deripaska moved his money, including the bank accounts and entities. Moreover, the verification page of that complaint states that part of the basis for bringing this forfeiture complaint includes "information obtained by other law enforcement officials" that are not the FBI.[27]

As a result of the intelligence community's longstanding interest in Mr. Fokin and Mr. Deripaska, it is inconceivable that the intelligence community (and specifically the NSA and

---

[24]     *Id.*

[25]     Press release, U.S. Department of Justice, Russian Oligarch Oleg Vladimirovich Deripaska and Associates Indicted for Sanctions Evasion and Obstruction of Justice (Sept. 29, 2022), https://www.justice.gov/opa/pr/russian-oligarch-oleg-vladimirovich-deripaska-and-associates-indicted-sanctions-evasion-and.

[26]     Verified Civil Compl. for Forfeiture, *supra* note 3 ¶ 14.

[27]     *Id.* at p. 20.

CIA) does not possess at least some of Mr. Fokin's and Mr. Deripaska's communication records (including phone records and intercepted communications) and electronic correspondence during the relevant time period. Such records are not material to Mr. Shestakov's defense and/or constitute *Brady* material. For example, Mr. Fokin's and Mr. Deripaska's phone records and electronic communications will show, among other things: (1) Mr. Shestakov was not in contact with Mr. Deripaska during the time charged in the Indictment; (2) to whom Mr. Fokin transmitted the intelligence work completed by Mr. McGonigal, and with whom Mr. Fokin communicated after receiving intelligence information from Mr. McGonigal; (3) Mr. Fokin was not in contact with Mr. Deripaska during the time the business intelligence work was request and performed; and (4) whether Mr. Deripaska ever received the intelligence work at issue and, if so, from whom.

Such evidence is not only material to the defense under Rule 16, but it will also be *Brady* material that the Government is obligated to turn over to Mr. Shestakov. For example, if there are no records of communications between Mr. Fokin and Mr. Deripaska from August through November of 2021, and their communications were being monitored, that is devasting evidence to the government's theory of the case and demonstrative of Mr. Shestakov's innocence. DOJ policy acknowledges that the USAO's discovery obligations include such information—even classified information—in possession of the broader United States intelligence community and directs prosecutors to conduct a prudential search within "sources that are readily available to the government and that, because of the known facts and nature of the case, should be searched as a function of fairness to the defendant."[28] Indeed, case law demonstrates that DOJ's policy recommending prudential searches be conducted often results in documents helpful to defendants. *See, e.g.*, *United States v. Raymond*, 2023 WL 7611601, at *2 (D.D.C. Nov. 14, 2023) ("The

---

[28] U.S. Department of Justice, Criminal Resource Manual, *supra* note 15, § 2052(B)(2).

Government's prudential review uncovered a number of classified records that may qualify as *Brady*, *Giglio*, or Jencks material.")

Therefore, as the government has refused to state whether or not they conducted a prudential search for records held by the intelligence community for information that is relevant and helpful to the defense—contrary to DOJ policy and practice as well as the USAO's discovery obligations under Rule 16 and *Brady*—the Court should compel them to conduct such a search.

### B. Alternatively, the Court Should Issue Mr. Shestakov's Rule 17(c) Subpoena to the NSA

Alternatively, the Court should grant the defense's request for issuance of a subpoena to the NSA as set forth in the defense's July 5, 2024 application to this Court for the proposed Rule 17(c) subpoena. The issuance of such a subpoena to the NSA does not preclude the NSA from moving to quash the subpoena or from being heard by the Court with respect to that subpoena. The Court, at that time, can then: (1) hear argument from the NSA about the subpoena, including whether there are responsive records and what they might consist of; (2) question the NSA—in an *ex parte* classified setting if necessary—regarding what records it may have that are responsive to the subpoena; and (3) require the NSA—if the NSA objects to producing potentially response records to the defense—to make the records available to the Court for *in camera* review before the Court determines if those records should be produced to the defense. But, at a minimum, the Court should grant the defense request for the Rule 17(c) subpoena to the NSA and then hear from the NSA if the NSA has objections.

There is no question that the NSA would have intercepted communications or records of communications involving Mr. Deripaska and Mr. Fokin. The NSA plays a central role in U.S. intelligence and provides "foreign signals intelligence (SIGINT) to [U.S.] policymakers and military forces" and provides U.S. "leaders with critical information . . . to defend our county, save

lives, and advance U.S. goals and alliances globally."[29]  SIGINT "is intelligence derived from electronic signals and systems used by foreign targets, such as communications systems."[30] Further, the NSA gathers "information about international terrorists and foreign powers, organizations or persons" through the use of SIGINT, *i.e.*, intercepted communications, which is then provided to "America's leaders" so they have "critical information they need to defend our country, save lives, and advance U.S. goals and alliances globally."[31]  In connection with its work, the NSA routinely intercepts communications of foreign nationals.  *See* U.S. Executive Orders 12333, 13355, and 13470 (authorizing the collection of data by the U.S. intelligence community); *see also* Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 et seq., Section 702 (permitting the NSA to intercept communications of foreigners outside the United States if the NSA has a basis to believe it will acquire certain types of foreign intelligence information that have been authorized for collection).  Mr. Deripaska is an important figure to U.S. intelligence—which is precisely why they sanctioned him and would be monitoring him during the sanctions.  For OFAC to sanction Mr. Deripaska, the intelligence community had to collect information about him and the memo in support of sanctions explicitly relied on classified information.  *See Deripaska*, 2021 WL 2417425, at *5 (the Evidentiary Memoranda, which mostly relied on classified information "substantiat[e] [OFAC's] sanctioning of Deripaska").

---

[29]     NATIONAL  SECURITY  AGENCY/CENTRAL  SECURITY  SERVICE,  Our  Mission, https://www.nsa.gov/ (last accessed July 5, 2024).

[30]     NATIONAL SECURITY AGENCY/CENTRAL SECURITY SERVICE, Signals Intelligence (SIGINT) Overview, https://www.nsa.gov/Signals-Intelligence/Overview/ (last accessed July 5, 2024).

[31]     *Id.*

As discussed in Section III.A, discovery provided in this case and public reporting[32] show that the U.S. intelligence community was very interested in Mr. Fokin, even conducting physical surveillance of him during trips to the U.S. in 2019 and 2021 and documenting who Mr. Fokin met with while in the U.S. Regarding Mr. Deripaska, the NSA would certainly have intercepted Mr. Deripaska's communications during the relevant time period given that the government sanctioned Mr. Deripaska in 2018, has been investigating Mr. Deripaska for two decades (if not longer), and indicted Mr. Deripaska. In fact, the December 2, 2024 civil forfeiture complaint filed by the USAO indicates that Mr. Deripaska is still being investigated by the government.[33] In addition, Mr. Deripaska's widely-reported relationship with Mr. Putin and other officials of the Russian Government—with whom the NSA would routinely gather intelligence for many U.S. policy interests—further suggests the NSA has intercepted Mr. Deripaska's communications.[34]

Because the NSA routinely intercepts communications of foreign officials and individuals of interest to the U.S. intelligence community, the subpoena directed to the NSA seeks specific, highly relevant, and admissible records that are not otherwise procurable reasonably in advance of trial by the defense. *See United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008) (finding a subpoena to the Bureau of Prisons for recorded telephone conversations involving a cooperating witness to be "material" to the defense and not unreasonably onerous as modified); *see also United*

---

[32]     Con Coughlin, *British Companies Owned by Russian Oligarchs to be Investigated by US Congress to Examine Link to Intelligence Agencies*, THE TELEGRAPH (Dec. 5, 2018), https://www.telegraph.co.uk/news/2018/12/05/british-companies-owned-russian-oligarchs-investigated-us-congress/ (produced in discovery as USAO_00018533) (reporting that "interest in EN+ comes after FBI officers identified Evgeny Fokin, who is the company's Director of International Cooperation, as formerly being the SVR's declared liaison officer with U.S. intelligence agencies in Washington DC in the mid-1990s . . . A spokesman for Mr[.] Fokin denied that he had been a member of the SVR.").

[33]     Verified Civil Compl. for Forfeiture, *supra* note 3.

[34]     Barrett, *supra* note 19.

*States v. Akhavan*, 505 F. Supp. 3d 289, 290-291 (S.D.N.Y. 2020) (two categories of supplemental subpoenas were reasonable and not unduly oppressive); *United States v. Nachamie*, 91 F. Supp. 2d 552, 563 (S.D.N.Y. 2000) (records and communications were "evidentiary and relevant" where they may contain "possible statements of co-conspirators" which "are relevant to the issues of knowledge and intent, because they reveal the work done by [the defendant] on an ongoing and regular basis, or the work done by similarly situated companies, or the interaction between the doctors, the billers, and the alleged coconspirators").

These records go directly to Mr. Shestakov's defenses and these records are critical to preparing the defense for trial, as set forth *supra*. And these records, for purposes of Rule 17(c), meet with *Nixon* standards for the reasons as set forth in ECF 135. Even the absence of such records—for example, no records of any communications between Mr. Fokin and Mr. Deripaska from August through November 2021 despite Mr. Deripaska and/or Mr. Fokin being monitored— is critical to Mr. Shestakov's defense that the work to be performed as part of the alleged conspiracy was in fact and in truth for EN+ rather than Mr. Deripaska.

Finally, to the extent the government argues this subpoena improperly seeks to sidestep the Classified Information Procedures Act ("CIPA"), the government has it backwards and misunderstands Rule 17(c). The defense is entitled by law to issue Rule 17(c) subpoenas to third parties obtain evidence for trial. To the extent that the NSA objects to such a subpoena or asserts that the records cannot be turned over because they are classified, then the NSA can raise that objection with the Court when the NSA is served with the subpoena and the Court can hear the objection at that time. That is the proper procedure.

### i. NSA Subpoena Request Number 1

The records to be produced in response to Request No. 1 are:

> For the time period June 1, 2021 through November 30, 2021, communications and records of communications (such as phone records, calling data, electronic communication data including dates, times, IP addresses, sender and recipient contact information and electronic addresses, and service providers) between Oleg Deripaska and Evgeny Fokin (DOB 12/24/1962).

What Mr. Fokin and Mr. Deripaska communicated about and did not communicate about during the time period when the contract with Spectrum was negotiated and signed is highly material to the defense and issues at trial. This request seeks material records including but not limited to records relating to: (1) the intelligence work to be performed by Mr. McGonigal; (2) payments made for the intelligence work; (3) what Mr. Fokin and Mr. Deripaska did and did not discuss, particularly to the extent there are no conversations between them concerning Pandean, Arina Lazarou,[35] payment to Mr. McGonigal or Mr. McGonigal's company, Spectrum, and the business intelligence work at issue; (4) the fact that Mr. Fokin did not discuss with Mr. Deripaska his trips to the United States between June 2021 and November 30, 2021, including Mr. Fokin's August 16, 2021 trip when U.S. Customs Officials stopped and questioned him about his relationship with Mr. McGonigal and the contract with Spectrum, and imaged his phone; and (5) the fact that Mr. Fokin was not acting as Mr. Deripaska's agent for the alleged conspiracy.

All of those communications—and the records of them—would prove that there was not a criminal conspiracy between Mr. Deripaska, Mr. McGonigal, Mr. Fokin, and Mr. Shestakov or any sanctions violation as charged by the Government. Thus, this request seeks records relating to the heart of Mr. Shestakov's defense. *See, e.g.*, *United States v. Soliman*, 2009 WL 1531569, at *4 (W.D.N.Y. May 29, 2009) (subpoena could issue where the connection was established

---

[35] Ms. Lazarou, an individual affiliated with EN+, signed the contract to perform intelligence work on behalf of Pandean, which is the corporate entity that paid Mr. McGonigal's company, Spectrum, to perform the business intelligence work.

between the requests and the defendant's defenses, including "his argued defenses in his pending motion to dismiss as well as his general defenses, including any showing that leads to reasonable doubt of his guilt"). Notably, the USAO has not produced *any* evidence in discovery establishing that Mr. Fokin was in contact with Mr. Deripaska during the relevant time period of the (wrongly) alleged sanctions conspiracy. The subpoenaed records would be admissible as business records, as statements offered not for the truth but for the fact they were said or that the communication occurred, and under Rule 806 to the extent that the government intends to admit statements of Mr. Deripaska or Mr. Fokin under Rule 801(d)(2).

### ii. NSA Subpoena Request Number 2

The records to be produced in response to Request No. 2 are

> For the time period June 1, 2021 through November 30, 2021, communications and records of communications (such as phone records, calling data, electronic communication data including dates, times, IP addresses, sender and recipient contact information and electronic addresses, and service providers) between Evgeny Fokin and Sergey Shestakov.

During the relevant time period, Mr. Shestakov communicated by phone and by electronic messaging with Mr. Fokin. Therefore, those communications are material to the defense that no conspiracy existed with Mr. Deripaska to evade U.S. sanctions. Communications responsive to this request that show what Mr. Fokin did and did not say go directly to Mr. Shestakov's state of mind during the alleged conspiracy. The communications will reflect that Mr. Fokin gave every indication to Mr. Shestakov that he was working for EN+ on this project and was communicating with EN+ and/or Rusal officials about the project, including that payments to Spectrum were made by EN+ and/or Rusal—not Mr. Deripaska. Those communications directly undermine any claim that there was a criminal conspiracy and that Mr. Shestakov was part of any conspiracy to violate U.S. sanctions. *See Nachamie*, 91 F. Supp. 2d at 563 (narrowed requests would be "specific" when the time frame aligned with the indictment and alleged co-conspirator records were relevant to

intent).  The records would also be admissible as business records, for the fact of what said and not said, and under Rule 806.

### iii. NSA Subpoena Request Number 3

The records to be produced in response to Request No. 3 are:

> For the time period June 1, 2021 through November 30, 2021, communications and records of communications (such as phone records, calling data, electronic communication data including dates, times, IP addresses, sender and recipient contact information and electronic addresses, and service providers) between Evgeny Fokin and officials of En+ Group International or Rusal PLC concerning: Fokin's travel to the United States in that time period; an August 2021 contract involving Spectrum Risk Solutions; Arina Lazarou; business intelligence work related to Vladimir Potanin; Atomyze; Symbridge; documents received by Fokin on or about September 15, 2021 concerning Vladimir Potanin and/or Norilsk Nickel; documents received by Evgeny Fokin on or about November 5, 2021 concerning Vladimir Potanin; and/or documents or information received by Evgeny Fokin on or about November 9, 2021 concerning Vladimir Potanin.

Mr. Fokin is a cornerstone of both the government and the defense, which both turn on whether Mr. Fokin was working as an agent for Mr. Deripaska or was acting on behalf of and in his capacity as a high-level EN+ employee at the time he engaged with Mr. McGonigal and Mr. Shestakov for business intelligence services concerning Nornickel.  And we now know through Mr. Fokin's individual counsel that Mr. Fokin is expected to testify that he was not working on behalf of Mr. Deripaska as charged, and instead was working on behalf of EN+.  ECF No. 176 at 10 ("[C]ounsel for En+ already informed the government of Mr. Fokin's most recent statements on this issue, including that En+ deputy CEO Alexander Osminin, not Mr. Deripaska, directed Mr. Fokin to engage investigators to perform business intelligence work on Nornickel and approved the contract with Mr. McGonigal through Spectrum."); ECF No. 190 at 1 ("Mr. Fokin has consistently stated that the business intelligence work at issue was done on behalf of En+—not Oleg Deripaska as wrongly charged in the Indictment.").  Thus, records of Mr. Fokin's communications with EN+ and/or Rusal employees are material to the defense given: (1) Mr. Fokin's conversations with Mr.

Shestakov about what work would be done for EN+; (2) text messages in which Mr. Fokin discusses the intelligence work at issue—including records and information Mr. McGonigal provided to Mr. Fokin on September 15, 2021, November 5, 2021 and November 9, 2021 pursuant to that work—and Mr. Fokin's interest getting more information from Mr. McGonigal about specific Potanin-related entities "Symbridge" and "Atomyze;" and (3) records in which Mr. Fokin and Mr. McGonigal discuss payment for the work to be done. In particular, this request seeks records of communications discussing Mr. Fokin's travel to the United States during the relevant time period in which he met with Mr. McGonigal; the fact that Mr. Fokin's travel was for EN+ and/or Rusal business; the contract to be signed for the intelligence work with Spectrum; payments to Spectrum and source of such payments; and the intelligence work product Mr. Fokin received from Mr. McGonigal.

The fact that Mr. Fokin discussed the intelligence work, contract, and/or payments to Spectrum with EN+ and/or Rusal employees would be highly probative evidence including but not limited to: (1) Mr. Fokin's state of mind regarding who that work was to be done for; (2) the interest that EN+ and Rusal had in that intelligence work; (3) the fact that EN+ and/or Rusal were aware of the transaction with Spectrum for the work done on behalf of the interests of EN+ and Rusal; and (4) the fact that the work was done in connection with a corporate battle that EN+ and/or subsidiary Rusal was considering and ultimately filed against Mr. Potanin concerning Nornickel.

Intercepted records of communications that demonstrate Mr. Fokin sent the business intelligence work and related requests for payment through EN+/Rusal channels for discussion and/or approval are critically important to prove Mr. Fokin's work was done on behalf of EN+ and/or Rusal. Such communications could not be more material to the defense as the documents

would show that the charged criminal conspiracy with Mr. Deripaska never existed—as Mr. Fokin has insisted. *See United States v. Rajaratnam*, 753 F. Supp. 2d 299, 322-23 (S.D.N.Y. 2010) (third-party documents reflecting communications with defendant and any agent or employee of the hedge fund were required to be produced as evidentiary and relevant). Thus, given Mr. Fokin's central importance as well as documents produced by the government demonstrating additional responsive records to this request have not yet been produced, documents responsive to this request are essential to presenting Mr. Shestakov's case. The records would be admissible for the fact of what was said and not said, as well as under Rule 806 because the government intends to introduce statements by Mr. Fokin under 801(d)(2).

### C. The Court Should Further Order the Government to Produce the Narrow Subset of Rule 16 Materials Set Forth in Mr. Shestakov's July 15, 2024 Letter Motion

Mr. Shestakov also requests the court compel the government to produce, pursuant to Rule 16, the narrower subset of the materials sought by Mr. Shestakov in his July 15, 2024 letter motion. *See* ECF Nos. 84-87, 91, 123. On July 15, 2024, Mr. Shestakov requested that the Court reconsider its complete denial of Mr. Shestakov's motion to compel discovery of certain materials in the possession of the USAO concerning unindicted co-conspirator Mr. Deripaska or, in the alternative, hold an immediate hearing on the motion to compel discovery so that the reasons underlying the Court's denial could be made part of the record. ECF No. 141.

In the July 15 letter, Mr. Shestakov asked the Court consider directing the government to produce a narrower subset of these materials sought in the original 2023 motion to compel, ECF Nos. 84-86, including: (1) records and information concerning entities, individuals, and accounts with whom or through which Mr. Deripaska conducted business or financial transactions from 2018 to 2022; (2) the "contacts" lists stored in the seized electronic devices and/or messaging accounts of Ms. Shriki, Mr. Bonham-Carter, Ms. Bardakova, and Ms. Voronina;

(3) communications concerning the manner in which Mr. Deripaska conducted business and financial transactions from 2018 through 2022; (4) any information or records reflecting that Mr. Deripaska, Mr. Bonham-Carter, Ms. Shriki, Ms. Bardakova, and Ms. Voronina had no dealings with Pandean, Pandean's Gazprombank account, or Ms. Lazarou from 2018 through 2022; and (5) any information or records reflecting that Mr. Deripaska did not communicate with Mr. Fokin between July 1, 2021 and November 30, 2021, or did not communicate with Mr. Fokin about Pandean, Mr. McGonigal or the business intelligence work to be performed regarding Nornickel and its CEO, Mr. Potanin, between July 1, 2021 and November 30, 2021.  ECF No. 141.

The next day after Mr. Shestakov made this request, on July 16, 2024, the government filed a letter motion requesting an adjournment of the trial in this matter because "[i]nformation [came] to the Government's attention that may require litigation pursuant to the Classified Information Procedures Act."  ECF No. 144.  The next day, July 17, the Court ordered, "[a]ll deadlines in the case are hereby adjourned *sine die* pending the conference scheduled for July 23, 2024."  ECF No. 147.  Since July 17, the government did not file a response to the narrower requests set out in the July 15 letter nor has the Court ruled regarding the narrower set of materials Mr. Shestakov requested on July 15.[36]

Mr. Shestakov reaffirms his request that the Court direct the government to produce those Rule 16 materials.  Specifically, these materials will reveal, among other things: (1) Mr. Deripaska did not use Gazprombank, Arina Lazarou, or Pandean Ltd. for his business or financial matters; (2) pursuant to Fed. R. Evid. 406, Mr. Deripaska's habit, routine or practice during the relevant time period in terms of how he conducted his business and financial transactions during the

---

[36]     Mr. Shestakov notes that any meet and confer with the government would be futile, as the government has consistently refused to produce these documents and taken the position that they are not in their possession.

relevant time period through particular banks, persons and entities; (3) neither Mr. Deripaska nor his most trusted business associates (Olga Shriki, Graham Bonham-Carter, Natalia Bardakova) who handled Mr. Deripaska business and financial transactions were in touch with Mr. Fokin during the pertinent time period; and (4) who was and was not included the "contacts" of the devices the government seized from those individuals, such as Arina Lazarou and Pandean. Thus, these materials will corroborate Mr. Shestakov's defense that any work he performed was done so without any intent to evade or violate any sanctions and that there was no criminal conspiracy involving Mr. Shestakov as alleged by the Government.

These records are critical to show that the business intelligence work was not done on behalf of and paid for by Mr. Deripaska. For example, the government alleges Mr. Deripaska initiated this transaction; is the "client" for the business intelligence work about Nornickel and Potanin; was behind the contract between Pandean and Mr. McGonigal's company, Spectrum; and paid Spectrum for this business intelligence work through a Gazprombank account in the name of Pandean. However, documents responsive to these narrow requests will show that each of the Government's allegations are categorically false.

A key part of Mr. Shestakov's defense is that it would make no sense for Mr. Deripaska— an extraordinarily wealthy and sophisticated Russian oligarch with intelligence and business ties throughout the world—to contract with Spectrum through Pandean for the business intelligence work as alleged in the Indictment. Mr. Deripaska had plenty of other entities and accounts through which such transactions were habitually and routinely performed by Mr. Deripaska's experienced and trusted business associates and *would have done so here* if Mr. Deripaska was really involved in the transaction with Mr. McGonigal and Mr. Shestakov as charged in the Indictment. The USAO last month unveiled a civil complaint for forfeiture against Mr. Deripaska regarding funds

transferred through completely different bank accounts than at issue in this criminal case.[37]  Such evidence is critical to the defense theory that Mr. Deripaska was not part of the charged transaction with Mr. McGonigal and Mr. Shestakov.

The fact that Mr. Deripaska had nothing to do with Pandean, was not involved in the business intelligence work at issue, and was involved in the payment for that work to Spectrum is why the materials at issue in the Motion to Compel records are so critically important to preparing the defense.  How Mr. Deripaska conducted business during the critical time period after he was sanctioned in 2018 *and how he did not conduct business* (*e.g.*, not through Pandean, not with Ms. Lazarou, or not with the bank account at Gazprombank through which Spectrum was paid) is a core issue for presenting Mr. Shestakov's defense.  The materials sought here will also identify witnesses that the defense may seek to call at trial to present this defense.  By summarily depriving the defense, without explanation, of the records that the USAO possesses from the *Shriki* and *Bonham-Carter* cases—which demonstrate the personnel, entities, and financial institutions and accounts through which Mr. Deripaska routinely handled his transactions after being sanctioned by the U.S.—the defense has been denied critical information to preparing the defense and the use of that information to demonstrate that there was neither a criminal conspiracy with Mr. Deripaska nor a substantive sanctions violation as charged.

These requests would yield documents in the government's possession that go directly to preparing the defense and from which the defense can use to obtain other evidence for trial.  This includes, but is not limited to: (1) records regarding the various entities set up so that Mr. Deripaska could continue business despite the sanctions (*e.g.*, GBCM Limited, Global Consulting Services

_____
[37]        Press Release, U.S. Dep't of Justice, *Justice Department Files Civil Forfeiture Complaint Against Sanctioned Oligarch's U.S. Music Studio Sale Proceeds* (Dec. 2, 2024), https://www.justice.gov/usao-sdny/pr/justice-department-files-civil-forfeiture-complaint-against-sanctioned-oligarchs-us.

LLC, Gracetown Inc.); (2) records regarding the various bank accounts and financial institutions through which Mr. Deripaska made and received payments for his various transactions after the U.S. imposed sanctions on him; (3) records concerning the individuals and entities through which and with whom Mr. Deripaska routinely transacted business during the time period after the 2018 sanctions (*e.g.*, longtime confidantes and employees such as Mr. Bonham-Carter, Ms. Shriki, and Ms. Bardakova); (4) the manner through which Mr. Deripaska and those individuals conducted business on behalf of Mr. Deripaska and communicated to conduct such business; and (5) critically, the lack of any ties of Mr. Deripaska established network with Pandean, Ms. Lazarou, or the Gazprombank account from which Spectrum was paid.

Absent these materials, Mr. Shestakov will not be able to mount an effective defense.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, we ask the Court to compel review and production of the aforementioned materials.

Dated: New York, New York  
      January 10, 2025

Respectfully submitted,

   */s/ Rita M. Glavin*

Rita M. Glavin  
Katherine E. Petrino  
Leo S. Korman  
Glavin PLLC  
156 West 56th Street, Ste. 2004  
New York, NY 10019  
Tel: (646) 693-5505  
Email: rglavin@glavinpllc.com

*Counsel for Sergey Shestakov*